# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| J.G.G., *et al.*, | Civil Action No. 1:25-cv-00766 |
| Plaintiffs-Petitioners, | |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, | |
| Defendants-Respondents. | |

## RESPONSE AND MOTION TO VACATE HEARING

Plaintiffs cannot use these proceedings to interfere with the President's national-security and foreign-affairs authority, and the Court lacks jurisdiction to do so. In response to Plaintiffs' filing (Dkt. 21) and this Court's order setting a hearing for this afternoon, the government submits the below response. Because it provides the necessary information to confirm the government's compliance, and represents the full extent of what counsel is authorized to share with the public or Plaintiffs, the Court should vacate the hearing and de-escalate the grave incursions on Executive Branch authority that have already arisen.

**1.** As the government has already explained and Plaintiffs do not appear to dispute, the government complied with the Court's temporary restraining order issued during the morning of March 15, and did not remove any of the five individual plaintiffs. The government did so despite its powerful jurisdictional and other objections to the Court's unprecedented assertion of judicial power to review the Proclamation. *Cf. Ludecke v. Watkins*, 335 U.S. 160, 164 (1948) (explaining that the "very nature of the President's power to order the removal of all enemy aliens rejects the notion that courts may pass judgment upon the exercise of his discretion").

1

**2.** Much of Plaintiffs' submission rests on the oral directives that the Court provided during the hearing held during the evening of March 15. But as Plaintiffs implicitly recognize, the Court's written injunction, which issued at approximately 7:25 PM EDT, properly did not seek to interfere with the President's Article II powers to conduct military operations overseas by directing the return of aliens associated with a designated foreign terrorist organization who had already been removed from United States territory—even though the written order did memorialize other, narrower oral directives from the hearing.

Contrary to Plaintiffs' assertion (Dkt. 21, at 2), an oral directive is not enforceable as an injunction. *See Bates v. Johnson*, 901 F.2d 1424, 1427 (7th Cir. 1990) ("Oral statements are not injunctions."). "A judge who proclaims 'I enjoin you' and does not follow up with an injunction has done nothing," and, if the judge "does not record an injunction or declaratory judgment on a separate document, the defendant is under no judicial compulsion." *Id.* at 1427-28. That accords with Federal Rule of Civil Procedure 65, which "contemplates the issuance of a written order." *Lau v. Meddaugh*, 229 F.3d 121, 123 (2d Cir. 2000). Indeed, the Rule provides that "[e]very order granting an injunction and every restraining order must … state the reasons why it issued," "state its terms specifically," and "describe in reasonable detail … the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). Written orders are crucial because they clarify the bounds of permissible conduct. *See Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 105 (2d Cir. 2009) (Miner, J., joined by Sotomayor and Katzmann, JJ.) ("Requirements for the form and content of preliminary injunctions and temporary restraining orders are properly met by a written order.").

This district has long followed that principle. *See Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 70, 80 (D.D.C. 2003) ("[A]n injunction does not become an injunction until it is reduced to writing."). And that principle holds especially true when the Court does issue a written order—

but phrases it more narrowly. In that event, the written order controls. *See Parsons v. Ryan*, 912 F.3d 486, 498 (9th Cir. 2018) ("We do not review oral statements from the bench on a matter later committed to writing; we review instead the written order entered by the district court."). Indeed, the narrower written order may well represent a more considered judgment by the court about the proper exercise of its powers. *See Ellison v. Shell Oil Co.*, 882 F.2d 349, 352 (9th Cir. 1989) ("Oral responses from the bench may fail to convey the judge's ultimate evaluation. Subsequent consideration may cause the district judge to modify his or her views.").

In accord with this well-established law, the written minute order governed. It enjoined the government from "removing" the foreign terrorists "pursuant to the Proclamation." The government did not violate that injunction. As Plaintiffs themselves say, the two flights that they identified departed from the United States *before* 7:25 PM EDT (and, for that matter, before any oral directives). Dkt. 21, at 3.[1]

**3.** As to any flights that were already outside U.S. territory and airspace, anyone aboard had already been "removed" within the meaning of the Alien Enemies Act and the Court's order, and therefore were not covered by the order. The plain meaning of "remove" is "[t]he transfer or moving of a person or thing from one location, position, or residence to another." *Removal*, Black's Law Dictionary, at 1409 (9th ed. 2009). And that meaning aligns with the context of the Alien Enemies Act, which is concerned with protecting the territorial integrity of the United States from foreign incursions—not what happens to the alien enemies *after* they are removed from the United States. *See* 50 U.S.C. § 21. *Cf. Nicusor-Remus v. Sessions*, 902 F.3d 895, 899 (9th Cir. 2018) (holding, in distinct INA context, that alien is removed once he has "left the United States").

