# In the United States Court of Appeals for the District of Columbia Circuit

————————————————————————

J.G.G, et al.,

*Plaintiffs-Appellees,*

v.

Donald J. Trump, in his official capacity as
President of the United States, et al.,

*Defendants-Appellants.*

————————————————————————

On Appeal from the United States District Court
for the District of Columbia, Case No. 25-cv-00766
The Hon. James E Boasberg, Chief Judge

————————

## BRIEF OF *AMICUS CURIAE* THE HONORABLE BRANDON GILL, MEMBER OF CONGRESS, IN SUPPORT OF THE DEFENDANTS-APPELLANTS

————————

Daniel Z. Epstein (D.C. Bar No. 1009132)
James K. Rogers
Andrew J. Block (D.C. Bar No. 90002845)
Jacob D. Meckler (D.C. Bar No. 90005210)
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave., SE #231
Washington, D.C. 20003
Tel.: (202) 964-3721
E-mail: Jacob.Meckler@aflegal.org

*Counsel for Amicus Curiae*
*The Honorable Brandon Gill*

# TABLE OF CONTENTS

Table of Authorities ................................................................................ iii

Statement of Interest and Identity .......................................................... 1

Summary of Argument ............................................................................ 2

Argument ................................................................................................. 3

I.   The Alien Enemies Act confers on the President the absolute authority to determine when an invasion has occurred, and that determination is nonjusticiable ................................................. 3

    A.   The AEA confers on the President the power to determine when an invasion or predatory incursion has occurred ................................................................................. 4

    B.   The President's authority to invoke the AEA and make determinations under its authority is unreviewable. ............ 5

        1.   The President's proclamation of an invasion under the AEA is a non-justiciable political question ........... 10

II.  The actions identified in the TdA Proclamation constitute an invasion under the AEA, and the Proclamation is correct that TdA's relationship with Venezuela is sufficient to support the finding of an invasion ................................................................... 14

III. Venezuela's government is institutionally commingled with drug cartels, uses TdA and other transnational criminal organizations to further its foreign policy strategy, and has delegated governmental functions to TdA, rendering TdA indistinguishable from, or even sharing sovereignty with, the official Venezuelan government ...................................................... 16

A.   Even if TdA were not a part of the Venezuelan government, invasions under the AEA include those perpetrated by non-state actors ........................................... 20

IV.  The AEA has procedures for the removal of aliens that are distinct from those of the Immigration and Nationality Act ........ 24

Conclusion ................................................................................. 33

# TABLE OF AUTHORITIES

Page(s)

## UNITED STATES SUPREME COURT CASES

*Baker v. Carr,*
369 U.S. 186 (1962) ............................................................ 6

*Barnhart v. Sigmon Coal Co.,*
534 U.S. 438 (2002) ............................................................ 5

*Blanchette v. Conn. General Ins. Corps.,*
419 U.S. 102 (1974) ............................................................ 30

*Bostock v. Clayton Cnty., Ga.,*
590 U.S. 644 (2020) ............................................................ 21

*Branch v. Smith,*
538 U.S. 254 (2003) ............................................................ 27

*Brown v. United States,*
12 U.S. 110 (1814) ............................................................ 8

*Cherokee Nation v. Georgia,*
30 U.S. (5 Pet.) 1 (1831) ............................................................ 19

*Chi. & S. Air Lines v. Waterman S.S. Corp.,*
333 U.S. 103 (1948) ............................................................ 13

*Haig v. Agee,*
453 U.S. 280 (1981) ............................................................ 13

*Johnson v. Eisentrager,*
339 U.S. 763 (1950) ............................................................ 9

*Jones v. Hendrix,*
599 U.S. 465 (2023) ............................................................ 30

*Ludecke v. Watkins,
335 U.S. 160 (1948) ..................................................... 7, 8, 9

Oetjen v. Cent. Leather Co.,
246 U.S. 297 (1918) ........................................................ 15

Ruckelshaus v. Monsanto Co.,
467 U.S. 986 (1984) ........................................................ 30

*Zivotofsky ex rel. Zivotofsky v. Kerry,
576 U.S. 1 (2015) ............................................................ 16

**OTHER FEDERAL CASES**

Arevalo v. Ashcroft,
344 F.3d 1 (1st Cir. 2003) ............................................... 26

Barber v. Hawai'i,
42 F.3d 1185 (9th Cir. 1994) .......................................... 11

*California v. United States,
104 F.3d 1086 (9th Cir. 1997) ........................................ 10

*Chiles v. United States,
69 F.3d 1094 (11th Cir. 1995) ........................................ 11

Citizens Protective League v. Clark,
155 F.2d 290 (D.C. Cir. 1946) ........................................ 28

*Ctr. for Biological Diversity v. Trump,
453 F. Supp. 3d 11 (D.D.C. 2020) .................................. 13

El-Shifa Pharm. Indus. Co. v. United States,
607 F.3d 836 (D.C. Cir. 2010) .......................................... 6

*El-Shifa Pharm. Indus. Co. v. United States*,
    559 F.3d 578 (D.C. Cir. 2009), *vacated on other grounds*,
    330 Fed. App'x 200 (D.C. Cir. 2009) ................................. 14

*Fed. Express Corp. v. U.S. Dep't of Com.*,
    39 F.4th 756 (D.C. Cir. 2022) ........................................... 7

*Lockington v. Smith*,
    15 F. Cas. 758 (C.C.D. Pa. 1817) (No. 8,448) ................... 8

*New Jersey v. United States*,
    91 F.3d 463 (3d Cir. 1996) ............................................... 23

*\*Padavan v. United States*,
    82 F.3d 23 (2d Cir. 1996) ..................................... 10, 11, 22

*People of Colo. Ex rel. Suthers v. Gonzales*,
    558 F. Supp. 2d 1158 (D. Colo. 2007) ............................. 11

