**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| J.G.G., *et al.*, |
|     **Plaintiffs,** |
|       v. |
|     **DONALD J. TRUMP,** *et al.*, |
|     **Defendants.** |

Civil Action No. 25-766 (JEB)

<u>**MEMORANDUM OPINION**</u>

In the predawn hours of Saturday, March 15, five Venezuelan noncitizens being held in Texas by the Department of Homeland Security sought emergency relief in this Court. They justifiably feared that, in a matter of hours, they might be removed from the country pursuant not to the Immigration and Nationality Act of 1952, but instead the Alien Enemies Act of 1798, a law last invoked in the wake of Pearl Harbor as the nation was preparing for a world war. That Act authorizes the President to summarily remove "natives, citizens, denizens, or subjects" of a "hostile nation or government" when there is "declared war" against it or when it has "perpetrated, attempted, or threatened against the territory of the United States" an "invasion or predatory incursion." 50 U.S.C. § 21. The President, Plaintiffs believed, had secretly signed a Proclamation invoking the Act, and, upon its imminent publication, the Government would begin immediately removing them without any hearing to ensure that they fell within its scope.

As expected, later that day the President indeed published a Proclamation announcing that because Tren de Aragua — a violent, transnational criminal organization based in Venezuela — had committed an "invasion" or "predatory incursion" upon the United States, the

1

Government could begin immediately deporting any Venezuelan noncitizens it deemed to be members of Tren de Aragua. See 90 Fed. Reg. 13033, 13034 (Mar. 14, 2025), § 1. Plaintiffs are among those so deemed.

But wait, they protest; the Government was mistaken. Each vehemently denies being a member of Tren de Aragua and thus subject to the Proclamation. Several in fact claim that they fled Venezuela to escape the predations of the group, and they fear grave consequences if deported solely because of the Government's unchallenged labeling. Plaintiffs therefore sought a Temporary Restraining Order preventing the Government from deporting them or other Venezuelan noncitizens under the Proclamation without a hearing.

To preserve the status quo until Plaintiffs' claims could be properly adjudicated, the Court issued two Temporary Restraining Orders that together prohibited the Government from relying solely on the Proclamation to remove the named Plaintiffs or any other Venezuelan noncitizens in its custody. Neither Order required the Government to release a single individual from its custody. Neither Order prevented the Government from apprehending anyone pursuant to the just-published Proclamation. And neither Order prevented the Government from deporting anyone — including Plaintiffs — through authorities other than the Proclamation, such as the INA. Indeed, as the President last month designated Tren de Aragua a Foreign Terrorist Organization, members of the gang are already inadmissible to (and thus deportable from) the United States under the INA. See 8 U.S.C. § 1182(a)(3)(B).

The Government now moves to vacate the TROs, primarily on the ground that there is not a sufficient likelihood that Plaintiffs will succeed on their legal claims. The President's unprecedented use of the Act outside of the typical wartime context — and Plaintiffs' various challenges to such use — implicates a host of complicated legal issues, including fundamental

and sensitive questions about the often-circumscribed extent of judicial power in matters of foreign policy and national security. Such concerns arise principally in connection with Plaintiffs' contention that any action taken pursuant to the Proclamation is unlawful because, despite the President's determination otherwise, Tren de Aragua is not a "foreign nation or government," and its actions, however heinous, do not amount to an "invasion" or a "predatory incursion."

The Court need not resolve the thorny question of whether the judiciary has the authority to assess this claim in the first place. That is because Plaintiffs are likely to succeed on another equally fundamental theory: before they may be deported, they are entitled to individualized hearings to determine whether the Act applies to them at all. As the Government itself concedes, the awesome power granted by the Act may be brought to bear only on those who are, in fact, "alien enemies." And the Supreme Court and this Circuit have long maintained that federal courts are equipped to adjudicate that question when individuals threatened with detention and removal challenge their designation as such. Because the named Plaintiffs dispute that they are members of Tren de Aragua, they may not be deported until a court has been able to decide the merits of their challenge. Nor may any members of the provisionally certified class be removed until <u>they</u> have been given the opportunity to challenge their designations as well. The Motion to Vacate will thus be denied.

## I.    Background

### A.    Statutory Background

It is uncontested that the Alien Enemies Act grants the President broad authority to take certain actions against individuals who are alien enemies. The relevant provision provides, in full:

> Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies. The President is authorized in any such event, by his proclamation thereof, or other public act, to direct the conduct to be observed on the part of the United States, toward the aliens who become so liable; the manner and degree of the restraint to which they shall be subject and in what cases, and upon what security their residence shall be permitted, and to provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom; and to establish any other regulations which are found necessary in the premises and for the public safety.

50 U.S.C. § 21.

Enacted in 1798, the Act is the only remaining component of "that ill-famed company known as the Alien and Sedition Acts." United States ex rel. Schlueter v. Watkins, 67 F. Supp. 556, 563 (S.D.N.Y. 1946). Unlike the doomed Alien Friends, Naturalization, and Sedition Acts, however, the Alien Enemies Act never faced serious questions concerning whether it was a constitutional exercise of Congress's war powers. See Citizens Protective League v. Clark, 155 F.2d 290, 293 (D.C. Cir. 1946). As James Madison explained in 1800, "With respect to alien enemies, no doubt has been intimated as to the federal authority over them; the Constitution having expressly delegated to Congress the power to declare war against any nation, and of course to treat it and all its members as enemies." James Madison, Madison's Report on the Virginia Resolution, 4 Elliot's Debates 546, 554 (1800), https://perma.cc/U57E-L59L. Chief Justice Marshall, describing the Act, similarly emphasized that the President's authority vis-à-vis alien enemies stems from Congressional statute, noting that the law "confers on the president very great discretionary powers respecting [alien enemies]" and "affords a strong implication

that he did not possess those powers by virtue of the declaration of war." Brown v. United States, 12 U.S. (8 Cranch) 110, 126 (1814).

D.C. Circuit Judge E. Barrett Prettyman, whose name now adorns our city's federal courthouse, confirmed the validity of the Act in the wake of the Second World War when he declared, "The Alien Enemy Act is constitutional, both as an exercise of power conferred upon the Federal Government and as a grant of power by the Congress to the President." Clark, 155 F.2d at 293. Prior to that seismic conflict, the Act had been invoked only twice, during the War of 1812 and the First World War. During World War II, President Roosevelt used the Act, variously, to apprehend, intern, and remove Japanese, Germans, and Italians residing within the United States. See United States ex rel. Zdunic v. Uhl, 46 F. Supp. 688, 689 (S.D.N.Y. 1942); Masami Sasaki v. Rogers, 185 F. Supp. 191, 192 (D.D.C. 1960); Hohri v. United States, 586 F. Supp. 769, 774 (D.D.C. 1984). While vigorously deploying that power, Roosevelt nonetheless "provide[d] for hearings for arrested alien enemies . . . in order to permit them to present facts in their behalf." Schlueter, 67 F. Supp. at 565 (quotation marks omitted). Alien hearing boards, "composed of from three to six civilian members, served without compensation, heard the alien's evidence and made recommendations which were not binding on the Attorney General." Id.

Following the Second World War, the Alien Enemies Act lay dormant for 75 years.

B.    Factual and Procedural Background

Until now. In early March, DHS began interrogating Venezuelan migrants in its custody, including Plaintiffs, about gang membership. See ECF No. 44-9 (Karyn Ann Shealy Decl.), ¶¶ 3–4; see also ECF No. 44-12 (Melissa Smyth Decl.), ¶ 11. Even after "vehemently den[ying] any affiliation with a gang, past or present," Plaintiffs say they were moved from detention centers across the country to the El Valle Detention Facility in south Texas. See Shealy Decl.,

¶¶ 4–5; ECF Nos. 44-6 (Austin Thierry Decl.), ¶¶ 5–6; 44-7 (Osvaldo E. Caro-Cruz Decl.), ¶¶ 8–10, 18; 44-8 (Katherine Kim Decl.), ¶ 5. The reason for this transport was unveiled on the night of Friday, March 14, when, in Plaintiffs' telling, they were among over 100 Venezuelan noncitizens who were pulled from their cells and told that they would be deported the next day to an unknown destination. See Shealy Decl., ¶ 7; Kim Decl., ¶ 19; Thierry Decl., ¶ 8.