---

[1] Plaintiffs also identify a third flight that departed later. Dkt. 21, at 4. That flight carried detainees who were removable on grounds other than the Proclamation and is therefore irrelevant. The government is able to disclose that limited fact for the same reason.

3

Accordingly, Plaintiffs' assertions about U.S. "custody" after 7:25 PM EDT (Dkt. 21, at 2) are not relevant. And Plaintiffs' questions about what occurred beyond U.S. territory or airspace—which implicate sensitive questions of national security, foreign relations, and coordination with foreign nations—are neither material nor appropriate. Indeed, they cannot be answered in public proceedings. Neither Plaintiffs nor the public are entitled to that sort of sensitive national-security information, and the government is not prepared to disclose it.

**4.** Finally, even if the Court's order *had* purported to enjoin the government from taking steps overseas pursuant to the Proclamation, that still would not restrict the President from exercising his *other* authorities under the Constitution to engage in diplomatic negotiations and to protect the United States from dangerous terrorists and criminals already outside the country.

The President is "Commander in Chief" of the armed forces. U.S. Const. art. II, § 2. This power is exclusive to the President and "includes all authorities essential to its due exercise." *Ex parte Milligan*, 71 U.S. 2, 139 (1866) (Chase, C.J., concurring in judgment). "As commander-in-chief, [the President] is authorized to direct the movements of the naval and military forces placed by law at his command, and to employ them in the manner he may deem most effectual to harass and conquer and subdue the enemy." *Fleming v. Page*, 9 How. 603, 615 (1850). The President is also constitutionally empowered to engage in diplomatic negotiations and foreign relations. *See Zivotofsky v. Kerry*, 576 U.S. 1, 16 (2015).

These inherent Article II powers, especially when exercised outside the United States, are not subject to judicial review or intervention. *See Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867) ("[T]his court has no jurisdiction of a bill to enjoin the President in the performance of his official duties."); *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918) ("The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and

4

Legislative—'the political'—Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision."); *Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention.").

In sum, just as a court assuredly could not enjoin the President from carrying out a foreign drone strike or an overseas military operation, or from negotiating with a foreign power to coordinate on such an operation, nor could a court lawfully restrict the President's inherent Article II authority to work with a foreign nation to transfer terrorists and criminals who are already outside the United States. Consequently, even if one could broadly and improperly construe the Court's written minute order as restricting the government from "turn[ing] over … to foreign governments" alien enemies who were already abroad (Dkt. 21, at 2), that still was limited by its terms to actions taken "pursuant to the Proclamation." Once the terrorists had been removed from the United States, any decision by the President to take such actions pursuant to independent constitutional authority is therefore not a violation of the Court's orders in all events.

5. Because there has been no violation of the Court's orders, and because the government is not prepared to disclose any further national security or operational security details to Plaintiffs or the public, the Court should vacate the hearing scheduled for this afternoon. The government does not make this request lightly. The Executive Branch has designated TdA a foreign terrorist organization, a designation that Plaintiffs do not challenge. The course of these proceedings—in which the Court has enjoined removal of aliens whom the Executive Branch has determined are part of a foreign terrorist organization—raises extraordinary concerns about the rule of law and the Executive Branch's ability to take swift actions to keep the Nation safe.

Respectfully Submitted,

PAMELA J. BONDI
U.S. Attorney General

TODD BLANCHE
Deputy Attorney General

EMIL BOVE
Principal Associate Deputy
Attorney General

CHAD MIZELLE
Acting Associate Attorney General

ABHISHEK KAMBLI
Deputy Associate Attorney General

YAAKOV M. ROTH
Acting Assistant Attorney General

s/ Drew C. Ensign
DREW C. ENSIGN
Deputy Assistant Attorney General
950 Pennsylvania Avenue
Washington, DC 20530
Phone: (202) 514-2000
e-Mail: drew.c.ensign@usdoj.gov

AUGUST E. FLENTJE
Acting Director

EREZ REUVENI
Assistant Director

BRIAN C. WARD
Acting Assistant Director

CHRISTINA P. GREER
Senior Litigation Counsel

PATRICK GLEN
Senior Litigation Counsel

6