*Rodriguez v. United States*,
    983 F. Supp. 1445 (S.D. Fla. 1997) ........................... 11, 12

*Schneider v. Kissinger*,
    412 F.3d 190 (D.C. Cir. 2005) ................................... 15, 16

*Sullivan v. United States*,
    No. 7:04-CV-103, 2004 WL 3362495 (E.D.N.C. July 7, 2004) ......... 12

*The Tropic Wind*,
    6 D.C. (1 Mackey) 351 (C.C.D.D.C. 1861) ...................... 12

*\*The Tropic Wind*,
    28 F. Cas. 218, 2 Hay. & Haz. 374 (C.C.D.D.C. 1861) (No.
    16541A) ......................................................................... 12

*U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*,
    103 F. Supp. 3d 133 (D.D.C. 2015) ........................... 29, 30

*U.S. ex rel. Von Heymann v. Watkins,*
    159 F.2d 650 (2d Cir. 1947) .......................................................... 9, 10

*United States v. Arizona,*
    2011 WL 13137062 (D. Ariz. Oct. 21, 2011) ..................................... 12

*Vonage Holdings Corp. v. FCC,*
    489 F.3d 1232 (D.C. Cir. 2007) ........................................................ 23

*Zivotofksy v. Sec. of State,*
    725 F.3d 197 (D.C. Cir. 2013) ............................................................. 7

## UNITED STATES CONSTITUTION

U.S. CONST. art. II, § 2 .......................................................................... 6

*U.S. CONST. art. IV, § 4 ...................................................................... 20

## FEDERAL STATUTES

8 U.S.C. § 1229a(a)(3)................................................................. 26, 31, 32

*50 U.S.C. § 21.......................................................................... 3, 4, 6, 25

50 U.S.C. § 24 ....................................................................................... 25

## OTHER AUTHORITIES

THE FEDERALIST NO. 43 (Cooke ed. 1961) ............................................ 20

H.R. REP. NO. 104-828 (1996) .............................................................. 26

*Hybrid Governance and the Criminal Fiefdoms of Tren de Aragua,*
    INSIGHT CRIME (July 12, 2023),
    https://perma.cc/2FKE-B3H5..................................................... 18, 18

Jose de Cordoba & Juan Forero, *Venezuelan Officials Suspected of Turning Country into Global Cocaine Hub*, WALL ST. J. (May 18, 2015), https://perma.cc/VW7Z-RLN4. ............................................... 17

*Narco-state*, OXFORD REFERENCE, https://perma.cc/KH6A-BTRF ....... 17

Nate Raymond, *Venezuelan First Lady's Nephews Convicted in U.S. Drug Trial*, REUTERS (Nov. 19, 2016), https://perma.cc/48DY-2GBV ........................................................................................ 17

*NOAH WEBSTER, A COMPENDIOUS DICTIONARY OF THE ENGLISH LANGUAGE (1806), https://perma.cc/MF8W-DQD2 ................... 22, 24

NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828), https://perma.cc/8PXB-A4KK ........................... 22

Press Release, Nicolas Maduro Moros and 14 Current and Former Venezuelan Officials Charged with Narco-Terrorism, Corruption, Drug-Trafficking and Other Criminal Charges, U.S. DEP'T OF JUST. (Mar. 26, 2020), https://perma.cc/Q5VX-78KZ ...................... 18

Proclamation No. 2714, 12 Fed. Reg. 1, 61 Stat. 1048 (Dec. 31, 1946).... 9

*Proclamation No. 10903, 90 Fed. Reg. 13033, 2025 WL 831088 (Mar. 14, 2025)................................................... 3, 4, 5, 13, 14, 15, 33

*THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION (Jonathan Elliot ed., 1836), https://perma.cc/Y7V5-XAQE ................................................ 21

*What a Murder in Chile Reveals About Maduro's Relationship With Tren de Aragua*, INSIGHT CRIME (Feb. 12, 2025), https://perma.cc/625P-TDA2.................................................. 18

## Identity and Interest of *Amicus Curiae*[1]

*Amicus curiae*, the Honorable Brandon Gill, is a congressman representing Texas's 26th district. His district contains suburbs of Dallas, a city which has suffered from violence perpetrated by members of Tren de Aragua (TdA), including at least one murder.[2] More generally, Texas, which has designated TdA a "foreign terrorist organization" and "tier 1 threat," describes the trans-national criminal organization as "the most dangerous and organized" criminal group in his home state.[3]

Representative Gill believes that TdA poses a clear and present danger to the United States and supports President Trump's efforts to neutralize this threat quickly and efficiently. He sees the President's use of the Enemy Aliens Act as vital to ensuring the safety of his constituents. Representative Gill is a member of the Article I branch of government

---

[1] The undersigned certifies that no party's counsel authored this brief in whole or in part, and that no party, party's counsel, or any other person other than *amicus* contributed money that was intended to fund preparing or submitting this brief.

[2] *Tren de Aragua Gang Members Wanted for Murder in North Texas Arrested*, U.S. IMMIGR. & CUSTOMS ENF'T (Nov. 1, 2024), https://perma.cc/269N-EASS.

[3] Zacharia Washington, *What We Know About Venezuelan Gang Tren De Aragua in Texas*, DALL. MORNING NEWS (Mar. 15, 2025), https://perma.cc/LWE2-P2ZM.

representing citizens who are impacted by the Gang's continued presence in the United States and who believes this case presents a quintessential political question.

## Summary of Argument

President Donald J. Trump's decision to declare an invasion and remove Alien Enemies is not subject to review by the Courts of the United States. Congress made that clear in the text of the Enemy Aliens Act (AEA). Determining the existence of an invasion is entirely given to the executive, and courts have unanimously found this prerogative to be a non-reviewable and non-justiciable political question. Removals under the authority granted by the AEA are likewise non-reviewable and non-justiciable.