Plaintiffs' counsel caught wind of these movements, and they came to believe that the President had signed or would imminently sign a Proclamation invoking the Alien Enemies Act. See ECF No. 1 (Compl.), ¶¶ 43–55. They suspected that the Proclamation would declare that Tren de Aragua had committed or attempted an "invasion" or "predatory incursion" such that any member of the group was summarily removable under the Act. See ECF No. 3-2 (TRO Br.) at 1–2, 4–5. Plaintiffs believed that the Proclamation could be published at any moment and, once it was, the Government would begin rapidly removing Venezuelan noncitizens — including Plaintiffs — whom it had determined to be members of Tren de Aragua. See id. at 2.

So, in the wee hours of Saturday morning, Plaintiffs filed this lawsuit and sought a Temporary Restraining Order preventing the Government from deporting them under the Act until their claims could be heard. See ECF No. 3-9 (Proposed TRO Order) at 1–2. In addition to contesting the lawfulness of the Proclamation, Plaintiffs staunchly deny that they are members of Tren de Aragua. See, e.g., Compl., ¶¶ 9–10, 12 (J.G.G., J.A.V., W.G.H.); ECF No. 3-6 (W.G.H. Decl.), ¶ 12; ECF No. 3-8 (J.A.V. Decl.), ¶ 5; Shealy Decl., ¶ 4; ECF No. 44-11 (Grace Carney Decl.), ¶ 3. They therefore feared being whisked away without a chance to challenge the Government's say-so.

From there, events developed rapidly. Shortly after being assigned this case around 8:00 a.m. on March 15, this Court contacted the Government and connected with defense counsel at

9:20 a.m.  By then, the Court had been informed by Plaintiffs that at least one Plaintiff had apparently been put aboard an airplane along with other Venezuelans.  See Shealy Decl., ¶ 8 (removal process began around 7:30 a.m.); ECF No. 44-10 (Stephanie Quintero Decl.), ¶ 3 (removal process began at 7:00 a.m.); Carney Decl., ¶¶ 11–12 (inmates were moved from El Valle at about 10:00 a.m.); Smyth Decl., ¶ 14.  It thus appeared that, although the Government knew of the suit contesting the legality of removals under the Proclamation, it was nonetheless moving forward with its summary-deportation plans.  In light of the "exigent circumstances," and because the Plaintiffs had "satisfied" the "factors governing the issuance of preliminary relief," the Court granted an initial TRO that morning.  See Minute Order of Mar. 15, 9:40 a.m.  That Order, which temporarily prohibited the Government from removing only the five named Plaintiffs, was "to maintain the status quo until a hearing" could take place with Plaintiffs and the Government.  Id.  The Order did not command the Government to release anyone from its custody.  Id.

The Court then set an emergency hearing for 5:00 p.m. the same day to consider Plaintiffs' claim that relief should be broadened to a class of all noncitizens subject to the anticipated Proclamation.  This gave both sides seven hours to investigate the facts and prepare their legal arguments.  See ECF No. 4 (Mot. to Certify Class); Minute Order of Mar. 15, 11:04 a.m.

About an hour before that hearing began, the White House published the Proclamation on its website.  See Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua, White House (Mar. 15, 2025), https://perma.cc/D3GM-5YBM; ECF No. 28-1 (Robert L. Cerna Second Decl.), ¶ 5.  As expected, it targeted Tren de Aragua.  See 90 Fed. Reg. at 13033.  The Proclamation announces that the gang has "infiltrated" the Maduro

government in Venezuela, "including its military and law enforcement apparatus." Id.  It explains that "Venezuelan national and local authorities have ceded ever-greater control over their territories to transnational criminal organizations" like Tren de Aragua, resulting in "a hybrid criminal state." Id.  It further states that Tren de Aragua "is perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States," including by "undertaking hostile actions and conducting irregular warfare against the territory of the United States both directly and at the direction . . . of the Maduro regime." Id. at 13034, § 1.  As a result, the Proclamation declares that "all Venezuelan citizens 14 years of age or older who are members of [Tren de Aragua], are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies" under the Act.  Id.

In the 5:00 p.m. hearing, the Court began by clarifying the limited basis and scope of the TRO then in place, see ECF No. 20 (Mar. 15 Hearing Tr.) at 3, and then turned to whether it should provisionally certify a class — comprising Plaintiffs and those similarly situated — and issue a second TRO covering that class.  See id. at 5–6.  The Government began by objecting that the Court lacked venue because Plaintiffs' claims could be raised only through a petition for habeas corpus in the federal district in Texas where they were being held, not in the District of Columbia.  See id. at 4–11.

Noting that it would benefit from further argument on the issue, the Court pivoted to addressing Plaintiffs' concerns "about imminent deportation." Id. at 11.  It asked the Government whether there were any "removals under this Proclamation planned . . . in the next 24 or 48 hours." Id.  Government counsel said that he did not know, but that he could report back. Id.  Plaintiffs' counsel, however, interjected that several "sources" had informed him that

two flights "were scheduled for this afternoon that may have already taken off or [will] during this hearing." Id. at 12. So, at 5:22 p.m., the Court adjourned the hearing until 6:00 p.m. and directed the Government to find out whether removing people under the Proclamation was then in motion. Id. at 13–15.

When the hearing resumed shortly after 6:00 p.m., the Government surprisingly represented that it still had no flight details to share. See id. at 15–18. The Court thus returned to the venue issue. Noting that it was a "reasonably close question" if the habeas claims remained, the Court permitted Plaintiffs to dismiss them without prejudice, leaving only claims under the Administrative Procedure Act, for which venue in the District of Columbia was proper. See id. at 22; Compl., ¶¶ 79, 83, 86, 90, 92–95. The Court next provisionally certified a class of Plaintiffs covering all noncitizens in custody subject to removal under the Proclamation. See Mar. 15 Hearing Tr. at 23–26, 38.

That left the central question to be resolved: should the Court issue a broader TRO covering the entire class? At around 6:45 p.m., the Court answered the question in the affirmative. Whether Plaintiffs could show a likelihood of success on the merits, as required for a TRO, presented novel and nuanced legal issues — issues not easily deciphered in the abbreviated timeframe resulting from the Government's decision to hastily dispatch flights as legal proceedings were ongoing, a move that implied a desire to circumvent judicial review. The Court nonetheless concluded that Plaintiffs had shown that they had a substantial likelihood of prevailing, and that they would suffer irreparable injury if Act-based removals were not temporarily halted. See id. at 41–42. The Court therefore ordered that for 14 days the Government was enjoined from removing any noncitizens in its custody solely on the basis of the Proclamation. See id. at 42. The Court then told Government counsel: "[Y]ou shall inform

your clients of [the Order] immediately, and that any plane containing [members of the class] that is going to take off or is in the air needs to be returned to the United States . . . . However that's accomplished, whether turning around a plane or not [dis]embarking anyone on the plane . . . , I leave to you.  But this is something that you need to make sure is complied with immediately." Id. at 42.  Not long after, the Court memorialized the Order on the docket, referencing the just-held hearing.  See id. at 47; Minute Order of Mar. 15, 7:25 p.m.

It is important to stress once again that the Order was narrow: it prevented Defendants only from removing the Plaintiff class on the sole basis of the Proclamation.  In other words, the Order did not prevent Defendants from removing anyone — to include members of the class — through other immigration authorities such as the INA.  Indeed, as previously mentioned, those affiliated with Tren de Aragua were all already deportable under that statute as members of an FTO.  See 8 U.S.C. 1182(a)(3)(B).  The Order also did not require Defendants to release a single person held in their custody, even individuals held only on the basis of the Proclamation.  And it did not even prevent Defendants from apprehending noncitizens under the authority of the Proclamation (or any other law, for that matter).