The President's Proclamation plainly demonstrates the ongoing invasion and lays out the close relationship between the narco-government of Venezuela and the (TdA) transnational criminal organization. This relationship includes the exercise of traditional governmental authority over parts of Venezuelan territory by TdA. Even without the demonstrated use of TdA to carry out Venezuelan foreign policy and conduct assassinations, the meaning of the word "invasion" as understood by the

Founders when they drafted the AEA extended to non-state actors, including smugglers, a term that describes the quintessential activity of a drug cartel.

Additionally, the Plaintiff's arguments are unavailing. No precedent in the Courts of the United States support the notion that the AEA was implicitly repealed. Similarly, the procedures in the AEA are separate and distinct from those of the Immigration and Naturalization Act.

## Argument

### I.  The Alien Enemies Act confers on the President the absolute authority to determine when an invasion has occurred, and that determination is nonjusticiable.

The AEA confers on the President the power to invoke the Act's provisions in cases of invasion or predatory incursion. 50 U.S.C. § 21. The AEA also confers on the President the power to determine *when* an invasion or predatory incursion has occurred and *who* is conducting it. Moreover, the President's authority to invoke the AEA and make determinations under its authority is unreviewable. And even if his determinations under the AEA were reviewable, he has properly invoked it here because he has validly determined that TdA "is undertaking hostile actions and conducting irregular warfare against the territory of the United States

both directly and at the direction, clandestine or otherwise, of the Maduro regime in Venezuela." Proclamation No. 10903, 90 Fed. Reg. 13033, 2025 WL 831088, at *2 (Mar. 14, 2025) (hereinafter "TdA Proclamation").

Furthermore, even if TdA were not acting at the direction of the government of Venezuela, the AEA's use of the terms "foreign government," "invasion," and "predatory incursion," as those terms were understood at the time of enactment, encompass actions not just by foreign states, but by non-state actors as well, and so the TdA Proclamation is still a valid exercise of authority under the AEA.

## A. The AEA confers on the President the power to determine when an invasion or predatory incursion has occurred.

The AEA is triggered in two circumstances: 1) when there has been a formal declaration of war and 2) "Whenever ... any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, *and* the President makes public proclamation of the event." 50 U.S.C. § 21 (emphasis added).

"Courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a

statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461–62 (2002) (cleaned up). By its plain language, the AEA confers on the President the sole authority to determine whether an invasion or predatory incursion has occurred, and he does so by making a public proclamation of his finding. Because President Trump made such a finding, he has validly invoked the AEA and has the legal authority to order the removal of the classes of aliens described in his TdA Proclamation.

**B.     The President's authority to invoke the AEA and make determinations under its authority is unreviewable.**

The President's authority to invoke the AEA and make determinations under its authority is not reviewable. "It is emphatically the province and duty of the judicial department to say what the law is but some questions, in their nature political, are beyond the power of the courts to resolve. The political question doctrine is essentially a function of the separation of powers and excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the

confines of the Executive Branch." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 840 (D.C. Cir. 2010) (cleaned up).

Review of President Trump's invocation of the AEA, 50 U.S.C. § 21, is a nonjusticiable political question because, as relevant to the AEA, at issue are the President's core constitutional powers, which the Supreme Court has repeatedly held are committed to the President's sole discretion.

The Constitution explicitly vests the President with authority as Commander-in-Chief. U.S. CONST. art. II, § 2, cl. 1 ("The President shall be Commander in Chief of the Army and Navy of the United States."). Because the AEA statutorily grants the President wartime powers, it signifies a textual commitment of discretion over the AEA's implementation to the executive branch. *Baker v. Carr*, 369 U.S. 186, 217 (1962). In such instances, courts may not second-guess decisions over matters committed to presidential discretion. Indeed, there are no "judicially discoverable and manageable standards" for a court to appropriately review presidential decision-making under the AEA. *See, e.g.*, *id*. As the D.C. Circuit has noted, executive branch decisions concerning "matters intimately related to foreign policy and national security are rarely proper subjects for

judicial intervention." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 770 (D.C. Cir. 2022) (quoting *Zivotofksy v. Sec. of State*, 725 F.3d 197, 219 (D.C. Cir. 2013)).

This case is a paradigmatic example of when the political question doctrine applies. The President's determinations here are unreviewable and this Court should dismiss the action for lack of subject matter jurisdiction.

The Supreme Court has already directly spoken on this very issue and held that the political question doctrine bars review of presidential determinations under the AEA. *Ludecke v. Watkins*, 335 U.S. 160 (1948). Curiously, the Plaintiffs cite *Ludecke* as standing for the opposite of its actual holding, claiming that "this Court has authority to restrain Defendants' impending attempt to summarily remove Plaintiffs from the United States." Mem. Supp. Pl.'s Mot. for TRO 9, *J.G.G. v. Trump*, No. 1:25-cv-00766 (D.D.C. Mar. 15, 2025), ECF No. 3-2 (hereinafter "TRO Motion"). However, even a cursory reading demonstrates that *Ludecke* held precisely the opposite.

In *Ludecke*, a German national filed a writ of habeas corpus petition challenging a 1946 order for his removal from the United States. His

removal had been ordered under the AEA, but the alien argued that this was unlawful because hostilities against Germany had ceased. The district court denied the writ, and the Second Circuit affirmed. The Supreme Court affirmed as well, explaining that "some statutes preclude judicial review. Barring questions of interpretation and constitutionality, the Alien Enemy Act of 1798 is such a statute. Its terms, purpose, and construction leave no doubt." *Ludecke*, 335 U.S. at 163–64 (cleaned up). Quoting Chief Justice Marshall's and Justice Bushrod Washington's contemporaneous constructions of the AEA, *Ludecke* explained that the AEA "confers on the president very great discretionary powers respecting their persons" and "appears ... to be as unlimited as the legislature could make it." *Id.* at 164 (quoting *Brown v. United States*, 12 U.S. 110, 126 (1814) & *Lockington v. Smith*, 15 F. Cas. 758, 760 (C.C.D. Pa. 1817) (No. 8,448)). In fact, *Ludecke* observed that "every judge before whom the question has since come has held that the statute barred judicial review." *Id.* at 164–65.