It soon emerged that two planes were indeed likely in the air during the hearing.  In other words, the Government knew as of 10:00 a.m. on March 15 that the Court would hold a hearing later that day, and the most reasonable inference is that it hustled people onto those planes in the hopes of evading an injunction or perhaps preventing them from requesting the habeas hearing to which the Government now acknowledges they are entitled.  See infra p. 13.  According to the Government, prior to this Court's oral ruling at around 6:45 p.m., two planes had departed the United States carrying persons designated as Tren de Aragua members and deported based solely on the Proclamation.  See ECF No. 49 (Cerna Third Decl.), ¶ 5.  A third plane that left some

hours later did not, at least according to the Government, contain persons removed solely pursuant to the Proclamation.  See ECF No. 26-1 (Cerna First Decl.), ¶ 6.  Upon landing in El Salvador, members of the Plaintiff class were apparently transferred into one of that country's detention facilities, known as the Center for Terrorism Confinement (CECOT).  See Secretary Marco Rubio (@SecRubio), X (Mar. 16, 2025, 8:39 a.m.), https://x.com/SecRubio/status/1901252043517432213 (sharing video of the transfer).  As will be discussed, conditions in CECOT are reportedly parlous.  See infra Section III.C.

Plaintiffs emphatically protest that many of the people on the first two flights are not members of Tren de Aragua.  They include in their filings the declarations of lawyers who state that their clients who were removed to El Salvador on those flights have no connection to the gang.  See generally ECF No. 44-5 (Linette Tobin Decl.); Thierry Decl.; Caro-Cruz Decl.; Kim Decl.; see also ECF No. 44 (Opp.) at 7–8.  The Government rejoins that Immigration and Customs Enforcement "personnel carefully vetted each individual alien to ensure they were in fact members of [Tren de Aragua]," although it concedes that not all of them "have criminal records in the United States."  Cerna First Decl., ¶¶ 7, 9.

Because the Court had to act on such an expedited basis, it wished to afford the Government an opportunity to brief the issues involved, and it thus permitted Defendants to move to vacate the TROs, which they have now done.  See ECF No. 26 (Mot. to Vacate).  Plaintiffs responded, and the Court held oral argument on March 21.  See ECF No. 51 (Mar. 21 Hearing Tr.).  The Government also appealed to the D.C. Circuit, seeking a stay of the TROs, see Corrected Emergency Motion for a Stay Pending Appeal, J.G.G. v. Trump, No. 25-5067 (D.C. Cir. Mar. 16, 2025), and also asked the Court of Appeals to reassign this case to a different district judge.  See Letter Pursuant to Rule 28(j) at 2, J.G.G. v. Trump (D.C. Cir. Mar. 17, 2025).

As the Circuit panel is set to hear the case shortly, the Court wishes to set forth its reasoning

more fully after briefing and argument.  See Order, J.G.G. v. Trump (D.C. Cir. Mar. 19, 2025).

## II.     Legal Standard

Like preliminary injunctions, TROs "do not conclusively resolve legal disputes."  Lackey

v. Stinnie, 145 S. Ct. 659, 667 (2025).  Rather, their purpose is "merely to preserve the relative

positions of the parties until a trial on the merits can be held and to balance the equities as the

litigation moves forward."  Id. (citations and quotation marks omitted).  Granting such

preliminary relief is thus "an exercise of discretion and judgment, often dependent as much on

the equities of a given case as the substance of the legal issues it presents."  Trump v. Int'l

Refugee Assistance Project, 582 U.S. 571, 579 (2017).

Motions for TROs and preliminary injunctions are governed by the same standards.

Gomez v. Trump, 485 F. Supp. 3d 145, 168 (D.D.C. 2020).  "A preliminary injunction is an

extraordinary remedy never awarded as of right."  Winter v. Nat. Res. Def. Council, Inc., 555

U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary injunction must establish [1] that he is

likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of

preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in

the public interest."  Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011) (alterations in

original) (quoting Winter, 555 U.S. at 20).  "The moving party bears the burden of persuasion

and must demonstrate, 'by a clear showing,' that the requested relief is warranted."  Hospitality

Staffing Solutions, LLC v. Reyes, 736 F. Supp. 2d 192, 197 (D.D.C. 2010) (quoting Chaplaincy

of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006)).

## III.    Analysis

The Court starts by addressing whether it has jurisdiction to hear Plaintiffs' APA claims. Finding that it does, it then addresses the four aforementioned TRO factors, devoting the lion's share of the analysis to the likelihood of success on the merits.

A.  Jurisdiction

Defendants initially contend that, because a noncitizen can contest the applicability of a Proclamation under the Alien Enemies Act through a petition for a writ of habeas corpus, he can do so only through such an action.  See Mot. to Vacate at 8–11.  According to the Government, Plaintiffs consequently should have brought this challenge via habeas claims in the district of their detention, and this Court has no jurisdiction over their APA claims.  Id. at 9.

To be sure, judicial review of Alien Enemies Act claims has generally taken place in the context of a petition for a writ of habeas corpus.  See, e.g., Ludecke v. Watkins, 335 U.S. 160, 163 (1948); United States ex rel. D'Esquiva v. Uhl, 137 F.2d 903, 904 (2d Cir. 1943); United States ex rel. Kessler v. Watkins, 163 F.2d 140, 140 (2d Cir. 1947); Bauer v. Watkins, 171 F.2d 494, 493 (2d Cir. 1948).  But that fact is largely a relic of historical happenstance.  In past invocations of the Act, those subject to removal were also detained solely on that basis.  See, e.g., D'Esquiva, 137 F.2d at 904 ("By habeas corpus the relator sought release from detention by the respondent, who holds him in custody as an alien enemy under an order of the Attorney General purporting to act pursuant to the Alien Enemy Act and the presidential proclamation of December 8, 1941.") (citations omitted).  Habeas was consequently the appropriate avenue for individuals to challenge the Government's application of the Act.

Prior to the 1952 passage of the INA, in fact, "the sole means by which an alien could test the legality of his or her deportation order was by bringing a habeas corpus action in district

court." INS v. St. Cyr, 533 U.S. 289, 306 (2001) (emphasis added). Pre-INA plaintiffs therefore naturally brought challenges under the Alien Enemies Act through habeas actions. Even so, plaintiffs have previously brought civil actions challenging their detention and removal under the Act on non-INA grounds on at least three occasions, and those actions were duly heard and decided by courts. In Clark, for instance, our Circuit considered a consolidated appeal of "three civil actions brought . . . for injunction, mandatory injunction and ancillary relief . . . upon the ground that the Alien Enemy Act is repugnant to the Constitution." 155 F.2d at 291–92 (noting that one group of plaintiffs comprised "individuals who are German nationals and who allege that they are threatened with deportation as alien enemies"). The district court "dismissed the complaints on the merits," id. at 292, and the court of appeals affirmed. Id. at 293. Defendants are wrong to suggest, then, that habeas has historically been the exclusive remedy for individuals contesting the application of the Act.

The Government nevertheless insists that the existence of habeas jurisdiction "preclu[des]" jurisdiction over any other claims, including those brought under the APA. See Mot. to Vacate at 9. The APA, however, has long been available to plaintiffs absent specific preclusion by Congress. See Robbins v. Regan, 780 F.2d 37, 42 (D.C. Cir. 1985) ("[J]urisdiction over APA challenges to federal agency action is vested in district courts unless a preclusion of review statute . . . specifically bars judicial review in the district court."); Fox Television Stations, Inc. v. FCC, 280 F.3d 1027, 1038 (D.C. Cir. 2002) ("clear and convincing evidence" of congressional intent is needed to "preclude judicial review" under APA) (quoting Abbott Lab'ys. v. Gardner, 387 U.S. 136, 141 (1967)).