Accordingly, the *Ludecke* court determined that it was not its place to determine whether a state of war still existed even though hostilities had ended because the question of a war's "termination is a political act.

Whether and when it would be open to this Court to find that a war though merely formally kept alive had in fact ended, is a question too fraught with gravity even to be adequately formulated when not compelled." *Id.* at 169 (cleaned up). Thus, all that mattered was that the President had "proclaimed that 'a state of war still exists,'" and "the Court would be assuming the functions of the political agencies of the Government" to hold otherwise. *Id.* at 170 (quoting Proclamation No. 2714, 12 Fed. Reg. 1, 61 Stat. 1048 (Dec. 31, 1946)). The Supreme Court, therefore, held that, "It is not for us to question" the President's determinations under the AEA because "these are matters of political judgment for which judges have neither technical competence nor official responsibility." *Id.* Subsequently, in *Johnson v. Eisentrager*, the Supreme Court emphasized again the high bar against judicial intervention when dealing with the President's war powers regarding enemy aliens. 339 U.S. 763, 789 (1950).

The Plaintiffs are similarly mistaken in arguing that this court has authority to restrain the President's implementation of the AEA because of the Second Circuit's holding in *U.S. ex rel. Von Heymann v. Watkins*, 159 F.2d 650, 653 (2d Cir. 1947). TRO Motion at 9. First, *Von Heymann* held that the President's determinations under the AEA were non-

justiciable. "The determination that [the appellant] was one of that type of alien enemies who should not be permitted to reside here *was for the executive branch to make in accordance with the presidential proclamation and is not reviewable in the courts*." *Von Heymann*, 159 F.2d at 653 (emphasis added). Second, to the extent that anything in *Von Heymann* supports the Plaintiffs' position here, that ruling was issued before the Supreme Court decided *Ludecke*, which controls here and definitively establishes that the Plaintiffs' claims are non-justiciable and must be dismissed.

### 1. The President's proclamation of an invasion under the AEA is a non-justiciable political question.

Nor is it relevant that *Ludecke* involved a war declared by Congress rather than a presidential determination of invasion. Nearly every federal court to examine the question has held that whether the United States has suffered an invasion is a political question committed to the political branches and not the judiciary because determining whether an invasion was occurring would require courts to inappropriately make "non-judicial policy decision[s]." *California v. United States*, 104 F.3d 1086, 1090–91 (9th Cir. 1997); *see also Padavan v. United States*, 82 F.3d

23, 28 (2d Cir. 1996) ("The plaintiffs' Invasion Clause claim is nonjusticiable. The protection of the states from 'invasion' involves matters of foreign policy and defense, which are issues that the courts have been reluctant to consider."); *Chiles v. United States*, 69 F.3d 1094, 1097 (11th Cir. 1995) ("Whether the level of illegal immigration is an 'invasion' of Florida and whether this level violates the guarantee of a republican form of government present nonjusticiable political questions."); *Barber v. Hawai'i*, 42 F.3d 1185, 1199 (9th Cir. 1994) (party's claim that Hawaii and the federal government had permitted the economic invasion of Hawaii by Japan was "dismissed as a nonjusticiable political question"); *People of Colo. ex rel. Suthers v. Gonzales*, 558 F. Supp. 2d 1158, 1161–62 (D. Colo. 2007) (Colorado's claim against federal officials for failing to protect the State from invasion "implicates foreign policy and national defense issues, which are the province of the political branches of government and which the courts are reluctant to address," which would place the court "in the untenable position of determining whether there has been an invasion," and thus "the issues raised by Plaintiff's Complaint are nonjusticiable under the political question doctrine"); *Rodriguez v. United States*, 983 F. Supp. 1445, 1464 (S.D. Fla. 1997) ("whether the level of

legal aliens in Florida who are no longer entitled to welfare benefits is an invasion of Florida ... is a nonjusticiable political question"); *The Tropic Wind*, 28 F. Cas. 218, 220, 2 Hay. & Haz. 374 (C.C.D.D.C. 1861) (No. 16541A) ("The status of foreign nations whose provinces or dependencies are in revolution, *foreign invasion of our own country*, and insurrection at home, are political questions determined by the executive branch of our government" (emphasis added)); *The Tropic Wind*, 6 D.C. (1 Mackey) 351, 355 (C.C.D.D.C. 1861) (same); *United States v. Arizona*, No. CV 10-1413, 2011 WL 13137062, at *5 (D. Ariz. Oct. 21, 2011) ("Arizona's claim for violation of the Invasion and Domestic Violence Clauses of Article IV, Section 4 presents a nonjusticiable political question."); *Sullivan v. United States*, No. 7:04-CV-103-FL(1), 2004 WL 3362495, at *3 (E.D.N.C. July 7, 2004) (holding that plaintiff's claims against U.S. government and federal officials that they had failed to "defend the several states from invasion," had "failed to uphold their official responsibilities in connection with the alleged invasion of illegal immigrants," and had failed to issue a presidential proclamation that Mexico was perpetrating an invasion was "a nonjusticiable political question" (citations omitted)).