The Supreme Court has made clear that the same principle applies even in immigration challenges where habeas is also available. In Brownell v. We Shung, 352 U.S. 180 (1956), a

noncitizen who was "ordered deported" challenged "the legality of an exclusion order" through

"an action for declaratory judgment under . . . the Administrative Procedure Act." Id. at 181.

The Supreme Court, asked to decide whether such a challenge must be "by habeas corpus,"

concluded that "either remedy is available in seeking review of such orders." Id.; accord

Shaughnessy v. Pedreiro, 349 U.S. 48, 49–52 (1955). As this Court has explained, "[A]lthough

Congress has expressly limited APA review over individual deportation and exclusion orders, it

has never manifested an intent to require those challenging an unlawful, nationwide detention

policy to seek relief through habeas rather than the APA." R.I.L-R v. Johnson, 80 F. Supp. 3d

164, 186 (D.D.C. 2015) (citation omitted). In other words, "APA and habeas review may

coexist." Id. at 185.

     Because Plaintiffs are "person[s] suffering legal wrong because of agency action, or

adversely affected or aggrieved by agency action," they are "entitled to judicial review" under

the APA. See 5 U.S.C. § 702. And because the Government's orders of removal are "the

consummation of the agency's decisionmaking process" and are actions "by which rights or

obligations have been determined, or from which legal consequences will flow," Bennett v.

Spear, 520 U.S. 154, 178 (1997) (quotation marks omitted), they are "final agency action[s] that

are "subject to judicial review." 5 U.S.C. § 704; cf. Nasrallah v. Barr, 590 U.S. 573, 584 (2020)

("A final order of deportation is now defined as a final order concluding that the alien is

deportable or ordering deportation.") (quotation marks omitted).

     The availability of APA review notwithstanding, Defendants insist that Plaintiffs'

contrary-to-law and arbitrary-and-capricious claims are merely "restyl[ed]" habeas claims. See

Mot. to Vacate at 10. The Government contends that, "at the end of the day, [Plaintiffs] are

challenging and asserting that the Government is entirely without authority under the [Alien

Enemies Act] to exercise custody over their persons."  Mar. 21 Hearing Tr. at 18.  In

characterizing Plaintiffs' arguments as "core habeas claim[s]," id., however, Defendants ignore

the unusual circumstances that gave rise to this suit.  Plaintiffs represent a class of noncitizens

who are both subject to the Proclamation and in Government custody pursuant to authorities

independent from the Act.  In other words, Plaintiffs had already been detained when the

Proclamation was applied to them.  They bring this action "seek[ing] this Court's intervention to

temporarily restrain [the Government's] summary removals."  Compl., ¶ 4; see also id. at 21

(requesting order "to stay [the Government's] removals under the Proclamation").

  Plaintiffs' challenge is accordingly centered on the legality of their removal under the

Alien Enemies Act.  Nowhere in their Complaint do they suggest that they are being unlawfully

detained.  Nor are they contesting the validity of their confinement or seeking to shorten its

duration.  Indeed, Plaintiffs have repeatedly emphasized throughout this litigation that they "do

not seek release from custody."  Opp. at 20; see also Mar. 15 Hearing Tr. at 19.

  The Government, then, is only loosely correct in arguing that Plaintiffs challenge its

authority to exercise custody over their persons.  The relevant detail for our purposes is instead

that Plaintiffs attack the Government's authority to deport (as opposed to detain) their persons.

That is because "[h]abeas is at its core a remedy for unlawful executive detention," and "[t]he

typical remedy for such detention is, of course, release."  Munaf v. Geren, 553 U.S. 674, 693

(2008) (emphasis added); accord Preiser v. Rodriguez, 411 U.S. 475, 489 (1973) (purpose of

habeas relief is "to provide the means for a . . . prisoner to attack the validity of his

confinement."); Heck v. Humphrey, 512 U.S. 477, 481 ("[H]abeas corpus is the exclusive

remedy for a . . . prisoner who challenges the fact or duration of his confinement and seeks

immediate or speedier release.").  The upshot of that axiom is that a plaintiff seeking relief that

"would not necessarily spell immediate or speedier release" brings a claim falling outside of "core habeas corpus relief." Wilkinson v. Dotson, 544 U.S. 74, 81 (2005) (emphasis and quotation marks omitted).

Indeed, the Supreme Court has never "recognized habeas as the sole remedy, or even an available one, where the relief sought would neither terminate custody, accelerate the future date of release from custody, nor reduce the level of custody." Skinner v. Switzer, 562 U.S. 521, 534 (2011) (cleaned up). On the contrary, it has made clear that when detained persons do not seek "simple release" and instead "request an injunction prohibiting the United States from transferring them to [foreign] custody," they "do not state grounds upon which habeas relief may be granted." Munaf, 553 U.S. at 692–93. Accordingly, "a federal prisoner need bring his claim in habeas only if success on the merits will 'necessarily imply the invalidity of confinement or shorten its duration.' Otherwise, he may bring his claim through a variety of causes of action." Davis v. U.S. Sent'g Comm'n, 716 F.3d 660, 666 (D.C. Cir. 2013) (quoting Wilkinson, 544 U.S. at 82).

Because the Government disregards that key distinction between challenging one's confinement and one's removal, none of the cases it cites is persuasive. Defendants point to several opinions in which our Circuit set out the principle that plaintiffs cannot mask habeas claims as actions for declaratory judgment in an effort "to give jurisdiction to a district other than that in which the applicant is confined or restrained." Kaminer v. Clark, 177 F.2d 51, 52 (D.C. Cir. 1949); see Mot. to Vacate at 10 (citing Clark v. Memolo, 174 F.2d 978, 981 (D.C. Cir. 1949), and Monk v. Sec'y of Navy, 793 F.2d 364, 366 (D.C. Cir. 1986)). That principle, however, carries little weight when — as here — the plaintiff does not actually seek to challenge his

"detention," Kaminer, 177 F.2d at 52, or "the validity of his confinement." Clark, 174 F.2d at 982.

For similar reasons, LoBue v. Christopher, 82 F.3d 1081 (D.C. Cir. 1996), is inapposite. In that case, the plaintiffs sought to challenge the constitutionality of an extradition statute under which they had been detained. Id. at 1081–82. The court rejected their attempt to distinguish their action from a habeas action, explaining that the relief in both suits would be the same: "a release from custody." Id. at 1083. Here, however, Plaintiffs do not endeavor to "manipulate the preclusive effect of habeas jurisdiction." Id. Unlike the LoBue challengers, they seek different relief in this suit — i.e., relief from removal — from what they would in a habeas action objecting to their confinement. The LoBue court, moreover, expressly distinguished its extradition holding from precedent permitting "an alien subject to a deportation order to seek relief by way of a declaratory judgment action." Id. (emphasis added). And it did so on the ground that, unlike in the deportation context, "extension of the APA to extradition orders is impossible." Id. If anything, then, the cases cited by the Government confirm the Court's conclusion that this challenge — unlike previous suits — does not pose jurisdictional issues.

Because Plaintiffs do not seek release from confinement — and such release would not be the inevitable result if they succeed on the merits of their claims — they are not limited to habeas relief. Instead, they may challenge the Government's application of the Proclamation to them as arbitrary and capricious and contrary to law under the APA. See Compl., ¶¶ 79, 83, 86, 90, 92–95. There is accordingly no need to address the independent availability of their other claims for relief, such as their ultra vires claims against the facial validity of the Proclamation, see id., ¶¶ 70–73, 96–99 — although there is reason to believe that such claims can be brought. See Chamber of Com. of U.S. v. Reich, 74 F.3d 1322, 1328 (D.C. Cir. 1996).

B.    Likelihood of Success on Merits

Plaintiffs raise three principal legal challenges.  First, they argue that any action taken

pursuant to the Proclamation is unlawful because the Proclamation itself lacks a legal basis.  That

is so, they contend, because the actions of Tren de Aragua constitute neither an "invasion" nor a

"predatory incursion," and the group, moreover, is not a "foreign nation or government."