Additionally, any case that challenges a president's determination to exercise emergency powers raises a "quintessential political question." *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 31 (D.D.C. 2020). In *Center for Biological Diversity v. Trump*, a judge in the District of the District of Columbia noted that while "the Nation remains under at least 32 national emergencies declared by this and former Presidents," "no court has ever reviewed the merits of such a declaration" even though "presidential declarations of emergencies—including this Proclamation—have been at issue in many cases." *Id*. Thus, the court determined that "matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention, since the Constitution commits those issues to the Executive and Legislative Branches." *Id*. at 31–32 (internal citations omitted) (citing *Haig v. Agee*, 453 U.S. 280, 292 (1981)).

At best, the Plaintiffs seek to use the federal courts to deliver a political victory. There is no dispute that the Plaintiffs are here illegally. Enjoining implementation of the TdA Proclamation unconstitutionally impedes the President's ability to respond to national security threats. *Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948)

(noting that executive decisions in foreign policy matters "are delicate, complex, and involve large elements of prophecy" that courts are ill-equipped to review). Here, Article III review is tantamount to interfering with the President's "battlefield decisions." *El-Shifa Pharm. Indus. Co. v. United States*, 559 F.3d 578, 583 (D.C. Cir. 2009) *vacated on other grounds*, 330 Fed. App'x 200 (D.C. Cir. 2009).

To hold that the questions raised here are justiciable (where a President has made an invasion determination that will lead to the removal of aliens from the country), whereas every other court to consider the issue has held the opposite (where the Executive was refusing to acknowledge an invasion and to expel aliens) sends a dangerous message and establishes a blatant double standard that these questions are justiciable only when it would allow aliens to remain in the country.

## II. The actions identified in the TdA Proclamation constitute an invasion under the AEA, and the Proclamation is correct that TdA's relationship with Venezuela is sufficient to support the finding of an invasion

Even if the Plaintiffs' claims were justiciable, they still fail because the TdA Proclamation correctly characterizes TdA's actions as an invasion and makes the specific factual finding that TdA is acting at the

direction of the government of Venezuela. TdA Proclamation, at *2. Specifically, the TdA Proclamation finds that "TdA is undertaking hostile actions and conducting irregular warfare against the territory of the United States both directly and at the direction, clandestine or otherwise, of the Maduro regime in Venezuela," that TdA "support[s] the Maduro regime's goal of destabilizing democratic nations in the Americas, including the United States," and that "TdA is closely aligned with, and indeed has infiltrated, the Maduro regime, including its military and law enforcement apparatus." *Id.* at *1, *2.

These factual determinations were made by the President pursuant to his executive power to conduct foreign relations and may not be questioned by this Court. "The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative— 'the political'—Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005) (quoting *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918)). Thus, there is "no doubt that decision-making in the fields of

foreign policy and national security is textually committed to the political branches of government." *Id.*

The power to recognize foreign governments is vested exclusively in the President. "The text and structure of the Constitution grant the President the power to recognize foreign nations and governments." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015) (holding that the President has exclusive power over recognition, and that Congress has no such power). Thus, the President has the unreviewable authority to recognize TdA as being part of the Venezuelan government, and this Court has no power to question that designation. Because the President has recognized TdA as being an arm of the Venezuelan government, there is no further inquiry for this Court to make and the case must be dismissed. However, even if such an inquiry were appropriate, the President's determination is well supported by the facts.

**III. Venezuela's government is institutionally commingled with drug cartels, uses TdA and other transnational criminal organizations to further its foreign policy strategy, and has delegated governmental functions to TdA, rendering TdA indistinguishable from, or even sharing sovereignty with, the official Venezuelan government.**

A "narco-state" is a type of failed state defined as, "A nation state whose government, judiciary, and military have been effectively

infiltrated by drug cartels, or where the illegal drug trade is covertly run by elements of the government. It can also refer to a region under the control of organized crime for the purposes of producing or trafficking drugs where legitimate political authority is absent."[4] Since the Bush Administration, the United States has consistently accused the Venezuelan government of sheltering, operating, and using drug cartels for political purposes.[5]

Venezuela meets the definition of a narco-state, and drug cartels are inextricably intertwined with its government. In 2015, the Department of Justice labeled the "country's second most-powerful man," National Assembly President Diosdado Cabello, one of the heads of a vast criminal organization comprised of senior officials across all branches of the Venezuelan government and the military.[6] Two of Maduro's nephews were convicted in 2016 of attempting to transport 800 kilos of cocaine into the U.S. to obtain funds to prop up the regime.[7] In 2020, Maduro himself

---

[4] *Narco-state*, OXFORD REFERENCE, https://perma.cc/KH6A-BTRF.
[5] *See generally* Jose de Cordoba & Juan Forero, *Venezuelan Officials Suspected of Turning Country into Global Cocaine Hub*, WALL ST. J. (May 18, 2015), https://perma.cc/VW7Z-RLN4.
[6] *Id.*
[7] Nate Raymond, *Venezuelan First Lady's Nephews Convicted in U.S. Drug Trial*, REUTERS (Nov. 19, 2016), https://perma.cc/48DY-2GBV.

and fourteen other current and former high-ranking Venezuelan officials, including the Minister of Defense and Chief Supreme Court Justice, were indicted for narco-terrorism, drug trafficking, and using "Cocaine as a Weapon to 'Flood' the United States."[8] Last month, the Government of Chile accused TdA of carrying out a murder in Santiago on the orders of the Venezuelan government.[9]

Beyond profiting from the activity of drug cartels generally and using TdA to carry out assassinations and destabilize the United States, the Government of Venezuela has delegated governmental authority to the group.[10] In parts of Venezuela, TdA front organizations carry out traditional governmental functions ranging from operating schools to regulating the appearance of residential houses to prosecuting crimes.[11] This did not result from the mere acquiescence of the official Venezuelan government; rather, TdA "was ably assisted by state elements who

---

[8] Press Release, Nicolas Maduro Moros and 14 Current and Former Venezuelan Officials Charged with Narco-Terrorism, Corruption, Drug-Trafficking and Other Criminal Charges, U.S. DEP'T OF JUST. (Mar. 26, 2020), https://perma.cc/Q5VX-78KZ.
[9] *What a Murder in Chile Reveals About Maduro's Relationship With Tren de Aragua*, INSIGHT CRIME (Feb. 12, 2025), https://perma.cc/625P-TDA2.
[10] *Hybrid Governance and the Criminal Fiefdoms of Tren de Aragua*, INSIGHT CRIME (July 12, 2023), https://perma.cc/2FKE-B3H5.
[11] *Id.*

systematically worked with the gang to create this hybrid governance."[12] Because TdA exercises sovereign control of parts of Venezuelan territory, it is tantamount to an agency of the Venezuelan government or analogizable to the "domestic dependent nations" of Native Americans in the United States. *See generally Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1 (1831).