Second, Plaintiffs protest that even if the Act has been lawfully invoked here, they fall outside

the scope of the Proclamation because they are not members of Tren de Aragua, and they must be

given an opportunity to contest the Government's assertion that they are.  Third, Plaintiffs assert

that even if they are removable under the Act, they cannot be deported to a place like El Salvador

where torture likely awaits.  While the Court takes up these questions in order, at this stage, the

second position is Plaintiffs' strongest.

1.    *Lawfulness of Proclamation*

Plaintiffs understandably focus their initial fire on the applicability of the Act itself.  The

Proclamation cannot invoke the Act, they argue, because Tren de Aragua is not the British in the

War of 1812 nor the German state in the two World Wars; it is not a "nation or government" and

has not committed an "invasion" or a "predatory incursion."  See TRO Br. at 9–12; Opp. at 24–

31.  Although it contends otherwise, the Government more fundamentally asserts that the Court

has no business intruding into these nonjusticiable political questions.  See Mot. to Vacate at 11–

13.  Given the broad powers the Executive possesses in national security and foreign affairs, this

issue is a close call, and one the Court need not resolve today.

The political-question doctrine "arises from the constitutional principle of separation of

powers."  Al-Tamimi v. Adelson, 916 F.3d 1, 8 (D.C. Cir. 2019).  It "excludes from judicial

review those controversies which revolve around policy choices and value determinations

constitutionally committed for resolution to the halls of Congress or the confines of the

Executive Branch." Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 (1986). Put

differently, it prevents courts from resolving "matters not legal in nature," id. (quotation marks

omitted), or deciding an issue that "turn[s] on standards that defy judicial application." Baker v.

Carr, 369 U.S. 186, 211 (1962).

Simply because a legal claim implicates foreign affairs or national security, however,

does not mean that the political-question doctrine places it "beyond judicial cognizance." Id.;

see Al-Tamimi, 916 F.3d at 10–11; El-Shifa Pharm. Indus. Co. v. United States, 607 F.3d 836,

841–43 (D.C. Cir. 2010). Indeed, the Supreme Court has cautioned that a court should not

unnecessarily flinch from a justiciable controversy that it has "a responsibility to decide" simply

because the claim arises in the foreign-affairs context. Zivotofsky ex rel. Zivotofsky v. Clinton

(Zivotofsky I), 566 U.S. 189, 194–201 (2012). To the degree that a claim requires the court to

interpret a statutory provision or decide a law's constitutionality, the political-question doctrine is

not implicated: deciding such questions "is a familiar judicial exercise." Id. at 196. But insofar

as the claim would ultimately require the court to "supplant a foreign policy decision of [a]

political branch[] with [its] own unmoored determination of what" the "policy . . . should be,"

id., or to "reconsider[] the wisdom of discretionary decisions made by the political branches in

the realm of foreign policy or national security," El-Shifa, 607 F.3d at 842, the claim is not

justiciable. Id. In such cases, the political-question doctrine typically comes into play either

because there is "a textually demonstrable constitutional commitment of the issue to a coordinate

political department" or because there are no "judicially discoverable and manageable standards

for resolving it." Baker, 369 U.S. at 217. Both of those reasons, the Government contends,

preclude review of Plaintiffs' challenge to the Proclamation's underlying legality.  See Mot. to Vacate at 12–13.

On this issue, the Court is not drawing on a blank slate.  The Supreme Court's decision in Ludecke provides the crucial jumping-off point for determining which, if any, predicates to the Alien Enemy Act's use are justiciable.  That case arose because the United States sought to remove a German national under the Act in 1946 — that is, after the "shooting war" with Germany had ended but before the political branches had formally declared peace with the Nazis' successors.  See Ludecke, 335 U.S. at 162–63, 166.  The German national objected that the President's statutory authority dissolved upon the end of actual hostilities.  Id. at 166–67.  The Court disagreed, holding that the Act's grant of authority remained available to the President until war with Germany was terminated by "treaty," "legislation," or "Presidential proclamation."  Id. at 168.  And the Court found no evidence of any such "political act."  Id. at 169–70.  In fact, it pointed to a recent presidential proclamation indicating that the Executive Branch thought that the war remained ongoing.  See id. at 170.

The Ludecke Court, however, did not say that deciding whether a war had ended was a political question that the judiciary was unempowered to resolve.  Instead, it interpreted "declared war," defined its termination based on that construction, and decided as a factual matter whether such termination had occurred.  See also United States ex rel. Jaegeler v. Carusi, 342 U.S. 347, 348 (1952) (holding that "joint resolution of Congress . . . terminated the state of war" with Germany and thereby extinguished Executive's "statutory power" to remove aliens under Act).  None of those issues presented a political question.  Instead, the Court disclaimed a judicial role only in considering whether there even was a German government "capable of negotiating a treaty of peace" and whether removals of enemy aliens was worthwhile "when the

guns are silent but the peace of Peace has not come." Ludecke, 335 U.S. at 170. Those were "matters of political judgment for which judges have neither technical competence nor official responsibility." Id.

In light of Ludecke and the political-question doctrine's principles thus far explained, this Court is confident that it can — and therefore must, at the appropriate time — construe the terms "nation," "government," "invasion," and "predatory incursion." Cf. Loper Bright Enters. v. Raimondo, 603 U.S. 369, 412 (2024). While doing so may be no light undertaking, it is a judicial one. A harder question is whether, based on those definitions, this or any court would be empowered to decide if the characteristics of Tren de Aragua qualify it as a "nation" or "government," or if its conduct constitutes a "perpetrated, attempted, or threatened" "invasion" or "predatory incursion." 50 U.S.C. § 21. There may be judicially discoverable and manageable criteria that would allow a court to do so. In such a scenario, the Executive's view would not be dispositive, but it would be important: its "evaluation of the facts" and "informed judgment" would be afforded significant "respect." See Holder v. Humanitarian L. Project, 561 U.S. 1, 33–34 (2010).

Such a framework is not inconceivable or even unprecedented. The plurality opinion in Hamdi v. Rumsfeld, 542 U.S. 507 (2004), suggests that in order to determine whether a Congressional grant of authority is available to the Executive Branch, courts can assess the record to decide whether something as dynamic and murky as "active combat" is then occurring. See id. at 521; but see id. at 588 (Thomas, J., dissenting) (objecting that courts are "bound by the political branches' determination that the United States is at war" and citing Ludecke as support). The plurality concluded as much even though (or perhaps because) the conflict that served as the predicate for the Executive's detention authority was "unconventional [in] nature" and rested on

"malleable" national-security "underpinnings." See id. at 520 (plurality opinion) (quotation marks omitted) (noting War on Terror "unlikely to end with a formal cease-fire" and Executive Branch might "not consider [the] war won for two generations") (quotation marks omitted). Nor, in the plurality's view, was deciding whether "active hostilities" persisted constitutionally committed to the Executive in that context. Id. at 520–21; but see id. at 516–17 (not reaching whether Article II alone provides Executive detention authority at issue). In other contexts, moreover, courts regularly decide whether certain conduct qualifies as militaristic or warlike. See, e.g., Kaplan v. C. Bank of the Islamic Republic of Iran, 896 F.3d 501, 512, 514 (D.C. Cir. 2018); Pan Am. World Airways, Inc. v. Aetna Casualty & Surety Co., 505 F.2d 989, 1012–13, 1015–17 (2d Cir. 1974).

In any event, these complicated issues bearing on fundamental questions of Judicial, Congressional, and Executive power need not be settled at this early posture. As the Court will next explain, Plaintiffs have established a likelihood of succeeding on a more discrete claim that justifies retaining the TROs even assuming *arguendo* that the Proclamation has a legal basis.