The single Maduro Regime statement cited by the Plaintiffs is contradicted by decades of documented practices by the Venezuelan government and a consistent position across five United States presidential administrations. TRO Motion at 4–5. The Presidential Proclamation is correct that the Maduro Regime, through its officials, members of its First Family, and its instrumentality, TdA, perpetrates invasion and predatory incursions into the United States to destabilize the nation.

Therefore, the Plaintiffs are incorrect to claim that "no 'invasion or predatory incursion' has been 'perpetrated, attempted, or threatened against the territory of the United States.'" TRO Motion at 9.

---

[12] *Id.*

**A.   Even if TdA were not a part of the Venezuelan government, invasions under the AEA include those perpetrated by non-state actors.**

Plaintiffs are incorrect in claiming that "invasions" can only be perpetrated by state actors. TRO Motion at 9–10. When the AEA was enacted at the end of the 18th Century, "invasion" was understood to encompass not just acts by states but also actions by non-state actors. In Federalist 43, James Madison explained with respect to the Invasion Clause, U.S. CONST. art. IV, § 4, that, "A protection against invasion is due from every society to the parts composing it. The latitude of the expression used here seems to secure each state, not only against foreign hostility, but against *ambitious or vindictive enterprises* of its more powerful neighbors." THE FEDERALIST NO. 43 at 293 (Cooke ed. 1961) (emphasis added). By its plain meaning, the phrase "ambitious or vindictive enterprises" would include for-profit activities that involve violence, such as activities undertaken by TdA.

At the Virginia Ratifying Convention for the U.S. Constitution, James Madison confirmed that the term "invasion" applies not just to states, but also to non-state actors, explaining that the States' right under Article I, Section 10 of the U.S. Constitution to make war in the case

of "invasion" applies to hostile non-state actors. Madison specifically brought up "suppress[ing] smugglers" as an example of a justified use of a State's militia, and he cited with approval an actual prior case of Virginia calling out its militia to do just that: "There were a number of smugglers, who were too formidable for the civil power to overcome. The military quelled the sailors, who otherwise would have perpetrated their intentions."[13] One of the quintessential activities of transnational criminal organizations such as TdA is smuggling; therefore, the President was correct to regard TdA's activities as an invasion as that term was understood in the late 18th Century. The President was thus also right to carry out his Constitutional obligation to defend the American people from this invasion.

Further, we interpret statutory terms according to the ordinary plain meaning at the time of enactment. *Bostock v. Clayton Cnty., Ga.,* 590 U.S. 644, 654–55 (2020). Webster's 1806 dictionary—the first American English dictionary—defines "invade" broadly, as meaning "to enter

---

[13] 3 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 414 (Jonathan Elliot ed., 1836), https://perma.cc/Y7V5-XAQE.

or seize in hostile manner."[14] Webster's 1828 dictionary also defines "invade" broadly, to include not just the entrance of a foreign army into a country, but also "1. ... to enter as an enemy, with a view to conquest or plunder; to attack"; "2. To attack; to assail; to assault"; "3. To attack; to infringe; to encroach on; to violate."[15] The cartel and gang violence wrought by groups such as TdA fall well within these broad definitions of "invade," since cartel and gang members are entering the United States in a hostile manner that attacks, encroaches on, and violates the country.

The Plaintiffs quote language from other circuits that imply that invasions may only be perpetrated by a "political entity." TRO Motion at 12. However, all the language they cite is dicta because, in each of the cases cited, the court had also held that determining whether an invasion had taken place was a nonjusticiable political question. *See Padavan*, 82 F.3d at 28 ("the plaintiffs' Invasion Clause claim is nonjusticiable. The protection of the states from 'invasion' involves matters of foreign policy

---

[14] NOAH WEBSTER, A COMPENDIOUS DICTIONARY OF THE ENGLISH LANGUAGE 164 (1806), https://perma.cc/MF8W-DQD2.
[15] NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 113 (1828), https://perma.cc/8PXB-A4KK.

and defense, which are issues that the courts have been reluctant to consider."); *New Jersey v. United States*, 91 F.3d 463, 470 (3d Cir. 1996) (applying political question doctrine and affirming the district court's dismissal of the State's complaint that included the claim that the federal government had failed to protect the State from invasion by illegal aliens).

Therefore, the Plaintiffs' claim that "the relevant actions were not perpetrated by a 'foreign nation or government'" is irrelevant. The President is correct that TdA's activities fall squarely within the meaning of "invasion," as understood by both the Framers in this precise context and the American people generally at the time of enactment. TRO Motion at 9.