### 2. *Application of Proclamation to Plaintiff Class*

The thorny issues of justiciability just described do not attend the entirely separate determination that an individual detained or removed under the Proclamation is, in fact, an "alien enemy," 50 U.S.C. § 21, as defined by the President's Proclamation — *i.e.*, a Venezuelan citizen 14 years of age or older who is a member of Tren de Aragua and not a naturalized or lawful permanent resident of the United States. See 90 Fed. Reg. at 13034, § 1. As the Government essentially concedes, see Mot. to Vacate at 8; Mar. 21 Hearing Tr. at 13–15, an unbroken line of precedent establishes that federal courts may review under habeas the factual basis for an "alien enemy" determination when it is challenged. Here, even assuming that the Proclamation itself is

23

lawful, all five named Plaintiffs challenge their designation as members of Tren de Aragua.  See Opp. at 7.  The Court holds that they may do so under the APA, and that they may not be removed from the United States until those challenges have been adjudicated.  It further holds that all class members must be given the opportunity to challenge their classifications as alien enemies, if they wish to do so, before they may be lawfully removed from the United States pursuant to the Proclamation.

In concluding as much, the Court breaks no new ground.  First, it is a familiar exercise for courts to review under the APA whether a person falls within the scope of an executive order without addressing the underlying lawfulness of the order, including in the context of foreign affairs and national security.  See, e.g., Holy Land Found. for Relief & Dev. v. Ashcroft, 333 F.3d 156, 159, 162 (D.C. Cir. 2003) (describing review of Treasury Department designations under the International Emergency Economic Powers Act).  Such a circumscribed contest addresses Executive Branch officials' factual determination that a plaintiff falls within the parameters of the executive order; it does not in any way question the President's authority to issue the order in the first instance.

Second, review of alien-enemy status has long been routine under the Alien Enemies Act.  Indeed, Ludecke expressed no reticence over the role of courts in adjudicating "whether the person restrained is in fact an alien enemy fourteen years of age or older."  335 U.S. at 171 n.17.  Indeed, the Court readily admitted that such determinations "may . . . be reviewed."  Id.  In Clark, our Circuit likewise acknowledged that "whether the individual involved is or is not an alien enemy . . . [is] open to judicial determination."  155 F.2d at 294.  To be sure, neither case squarely presented that question, see Ludecke, 335 U.S. at 171 n.17; Clark, 155 F.2d at 294, making those pronouncements dicta.  See In re Grand Jury Investigation, 916 F.3d 1047, 1053

(D.C. Cir. 2019).  But that is of little help to Defendants.  *Dicta* from the Supreme Court

"generally must be treated as authoritative," United States v. Oakar, 111 F.3d 146, 153 (D.C. Cir.

1997) (quotation marks omitted), and the Government has not contested that courts may review

Plaintiffs' challenges to their factual designations as members of Tren de Aragua.  See Mot. to

Vacate at 8.

The Court in Ludecke, moreover, was drawing on a rich tradition of such review in the

lower courts.  Faced with repeated claims from detained individuals challenging their

designation as alien enemies, courts time and again examined the factual basis for the

designation and, where necessary, ordered release if the facts did not show that the detainee was

an alien enemy.  That body of caselaw serves as exceedingly persuasive authority for exercising

such review power here.

Take, for example, *Ex parte* Gilroy, 257 F. 110 (S.D.N.Y. 1919) — a case on which

Defendants themselves rely.  See Mot. to Vacate at 7.  There, a certain Walter Alexander filed a

petition for a writ of habeas corpus to contest the determination that he was detainable as a

"German alien enemy."  See Gilroy, 257 F. at 110–11.  The Government argued that the court

was without jurisdiction to review its factual finding because, "even though it can be shown

beyond question that an error has been made, . . . the decision of the executive is final."  Id. at

112.  The court, in one of the earliest discussions of this issue on record, rejected that assertion.

While acknowledging that it was "[v]ital" in "time of war not to hamper acts of the executive in

the defense of the nation and in the prosecution of the war," the court thought it "of equal and

perhaps greater importance" to "preserv[e] . . . constitutional rights."  Id. at 114.  It thus held a

hearing on Alexander's challenge at which "each side was permitted to adduce testimony with a

good deal of liberality," id., and it proceeded to undertake an involved examination of the facts

— evaluating the credibility of witnesses, the reliability of evidence, and the probative value of the testimony offered. See id. at 114–24. At the end of this thorough inquiry, the court overturned the Government's factual finding, declaring that Alexander was in fact a U.S. citizen. Id. at 128.

Subsequent cases during the Second World War largely followed that approach. In Zdunic, the court addressed whether a detainee fell "within the class of aliens whose restraint is authorized under the statute and presidential proclamation pursuant to which he is held in custody." 137 F.2d at 860. As it noted, the "ultimate issue" presented was whether he was a "'native, citizen, denizen, or subject' of Germany." Id. (quoting 50 U.S.C. § 21). "The meaning of those words as used in the statute," the court held, was a "question of law." Id. Likewise, whether the individual detained fell within "the statutory definition of alien enemies" correspondingly involved "questions of fact" as to which he was also "entitled to a judicial inquiry." Id. at 860–61. Because the lower court had held that there was "no substantial issue of fact" to warrant a hearing or to release the detainee, the appellate tribunal reversed. Id. at 860. United States ex rel. Schwarzkopf v. Uhl, 137 F.2d 898 (2d Cir. 1943), affirmed an essentially identical approach. The court there held that a detainee who "allege[d] that he [was] neither a citizen nor subject of Germany" and who raised "issues of fact" was "entitled to . . . a hearing of testimony before the court." Id. at 900. It noted that the "only ground" that could justify detention under the Act was one's alien-enemy status — and not because one was "dangerous to public safety" or even simply an "alien." Id. at 903. Because, on "conceded facts," the detainee was "not a German citizen," he was ordered "discharged from custody." Id.

The Court could go on. Other cases just within the Second Circuit sing from the same songbook. See, e.g., D'Esquiva, 137 F.2d at 904, 907 (reversing denial of writ to Austrian Jew

who contested that he was "native" of Germany simply because it had annexed Austria); Bauer, 171 F.2d at 494 (holding "record as it now stands" did not show conclusively that detainee was German native or citizen).  Courts throughout the country — from Georgia, see Banning v. Penrose, 255 F. 159, 160 (N.D. Ga. 1919), to Illinois, see United States ex rel. Hack v. Clark, 159 F.2d 552, 554 (7th Cir. 1947); Minotto v. Bradley, 252 F. 600, 602 (N.D. Ill. 1918), to Mississippi, see Ex parte Franklin, 253 F. 984, 984 (N.D. Miss. 1918) — charted the same course.  To be sure, the fact that a detained person might in fact be a U.S. citizen was front and center for some courts.  See, e.g., Banning, 255 F. at 160; Gilroy, 257 F. at 119–24.  But others applied equally rigorous review when detainees claimed only that they were not citizens or natives of an enemy nation.  See, e.g., Zdunic, 137 F.2d at 859–60 (Yugoslavia); D'Esquiva, 137 F.2d at 903 (Austria); see also Schwarzkopf, 137 F.2d at 903 ("aliens owing allegiance to some friendly nation" outside purview of Act).  These cases establish conclusively that courts can determine an individual's alien-enemy status — and are obligated to do so when asked.

The Government's only answer to this substantial body of caselaw is to rest on its assertion that such judicial inquiry can take place only in a habeas court.  See Mot. to Vacate at 8–11.  As previously explained, that is incorrect.  See supra Section III.A.  For reasons both historical and circumstantial, habeas was indeed the traditional route to test the legality of the Act's application to alleged alien enemies.  Where, as here, individuals do not seek release from confinement, a cause of action under the APA is appropriate (and indeed, may be the only way) to determine whether Executive Branch officials have operated in accordance with law.  The availability of judicial review — under either habeas or the APA — to evaluate whether an alien falls within the terms of the Act is therefore well established.