The AEA's use of the modifier "by any foreign nation or government" does not change this analysis. The D.C. Circuit has "repeatedly held that where different terms are used in a single piece of legislation, the court must presume that Congress intended the terms to have different meanings." *Vonage Holdings Corp. v. FCC*, 489 F.3d 1232, 1240 (D.C. Cir. 2007) (cleaned up). Thus, the terms "nation" and "government" should not be read as synonymous. Indeed, Webster's 1806 dictionary

defines those terms differently. It defines "nation" as "a body of people united under one prince or government, or their date or kingdom."[16] However, it defines "government" far more broadly, as a "general system of polity for regulating a society, a state or body politic, administration or executive power, direction or control."[17] It defines "society" as a "company, fraternity, partnership, union."[18] Because the meaning of "government" at the time of adoption of the AEA included not just the institutions for governing a state, but also for governing a "society," and because "society" included non-state organizations such as companies, fraternities, partnerships, and unions, the term "government" in the AEA encompasses non-state actors and covers invasions perpetrated both by state and non-state actors.

## IV. The AEA has procedures for the removal of aliens that are distinct from those of the Immigration and Nationality Act.

The AEA independently establishes the procedures for the removal of aliens under the Act. Specifically, it confers on the President broad authority to establish how and when aliens are to be removed: "The

---

[16] WEBSTER, COMPENDIOUS DICTIONARY, *supra* note 16, at 199.
[17] *Id.* at 133.
[18] *Id.* at 283.

President is authorized in any such event, by his proclamation thereof, or other public act, to": 1) "direct the conduct to be observed on the part of the United States, toward the aliens who become so liable"; 2) direct "the manner and degree of the restraint to which they shall be subject"; 3) direct "in what cases, and upon what security their residence shall be permitted"; 4) "to provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom"; and 5) "to establish any other regulations which are found necessary in the premises and for the public safety." 50 U.S.C. § 21. Indeed, the AEA confers on the President absolute authority, after having issued a proclamation, to order the U.S. marshals to remove any enemy alien with no other intervening procedure or process: "When an alien enemy is required by the President ... to depart and to be removed, it shall be the duty of the marshal ... to provide therefor and to execute such order in person ... by causing a removal of such alien out of the territory of the United States." 50 U.S.C. § 24.

The Plaintiffs incorrectly argue that five words in the Immigration and National Act ("INA") enacted by Congress in 1996 abrogate all of the procedures of the AEA. TRO Motion at 13–14. Specifically, they argue

that Congress abrogated most of the AEA through the words "the sole and exclusive procedure" in Section 240 of the INA, 8 U.S.C. § 1229a. Congress added this section to the INA in 1996 as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). *See* Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104–208, § 304, 110 Stat. 3009 (Sept. 30, 1996).

The Plaintiffs would have this Court interpret IIRIRA as weakening the AEA, loosening immigration restrictions, and making it easier for aliens who are subject to the AEA's provisions to remain in the United States. However, "Congress enacted [IIRIRA] in a comprehensive effort to *strengthen* and *tighten* the immigration laws." *Arevalo v. Ashcroft*, 344 F.3d 1, 4 (1st Cir. 2003) (emphasis added). The House Conference Report on IIRIRA similarly made plain that the bill's purpose was "to improve deterrence of illegal immigration to the United States by ... reforming exclusion and deportation law and procedures." H.R. REP. NO. 104-828, at 1,199 (1996) (Conf. Rep.). President Clinton's signing statement likewise described IIRIRA as "landmark immigration reform legislation that ... strengthens the rule of law by cracking down on illegal immigration at the border, in the workplace, and in the criminal justice system." 32

WEEKLY. COMP. PRES. DOC. 1935 (1996), *reprinted in* 1996 U.S.C.C.A.N. 3388, 3391 (Sep. 30, 1996).

When Congress adopted the INA and later enacted IIRIRA, it never explicitly abrogated the AEA, and it made clear that its intent was not to facilitate the presence of illegal aliens in the country but to deter it by making it easier to remove aliens. The Plaintiffs are thus forced to urge a construction of the INA that would require this Court to render all of the AEA's language about procedure a nullity based merely on implication. In other words, in the Plaintiffs' telling, when Congress enacted IIRIRA and amended the INA in Title 8 of the U.S. Code, it abrogated almost all of the AEA in Title 50, but it did so secretly, without telling anybody.

The Supreme Court has "repeatedly stated ... that absent a clearly expressed congressional intention, repeals by implication are not favored. An implied repeal will only be found where provisions in two statutes are in irreconcilable conflict, or where the latter Act covers the whole subject of the earlier one and is clearly intended as a substitute." *Branch v. Smith*, 538 U.S. 254, 273 (2003) (cleaned up).

There is no irreconcilable conflict between the AEA and the INA. Thus, there is no need to find that IIRIRA repealed the AEA. The INA does *not* cover the whole subject covered by the AEA. Indeed, it does not cover it at all. The AEA is a statute enacted under the President's authority as commander-in-chief and based on his powers over foreign affairs. It is codified in Title 50 of the U.S. code, which is titled "War and National Defense." The INA does not cover the whole subject of national defense and, indeed, was obviously never intended to do so. Nothing in the text of the INA or IIRIRA clearly announces that it was intended to substitute for the AEA.

Indeed, prior plaintiffs challenging the AEA in the DC Circuit have made a repeal-by-implication argument similar to what the Plaintiffs attempt here: "Appellants do not claim repeal in terms, but assert repeal by implication." *Citizens Protective League v. Clark*, 155 F.2d 290, 295 (D.C. Cir. 1946). The D.C. Circuit rejected this argument, holding instead that, "The Alien Enemy Act has not been repealed." *Id.* The DC Circuit found relevant to its determination that Congress had mentioned the AEA in an act passed five years earlier. Here, similarly, a number of Senators and Congresspersons have repeatedly proposed legislation that

would repeal the AEA,[19] thus demonstrating that Congress understands the AEA to very much still be in force. Such repeal would be unnecessary if the Plaintiffs' repeal-by-implication argument were correct.

Nor can the Plaintiffs argue that IIRIRA merely amended the AEA by implication. "The hurdle of establishing an amendment by implication ... is a high one. Although more frequently invoked in the context of implied repeals, the standards are conceptually identical and implied amendments are no more favored than implied repeals." *U.S. Ass'n of Reptile Keepers, Inc. v. Jewell*, 103 F. Supp. 3d 133, 155 (D.D.C. 2015) (cleaned up).