It is admittedly less clear, however, where lie the precise contours of that review.  When presented with such questions, habeas courts have appeared to sanction a searching inquiry, including convening hearings in which evidence could be introduced and testimony heard.  See, e.g., Gilroy, 257 F. at 114–24; Schwarzkopf, 137 F.2d at 900; Zdunic, 137 F.2d at 860; Bauer, 171 F.2d at 493–94.  But they have split on whether the Government would bear the burden of proof in such proceedings.  Compare, e.g., Gilroy, 257 F. at 114 (burden is plaintiff's), and Ex parte Risse, 257 F. 102, 103 (S.D.N.Y. 1919) (same), with Bauer, 171 F.2d at 493 (burden is Government's).  Plaintiffs' decision to bring their claims under the APA rather than habeas also raises the question of whether the standard of review is the same under each avenue of relief.  The APA, for instance, subjects agency factfinding to the lenient "substantial evidence" standard of review, but only where a court evaluates the "record of an agency hearing."  5 U.S.C. § 706(2)(E); see Reiner v. United States, 686 F.2d 1017, 1022 n.4 (D.C. Cir. 1982) ("The substantial evidence test applies to agency adjudication only after a trial-type hearing required by statute to be on the record.").  To date, there is no indication that the Government has provided, or intends to provide, hearings to determine whether those subject to the Proclamation are indeed members of Tren de Aragua.  See Mar. 21 Hearing Tr. at 51.  That leaves the Court nothing to evaluate except the affidavits that have been filed.  See, e.g., Cerna First Decl.

Even were agency adjudication to be provided, hard questions would nonetheless remain concerning what deference, if any, the agency's factual determinations should receive from the reviewing court — especially when those determinations themselves would decide the lawful scope of the agency's authority and may implicate constitutional rights.  See Crowell v. Benson, 285 U.S. 22, 58–61 (1932); N. Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 82 n.34 (1982) (plurality opinion).  The answer to such questions may depend on the nature of the

challenge articulated (*e.g.*, whether the alien asserts that he is an American citizen, a lawful permanent resident, or not a member of Tren de Aragua), as well as the character of the administrative procedures in place.  Cf. Hamdi, 542 U.S. at 533 (plurality opinion) ("[A] citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker."); Boumediene v. Bush, 553 U.S. 723, 771, 781 (2008) (holding that aliens designated enemy combatants and detained by United States may challenge their designation, but "the necessary scope of habeas review in part depends upon the rigor of any earlier proceedings"); Al-Adahi v. Obama, 613 F.3d 1102, 1103–05 (D.C. Cir. 2010) (discussing whether preponderance-of-evidence standard is necessary in reviewing factual determinations made by Executive tribunals adjudicating whether detainees were members of Taliban).

       The Court need not resolve such quandaries today, even though they loom on the horizon. Indeed, when asked at argument on the Motion to delineate what procedures would be appropriate, neither side offered a clear protocol.  See Mar. 21 Hearing Tr. at 19–22, 35–38.  At this juncture, however, that does not hamstring Plaintiffs' effort to obtain a TRO.  The named Plaintiffs, on behalf of themselves and their class, contest their designations as members of Tren de Aragua and argue that they must be given an opportunity to challenge Defendants' position that they fall within the Proclamation.  See Opp. at 7–8, 13.  Because the caselaw is clear that such questions are reviewable, and because those outside the bounds of the Proclamation's definition of "alien enemies" are not removable under the Act, Plaintiffs are likely to succeed on the merits of their claim.

The Alien Enemies Act itself, moreover, arguably envisions that those caught up in its web must be given the opportunity to seek such review. That is because the Act places limits on when the President may "provide for the removal of" alien enemies: he may do so only when those so identified "refuse or neglect to depart" from the United States. See 50 U.S.C. § 21. Notably, no such qualification is placed on the President's authority to detain alien enemies. See id. (authorizing the President to "direct . . . the manner and degree of the restraint to which [alien enemies] shall be subject and in what cases"). By its plain terms, then, the Act withholds from the President or his officers the authority to remove an alien enemy until that person has been given time to decide whether to depart on his own. See United States ex rel. Von Heymann v. Watkins, 159 F.2d 650, 653 (2d Cir. 1947) (directing district court to release detainee unless government showed, "within a reasonable time to be fixed by that court, that the [detainee] has refused or neglected to leave the country, after having been given a reasonable time so to do unhampered by his present restraint"). It follows that summary deportation following close on the heels of the Government's informing an alien that he is subject to the Proclamation — without giving him the opportunity to consider whether to voluntarily self-deport or challenge the basis for the order — is unlawful.

Members of the Plaintiff class therefore must be given the opportunity, if they so choose, to contest that they are "Venezuelan citizens 14 years of age or older who are members of [Tren de Aragua], are within the United States, and are not actually naturalized or lawful permanent residents of the United States." 90 Fed. Reg. at 13034, § 1. The form that challenge must take, and the standards used in adjudicating it, must await answers at a future date. In the meantime, the Plaintiff class may not be removed under the Proclamation.

3.  *Separate Statutory Restrictions on Removal*

There may well also be independent restrictions on the Government's ability to deport class members — at least to Salvadoran prisons — even if they do fall within the Proclamation's terms.  Plaintiffs additionally contend that Defendants violated the Foreign Affairs Reform and Restructuring Act (FARRA) in removing them without regard to legally binding humanitarian protections.  See Compl., ¶¶ 88–91; 8 U.S.C. § 1231 notes.  The Government counters that this contrary-to-law claim cannot be reviewed, and, even if it could, it is unmeritorious because "alien enemies are not entitled to seek any relief or protection."  Mot. to Vacate at 19–20 (citing Clark, 155 F.2d at 294); id. at 1.  Plaintiffs disagree, retorting that "humanitarian protections . . . remain available regardless of a noncitizen's status or circumstances."  Opp. at 34.  To prevail, Plaintiffs must show first that the Court has jurisdiction to hear their claim, and second that they are eligible for — and have been denied the opportunity to apply for — those protections.

FARRA, which codifies the United Nations Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (CAT), states: "It shall be the policy of the United States not to expel . . . any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture."  8 U.S.C. § 1231 notes; see also 8 C.F.R. §§ 208.16 to 208.18 (FARRA procedure).  While FARRA contains a limiting clause that it shall not provide "any court jurisdiction to consider . . . claims raised under the Convention . . . except as part of the review of a final order of removal pursuant to [the INA]," 8 U.S.C. § 1231 notes, that jurisdiction-stripping mandate pertains only to the review of the substance of CAT claims.  Here, Plaintiffs do not contest any potential outcome of their CAT claims; rather, they assert that the Administration violated the APA by denying them any

opportunity to <u>raise</u> CAT claims before their deportation.  <u>See</u> Compl., ¶ 90.  Because Plaintiffs'

cause of action is rooted in the APA rather than CAT, the Court has jurisdiction over this issue.

On the merits, Plaintiffs must first show that CAT protections apply to their deportations

under the Proclamation.  In <u>Huisha-Huisha v. Mayorkas</u>, 27 F.4th 718 (D.C. Cir. 2022), our

Circuit addressed a strikingly similar claim.  To be sure, the Court of Appeals cautioned that

because it was reviewing a preliminary injunction, its treatment of the issue was not binding

precedent.  <u>See id.</u> at 733.  This Court, however, finds its reasoning persuasive.

The <u>Huisha-Huisha</u> panel concluded that while the Executive could deport migrants

pursuant to a public-health authority, <u>see</u> 42 U.S.C. § 265, it was likely required to provide them

FARRA protections before doing so, meaning that it could not remove them to any "place[]

where they [would] be persecuted or tortured."  27 F.4th at 722.  The Circuit observed that while

§ 265 authorized the Executive to expel aliens, the law was silent about "<u>where</u> to expel" them.

<u>Id.</u> at 721; <u>see id.</u> at 732.  While FARRA, conversely, does not speak to "<u>whether</u> the Executive

can expel aliens," it plainly puts a "limit" on "<u>where</u> aliens can be expelled [to]."  <u>Id.</u> at 731–32.

Because the statutes governed distinct issues and did not conflict, the court reasoned, it likely

could "give effect to both."  <u>Id.</u> at 732 (citing <u>Epic Sys. Corp. v. Lewis</u>, 584 U.S. 497, 510 (2018)

("When confronted with two Acts of Congress allegedly touching on the same topic," a court

"must . . . strive to give effect to both.") (cleaned up)).