"An amendment or repeal is to be implied only if necessary to make the (later enacted law) work, and even then only to the minimum extent

---

[19] Neighbors Not Enemies Act, S. 193, 119th Cong. (2025) (sponsored by Senator Hirono and six cosponsors); Neighbors Not Enemies Act, H.R. 630, 119th Cong. (2025) (sponsored by Representative Omar and forty-one cosponsors); Neighbors Not Enemies Act, S. 1747, 118th Cong. (2023) (sponsored by Senator Hirono and three cosponsors); Neighbors Not Enemies Act, H.R. 3610, 118th Cong. (2023) (sponsored by Representative Omar and thirty cosponsors); Neighbors Not Enemies Act, S. 3690, 117th Cong. (2022) (sponsored by Senator Hirono and four cosponsors); Neighbors Not Enemies Act, H.R. 3621, 117th Cong. (2021) (sponsored by Representative Omar and forty cosponsors); Neighbors Not Enemies Act, H.R. 5734, 116th Cong. (2020) (sponsored by Representative Nadler and twenty cosponsors); Neighbors Not Enemies Act, S. 4837, 116th Cong. (2020) (sponsored by Senator Hirono and three cosponsors).

necessary." *Id*. Here, there is no need to imply amendment or repeal, and certainly, the Plaintiffs' urged interpretation—of repealing by implication virtually all of the AEA—fails the "minimum extent necessary" requirement.

"Basic principles of statutory interpretation require that [courts] construe [the statutes] in harmony, not set them at cross-purposes." *Jones v. Hendrix*, 599 U.S. 465, 478 (2023). "Where two statutes are 'capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.'" *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1018 (1984) (quoting *Blanchette v. Conn. General Ins. Corps.*, 419 U.S. 102, 133–34 (1974)). "A new statute will not be read as wholly or even partially amending a prior one unless there exists a positive repugnancy between the provisions of the new and those of the old that cannot be reconciled." *U.S. Ass'n of Reptile Keepers, Inc.,* 103 F. Supp. 3d at 155. There is no such "positive repugnancy" here that prevents the INA and the AEA from being reconciled. Rather, they are *easily* reconciled—the INA's removal procedures apply when immigrants are removed under the normal procedures and standards set forth in the INA. And the AEA's procedures apply to

covered enemy aliens when a President invokes the Act in times of war or invasion.

The Plaintiffs' arguments about asylum statutes fail for the same reasons: there is no positive repugnancy between the AEA and federal asylum statutes. TRO Motion at 14–16. Rather, they are easily reconciled. The asylum statutes apply to aliens claiming asylum except when the President has designated them as enemy aliens, in which case the AEA controls.

Additionally, the Plaintiffs' favored interpretation would lead to ludicrous results—in times of war or invasion, their interpretation would allow invaders and enemy combatants to invoke asylum and normal removal proceedings as a magical get-out-of-jail-free card to avoid detention and removal under the AEA. This is absurd and defeats the entire purpose of the AEA, which is to defend the country in times of war and invasion.

Further demonstrating the manifest error of the Plaintiffs' interpretative approach is that it only appears plausible in the first place because the Plaintiffs quote selectively only the following five words from 8 U.S.C. § 1229a(a)(3): "the sole and exclusive procedure." TRO Motion at

13. However, in its entirety, that subsection states that "*Unless otherwise specified in this chapter*, a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States. Nothing in this section shall affect proceedings conducted pursuant to section 1228 of this title." 8 U.S.C. § 1229a(a)(3) (emphasis added).

The phrase, "Unless otherwise specified in this chapter" throws a big wrench into the Plaintiffs' shoddily constructed interpretative machinery. That phrase makes two things clear: 1) Congress never intended for removal proceedings to be the only way to remove aliens in the United States, and 2) the "exclusive procedure" language was only intended to apply to "this chapter"—chapter 8 of the U.S. code. Because the AEA is contained in Chapter 50, the plain language of Section 1229a makes clear that "sole and exclusive procedure" was never intended to apply to the AEA.

## Conclusion

The Supreme Court has already spoken. The President's determinations under the AEA are non-reviewable. And even if they were, the

TdA Proclamation validly invoked the AEA's provisions because TdA's actions qualify as an invasion, as that term was understood when the AEA was enacted. The AEA has not been repealed or amended by implication because it is easily reconciled with the INA. Therefore, the Court's Temporary Restraining Order should be dissolved, and the Plaintiffs' complaint should be dismissed with prejudice.

March 21, 2025          Respectfully submitted,

                            */s/Jacob Meckler*

                            Dan Epstein (D.C. Bar No. 1009132)
                            James Rogers
                            Andrew J. Block (D.C. Bar No.90002845)
                            Jacob Meckler (D.C. Bar No. 90005210)
                            AMERICA FIRST LEGAL FOUNDATION
                            611 Pennsylvania Ave., SE #231
                            Washington, D.C. 20003
                            Tel.: (202) 964-3721
                            E-mail: Jacob.Meckler@aflegal.org

                            *Counsel for Amicus Curiae*
                            *The Honorable Brandon Gill*

**CERTIFICATE OF SERVICE**

I, Jacob Meckler, certify that on March 21, 2025, I caused the fore-going document to be filed with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ Jacob Meckler
Jacob Meckler

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 29(a)(4)(G), the undersigned counsel certifies compliance with the requirements of Fed. Rules App. P. 29 & 32. The brief is 6,497 words in length, less than half the length allowed for a principal brief under Fed. R. App. P. 32(a)(7)(B)(i). The brief follows the required font and formatting regulations.

*/s/ Jacob Meckler*
Jacob Meckler