This case is on all fours.  Here, even assuming *arguendo* that the Alien Enemies Act

provides the President with the power to remove Plaintiffs, it says nothing about the limits on

countries to which they can or should be removed.  As the <u>Huisha-Huisha</u> court observed,

FARRA does: it dictates the process that must occur before individuals may be removed to

places where they fear torture.  <u>See</u> Mot. to Vacate at 18 ("[T]here is no conflict between the

AEA and the INA."). Since both statutes can be given meaning, the Court must do so, and FARRA protections are likely available to those removed under the Act.

Plaintiffs claim that they never received the opportunity to request protection under CAT from being deported to El Salvador. Instead, they aver that when the Government loaded them on to planes on the morning of March 15, they were not only prevented from claiming CAT protection, but also not informed where they were being taken. See Shealy Decl., ¶ 10 ("On the plane, . . . detainees asked the officers where they were being taken. The officers would only say that they didn't know and then laughed."); Carney Decl., ¶ 12. Without such information, even if they had been given an opportunity to raise a torture claim, they would not have been able to meaningfully do so. As discussed in Section III.C, *infra*, the evidence at this point shows a likelihood of potential torture should Plaintiffs be removed to El Salvador and incarcerated there. To the extent that Defendants seek to remove Plaintiffs to that destination, CAT could stand as an independent obstacle.

C.  Irreparable Harm

Convinced that Plaintiffs are likely to succeed, the Court now turns to the other factors governing preliminary relief. Irreparable harm is undoubtedly "a high standard." Chaplaincy of Full Gospel Churches, 454 F.3d at 297. The harm "must be both certain and great," "actual and not theoretical," and "of such imminence that there is a clear and present need for equitable relief." Id. (cleaned up). It must also be "beyond remediation," meaning that "the possibility [of] adequate compensatory or other corrective relief . . . at a later date . . . weighs heavily against a claim of irreparable harm." Id. at 297–98 (quoting Wis. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985)).

Plaintiffs readily meet these criteria, even though the Court acknowledges that removal alone does not necessarily do the trick.  See Nken v. Holder, 556 U.S. 418, 435 (2009).  In Salvadoran prisons, deportees are reportedly "highly likely to face immediate and intentional life-threatening harm at the hands of state actors."  ECF No. 44-4 (Sarah Bishop Decl.), ¶ 63.  The country's government has boasted that inmates in CECOT "never leave"; indeed, one expert declarant alleges that she does not know of any CECOT inmate who has been released.  See ECF No. 44-3 (Juanita Goebertus Decl.), ¶ 3; see also Bishop Decl., ¶ 23 ("[W]e will throw them in prison and they will never get out.") (quoting Nayib Bukele (@nayibbukele), X (May 16, 2023, 7:02 p.m.), https://x.com/nayibbukele/status/1658608915683201030?s=20).  Once inmates enter the prisons, moreover, their families are often left in the dark.  See Bishop Decl., ¶ 25 ("In a sample of 131 cases, [it was] found that 115 family members of detainees have not received any information about the whereabouts or wellbeing of their detained family members since the day of their capture.").

Plaintiffs offer declarations that inmates are rarely allowed to leave their cells, have no regular access to drinking water or adequate food, sleep standing up because of overcrowding, and are held in cells where they do not see sunlight for days.  See Goebertus Decl., ¶¶ 3, 11; Bishop Decl., ¶ 31.  At CECOT specifically, one declarant states that "if the prison were to reach full supposed capacity . . . , each prisoner would have less than two feet of space in shared cells . . . [which] is less than half the space required for transporting midsized cattle under EU law."  Bishop Decl., ¶ 30.  Given poor sanitary conditions, Goebertus points out, "tuberculosis, fungal infections, scabies, severe malnutrition[,] and chronic digestive issues [a]re common." Goebertus Decl., ¶ 12.

Beyond poor living conditions, Salvadoran inmates are, according to evidence presented, often disciplined through beatings and humiliation. One inmate claimed that "police beat prison newcomers with batons . . . . [W]hen he denied being a gang member, they sent him to a dark basement cell with 320 detainees, where prison guards and other detainees beat him every day. On one occasion, one guard beat him so severely that [he] broke a rib." Id., ¶ 8. Three prior deportees from the United States reported being kicked in the face, neck, abdomen, and testicles, with one requiring "an operation for a ruptured pancreas and spleen." Id., ¶ 17. One inmate reported being forced to "kneel on the ground naked looking downwards for four hours in front of the prison's gate." Id., ¶ 10. That same prisoner also said that he was made to sit in a barrel of ice water as guards questioned him and then forced his head under water so he could not breathe. Id.

One scholar avers that, since March 2022, an estimated 375 detainees have died in Salvadoran prisons. See Bishop Decl., ¶¶ 15, 43. Although the Salvadoran government maintains that all deaths have been natural, others respond that 75% of them "were violent, probably violent, or with suspicions of criminality on account of a common pattern of hematomas caused by beatings, sharp object wounds, and signs of strangulation on the cadavers examined." Id., ¶¶ 44–45. When an inmate is killed, there are also reports that guards "bring the body back into the cells and leave it there until the body start[s] stinking." Id., ¶ 39. Needless to say, the risk of torture, beatings, and even death clearly and unequivocally supports a finding of irreparable harm. See, e.g., United States v. Iowa, 126 F.4th 1334, 1352 (8th Cir. 2025) (torture); Leiva-Perez v. Holder, 640 F.3d 962, 970 (9th Cir. 2011) (physical abuse).

D.  Balance of Equities and Public Interest

The last factors, which the Court considers together where the Government is a party, examine "the balance of equities" and "the public interest."  Sherley, 644 F.3d at 392 (quoting Winter, 555 U.S. at 20); see also Nken, 566 U.S. at 435.

While the Government surely suffers harm whenever its removal orders are stymied, here such harms do not outweigh Plaintiffs' need for preliminary relief.  The Government, recall, is required only to abstain from removing the Plaintiff class from the United States solely on the basis of the Proclamation; in other words, removal under other statutes is permitted.  Defendants point to no concrete problems that could attend that narrow restriction, instead alluding to vague foreign-policy and national-security concerns.  See Mot. to Vacate at 23–24.  That is insufficient. As examples of potential harm, Defendants cite only the importance of "prevent[ing] the entry of illegal aliens" and the potential "danger[]" of the individuals involved.  See id. at 23 (quotation marks omitted).  Neither is at issue here: the TROs impose no restriction on the Government's apprehending alleged members of Tren de Aragua under the contested authority of the Proclamation, not does it require that any individual — dangerous or otherwise — be released from custody.  To be sure, there is generally "a public interest in prompt execution of removal orders," but that interest is diminished when, among other things, the public is not in particular danger.  See Nken, 556 U.S. at 436.  The noncitizens comprising the class are already in United States custody, and any actual Tren de Aragua member is already subject to deportation as a member of an FTO, so there is little additional harm to the public by temporarily preventing their removal.

By contrast, Plaintiffs — as just explained — have shown that they have a high likelihood of suffering significant harm if the Proclamation is allowed to apply to them.  There

is, moreover, a strong public interest in preventing the mistaken deportation of people based on categories they have no right to challenge.  See id. ("Of course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.").  The public also has a significant stake in the Government's compliance with the law.  See, e.g., League of Women Voters v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action.  To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations.") (quotation marks and citations omitted).

        As the Government's asserted harms do not outweigh those Plaintiffs face, the Court finds that the balance of equities tips in Plaintiffs' favor, and that preliminary relief is in the public interest.

## IV.    Conclusion

        For the foregoing reasons, the Court will deny Defendants' Motion to Vacate the TRO. A separate Order so stating will issue this day.


                                        /s/ James E. Boasberg
                                        JAMES E. BOASBERG
                                        Chief Judge

Date:  March 24, 2025