# United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

**No. 25-5067** **September Term, 2024**

**1:25-cv-00766-JEB**

**Filed On:** March 26, 2025

J.G.G., et al.,

Appellees

v.

Donald J. Trump, in his official capacity as President of the United States, et al.,

Appellants

------------------------------

Consolidated with 25-5068

**BEFORE:** Henderson, Millett, and Walker*, Circuit Judges

**O R D E R**

Upon consideration of the emergency motions for stay, the opposition thereto, the reply, and the Rule 28(j) letters; the amicus brief filed by South Carolina, Virginia, and other states; the motion to participate as amicus curiae filed by Rep. Brandon Gill and the lodged amicus brief; and the motion for leave to participate as amicus curiae filed by State Democracy Defenders Fund and former government officials and the lodged amicus brief, it is

**ORDERED** that the motions to participate as amicus curiae be granted. The Clerk is directed to file the lodged amicus briefs. It is

**FURTHER ORDERED** that the emergency motions for stay be denied. Separate concurring statements of Judge Henderson and Judge Millett and a dissenting statement of Judge Walker are attached.

**Per Curiam**

**FOR THE COURT:**
Clifton B. Cislak, Clerk

BY: /s/
Daniel J. Reidy
Deputy Clerk

* Judge Walker dissents from the denial of the emergency motions for stay.

KAREN LECRAFT HENDERSON, *Circuit Judge*, concurring statement:

## I.  BACKGROUND

### A.  Statutory Background

In 1798, our fledgling Republic was consumed with fear. Fear of external war with France. Fear of internal strife from her sympathizers. And, for the incumbent Federalist party, fear of its chief political rival: the Jeffersonian Republicans. In the summer of 1798, the Federalists decided to kill two birds with one stone. In a series of laws known as the Alien and Sedition Acts, the Federalists granted the administration of President John Adams sweeping authority to expel immigrants, gag the free press and rid themselves of two key pillars of Republican support—immigrant voters and partisan newspapers. At the same time, these laws would purge the country of reviled Jacobin sympathizers.

Under the first of these laws, the Alien Friends Act, the Congress granted the President sweeping power to detain and expel any alien he deemed "dangerous to the peace and safety of the United States." Act of June 25, 1798, ch. 58., 1 Stat. 570. Under the Sedition Act, the Congress made it a crime to "write, print, utter or publish . . . any false, scandalous and malicious writing or writings against" the government, the Congress or the President, "with intent to defame . . . or to bring them . . . into contempt or disrepute, or to excite against them . . . the hatred of the [] people." Act of July 14, 1798, ch. 74, 1 Stat. 596. Both laws were enacted by narrow margins, widely derided as unconstitutional and allowed to lapse once the Federalists were swept from power in the elections of 1800. A third law, the Alien Enemies Act, offered a wartime counterpart to the Alien Friends Act. That law granted the President the power to detain and expel enemy aliens during times of war, invasion or predatory incursion. *See* Act of July

6, 1798, ch. 66, 1 Stat. 577. Unlike its counterparts, the Alien Enemies Act was never questioned by Jefferson or Madison—the de facto leaders of the Republicans—"nor did either ever suggest its repeal." *Ludecke v. Watkins*, 335 U.S. 160, 171 n.18 (1948). On the contrary, the then-Republican minority in the Congress supported its enactment. Perhaps unsurprisingly, it is the only component of the Alien and Sedition Acts that remains law today.

The Alien Enemies Act (AEA) contains two provisions: a conditional clause and an operative clause. The conditional clause limits the AEA's substantive authority to conflicts between the United States and a foreign power. Specifically, there must be (i) "a declared war between the United States and any foreign nation or government, or" (ii) an "invasion or predatory incursion [] perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government," and (iii) a presidential "public proclamation of the event." 50 U.S.C. § 21. If these conditions are met:

> [A]ll natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies. The President is authorized . . . to direct . . . the manner and degree of the restraint to which they shall be subject . . . and to provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom; and to establish any other regulations which are found

> necessary in the premises and for the public safety.[1]

*Id.* Thus, the AEA vests in the President near-blanket authority to detain and deport any noncitizen whose affiliation traces to the belligerent state. A central limit to this power is the Act's conditional clause—that the United States be at war or under invasion or predatory incursion.

### B. Factual & Procedural Background

On March 15, 2025, President Donald Trump invoked his authority under the AEA to apprehend, detain and remove "all Venezuelan citizens 14 years of age or older who are members of [Tren de Aragua]" and who are not "naturalized or lawful permanent residents of the United States." Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua (Proclamation), 90 Fed. Reg. 13,033 (Mar. 14, 2025). The Proclamation rests on two key findings.

First, that Tren de Aragua (TdA)—a designated Foreign Terrorist Organization—is conducting an invasion or predatory incursion into the United States. As evidence of these hostilities, the Proclamation cites TdA's "irregular warfare within the country," including its "drug trafficking" and "mass illegal migration to the United States." *Id.*

Second, that TdA is "closely aligned with, and indeed has infiltrated" the Venezuelan government, "including its military and law enforcement apparatus." *Id.* As evidence of these connections, the Proclamation notes that TdA "grew significantly" while Venezuela's Vice President was a state

---

[1] The original AEA was limited to males over the age of 14 but was amended during World War I to its current version. *See* Act of Apr. 16, 1918, ch. 55, 40 Stat. 531.

governor. *Id.* The Proclamation also asserts that the President of Venezuela, Nicholas Maduro, sponsors a "narco-terrorism enterprise" called Cártel de los Soles. *Id.* Cártel de los Soles in turn "coordinates with and relies on TdA and other organizations" to traffic illegal drugs into the United States. *Id.*

Learning of the President's Proclamation, five Venezuelans in the United States filed a putative class action to enjoin its enforcement. They also filed an emergency application for a temporary restraining order (TRO), alleging that the plaintiffs and class faced "imminent danger of being removed tonight or early tomorrow morning." Mot. for TRO, *J.G.G. v. Trump*, No. 1:25-cv-766 (D.D.C. Mar. 15, 2025), ECF No. 3. Given the exigencies, the district court entered an immediate and *ex parte* TRO to prevent the Executive Branch from deporting any of the named plaintiffs for 14 days. The court conducted a hearing that evening, during which it provisionally certified a class of plaintiffs consisting of all noncitizens *in U.S. custody* who are subject to the Proclamation. It also entered a second TRO to cover the class for a period of 14 days. The government immediately appealed and sought a stay of the TROs pending its appeal of those orders.

## II. JURISDICTION

In the ordinary course of litigation, a plaintiff obtains relief only if he secures a final judgment and prevails on the merits. Remedies come at the end—not the beginning—of a suit. But the world sometimes moves faster than the wheels of justice can turn. And waiting for a final judgment can do harm that no remedy can repair. For example, an election deadline may moot a challenge before a court can resolve the merits. *E.g.*, *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999 (6th Cir. 2006). Or a detainee

might face imminent expulsion before a court can resolve the lawfulness of his transfer. *E.g.*, *Belbacha v. Bush*, 520 F.3d 452 (D.C. Cir. 2008) (granting a temporary injunction to preserve jurisdiction in a Guantanamo Bay detainee case). In such circumstances, courts need the ability to press pause.

Our legal tradition recognizes this reality with various forms of interim relief. A plaintiff can obtain a preliminary injunction, which (as its name implies) is a preliminary form of relief meant to "preserve the status quo pending the outcome of litigation." *Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969). "The purpose of such interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579–80 (2017) (citation omitted). In other words, a preliminary injunction acts to shield the plaintiff "from irreparable injury" and to "preserve[] the trial court's power to adjudicate the underlying dispute." *Select Milk Prods., Inc. v. Johanns*, 400 F.3d 939, 954 (D.C. Cir. 2005) (Henderson, J., dissenting).

Sometimes even a preliminary injunction will not afford the rapid relief necessary to prevent irreparable injury. A preliminary injunction requires weighty considerations, and those considerations must be memorialized with findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52(a)(2). For that reason, courts may enter an even more provisional form of relief: a temporary restraining order. A TRO is "designed to preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction." 11A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2951 (3d ed. June 2024 update). Given the exigencies that often accompany a TRO, a court may enter the order *ex parte* and without notice to the enjoined party. Fed.

R. Civ. P. 65(b)(1).  But because the procedural safeguards are threadbare, a TRO may last for no longer than 14 days, although with the possibility of extension "for good cause" or with the consent of "the adverse party."  Fed. R. Civ. P. 65(b)(2).

TROs, unlike preliminary injunctions, are not ordinarily appealable.  This has a "practical justification," *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *12 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting)—TROs' limited temporal duration means the juice is often not worth the squeeze—but also a formal one: appellate courts have jurisdiction to review "final decisions of the district courts" only, with certain narrow exceptions.  28 U.S.C. § 1291.  One such exception is for "interlocutory orders . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions."  28 U.S.C. § 1292(a)(1).  That is why a preliminary injunction—although not final—is subject to appellate review.  But no such exception exists for TROs.  *See Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps.*, 473 U.S. 1301, 1303–05 (1985); *Adams v. Vance*, 570 F.2d 950, 953 (D.C. Cir. 1978) ("The grant of a [TRO] . . . is generally not appealable.").

Nevertheless, in certain limited circumstances, courts have treated TROs as appealable orders.  A TRO that threatens truly "irretrievable" harm—that is, harm that cannot be rectified on future appellate review—may be appealed.  *Adams*, 570 F.2d at 953.

The government asserts two theories of jurisdiction.  We need not decide the first because the second tips this case over the jurisdictional line.  The government argues that the TROs risk "scuttling delicate international negotiations" and "may [] forever stymie[]" those negotiations if allowed to remain in

place "even temporarily." Gov't Br. 9; *see also id.* at 12 (warning that "once halted, [deportations] have the significant potential of never resuming"). In an accompanying affidavit, the government alleges that it has negotiated time-sensitive agreements with the governments of El Salvador and Venezuela to accept certain Venezuelan nationals subject to the challenged executive order. *See* Kozak Decl. at 1 ¶ 2. If true, those allegations establish that the government risks irretrievable injury and thus that we may exercise appellate jurisdiction. Granted, the government does not specify why a two-week interlude would dismantle the agreements—it notes only that "foreign interlocutors *might* change their minds," *id.* at 2 ¶ 4 (emphasis added)—but in assessing our jurisdiction, we assume these claims to be true. *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 775 (D.C. Cir. 1984) (per curiam).

One additional factor tips this case over the jurisdictional line. The district court entered two injunctions against all named defendants—including the President of the United States. Equity "has no jurisdiction . . . to enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867). Nor does the Administrative Procedure Act (APA) authorize relief against the President. *See Dalton v. Specter*, 511 U.S. 462, 469 (1994). Although injunctions against executive officials are routine and proper, "injunctive relief against the President himself is extraordinary, and should . . . raise[] judicial eyebrows." *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992). Whatever the merits (or lack thereof) of the government's claims, an injunction against the President is reason enough to exercise jurisdiction.

## III. THE STAY FACTORS

Before granting a stay pending appeal, we consider (1) the applicant's likelihood of success on the merits; (2) whether the applicant faces irreparable injury absent a stay; (3) whether a stay will substantially injure the other parties; and (4) the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

### A. Likelihood of Success

The government raises three arguments for why it is likely to succeed on the merits. First, the district court lacked jurisdiction to hear the case. Second, the political question doctrine bars consideration of the issues raised in this suit. Third, its conduct is lawful under the plain text of the Alien Enemies Act.

#### 1. The District Court's Jurisdiction

The government argues that plaintiffs sued in the wrong venue because their habeas claims could be heard only in the federal district where they are detained. A habeas remedy runs against the immediate custodian of a detainee—"the person who holds [the detainee] in what is alleged to be unlawful custody." *Braden v. 30th Jud. Cir. Ct. of Ky.*, 410 U.S. 484, 494–95 (1973). Ordinarily, the immediate custodian "is the warden of the facility where the prisoner is being held." *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004). A habeas suit against the custodian must be brought in the detainee's "district of confinement," which "[b]y definition" is the same district in which the immediate custodian resides. *Id.* at 444. This is the only district where "jurisdiction lies." *Id.* at 443; *see also id.* at 434 n.7 (noting that jurisdiction has a specific meaning in the habeas statute); *id.* at 451–52 (Kennedy, J., concurring) (explaining the rule is "not jurisdictional in the sense of a limitation on subject-matter jurisdiction" but is instead "a

question of personal jurisdiction or venue"). The five named plaintiffs are currently detained at the El Valle Detention Center, Compl. ¶¶ 9–13, which is in the Southern District of Texas. For habeas relief, then, they must sue the warden of the Valle Detention Center in the U.S. District Court for the Southern District of Texas.[2]

Plaintiffs initially challenged the lawfulness of the Proclamation under the APA and sought various forms of relief, including a writ of habeas corpus. Compl. at 21. But they quickly abandoned their habeas claims and no longer contest their confinement, only their detention. *Cf. Rumsfeld*, 542 U.S. at 439 (explaining that habeas' geographic limits have "no application" when plaintiffs are "not challenging any present physical confinement"); *Citizens Protective League v. Clark*, 155 F.2d 290 (D.C. Cir. 1946) (hearing AEA challenge outside of habeas). The government's second brief omits any discussion of proper venue and instead contains a conclusory assertion that the district court lacked jurisdiction because "these claims sound in habeas." Gov't Br. 1. *But cf. POM Wonderful, LLC v. FTC*, 777 F.3d 478, 499 (D.C. Cir. 2015) (noting that arguments made "in conclusory fashion and without visible support" may be deemed forfeited (quoting *Bd. of Regents of Univ. of Wash. v. EPA*, 86 F.3d 1214, 1221 (D.C. Cir. 1996))). Assuming habeas relief is no longer sought, I turn to plaintiffs' APA claims, which again, I *assume* constitute claims they can assert thereunder.

---

[2] *Padilla* reserved judgment on whether the immediate-custodian rule applies to "an alien detained pending deportation." 542 U.S. at 435 n.8.

### 2. The Political Question Doctrine

#### *a. The Availability of Judicial Review*

The government argues that we may not even assess the lawfulness of its conduct. In its view, whether there is an invasion or predatory incursion—or whether an organization qualifies as a foreign nation or government—is a political question unreviewable by the courts.

Federal courts possess a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976); *accord Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) (Marshall, C.J.). One "limited and narrow exception" to this duty arises when a case presents a purely "political question." *Starr Int'l Co., Inc. v. United States*, 910 F.3d 527, 533 (D.C. Cir. 2018) (citing *United States v. Munoz-Flores*, 495 U.S. 385 (1990)). A case falls within the sparing ambit of the political question doctrine "where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'" *Nixon v. United States*, 506 U.S. 224, 228 (1993) (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)). It is not enough to highlight that "the issues have political implications," *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012) (quoting *INS v. Chadha*, 462 U.S. 919, 943 (1983)), or that the case "lies beyond judicial cognizance" because it "touches foreign relations." *Baker*, 369 U.S. at 211.

At the outset, the government's suggestion that judicial review of the Alien Enemies Act is categorically foreclosed is incorrect. *See* Gov't Br. 14 (allowing that there could be a narrow sliver of questions "potentially" open to review without conceding the point). Nothing in the text of the AEA expressly

or implicitly forecloses the strong "presumption [of] judicial review." *Coll. of Am. Pathologists v. Heckler*, 734 F.2d 859, 862 (D.C. Cir. 1984). That result accords with the understanding of the enacting legislature. In the Fifth Congress, supporters of the AEA insisted "persons [] imprisoned [under the Act] would [] have the power of demanding a trial." 8 Annals of Cong. 1958 (1798). And early practice comports with that understanding. *See McGirt v. Oklahoma*, 591 U.S. 894, 914 (2020) (explaining that early practice can shed light on an ambiguous statute). For example, during the War of 1812, the Pennsylvania Supreme Court entertained a habeas petition from a British resident of Philadelphia challenging his relocation under the AEA. *See Lockington's Case*, Bright (N.P.) 269 (Pa. 1813); *Boumediene v. Bush*, 476 F.3d 981, 988–89 (D.C. Cir. 2007) (describing the case), *rev'd*, 553 U.S. 723 (2008). Chief Justice Marshall, riding circuit and sitting with St. George Tucker, ordered the release of an alien detained under the Act. *See* Gerald L. Neuman & Charles F. Hobson, *John Marshall and the Enemy Alien*, 9 Green Bag 2D 39, 41–42 (2005) (reproducing Marshall's decision in *United States v. Williams*).

***b. The Scope of Judicial Review***

Although these cases establish the availability of judicial review, they do not settle the scope of that review. The government asserts that the "sole question" amenable to judicial scrutiny is whether a detained individual is "an alien enemy," Gov't Br. 14, *i.e.*, whether the person is a fourteen year or older "native[], citizen[], denizen[], or subject[]" of a presidentially declared hostile nation. 50 U.S.C. § 21. Any other AEA prerequisites are purportedly "political question[s]" "outside the competence of the courts." Gov't Br. 13.

The Court does not approach this issue in an analytic vacuum. In *Ludecke v. Watkins*, the Supreme Court reviewed the habeas petition of a German alien detained under the AEA during the Second World War. 335 U.S. at 162–63. Following Germany's unconditional surrender and a cessation of actual hostilities, the petitioner claimed that there was no longer a war giving rise to AEA authority. *Id.* at 166. Splitting 5-4, the Court disagreed. As it explained, a mere ceasefire does not conclusively resolve a war, nor do war powers subside simply because the "shooting stops." *Id.* at 167. The mode of ending a war "is a political act" and courts "would be assuming the functions of the political agencies" to declare a war over when "[t]he political branch of the Government" has not. *Id.* at 169–70. The quantum of threat posed by enemy aliens during "a state of war [] when the guns are silent but the peace of Peace has not come" is a "political judgment for which judges have neither technical competence nor official responsibility." *Id.* at 170.

From *Ludecke*, the government draws the mistaken inference that all questions of AEA authority are political and thus beyond the scope of judicial review. But that is not what the Court held. In no uncertain terms, the Court said the AEA "preclude[s] judicial review . . . [*b*]*arring questions of interpretation and constitutionality*." *Id.* at 163 (emphasis added). Questions of interpretation and constitutionality—the heartland of the judicial ken—are subject to judicial review. *See Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986) (explaining that "a decision which calls for applying no more than the traditional rules of statutory construction" is not a political question). Indeed, the *Ludecke* Court itself engaged in interpretation, rejecting a definition of "the statutory phrase 'declared war'" that would "mean 'state of actual hostilities.'" *Id.* at 166 n.11, 170–71. *Ludecke* did not foreclose courts' ability to interpret the AEA's predicate

acts—a declared war, invasion or predatory incursion—or whether such conditions exist. Instead, *Ludecke* stands for the proposition that when and by what means to end that acknowledged war are choices "constitutional[ly] commit[ted] . . . to a coordinate political department." *Nixon*, 506 U.S. at 228.

*Ludecke* itself couched its holding in the line between law and policy and the role of the judge to only decide the former. The Alien Enemies Act, the Court explained, sets forth "conditions upon which it might be invoked" but is silent as to "how long the power should last when properly invoked." *Ludecke*, 335 U.S. at 166 n.11. The petitioner did not contest the "propriety" of the conditional trigger—"the President's Proclamation of War"—only its continued durability. *Id.* That latter question (how long the power should last) has no answer in the plain text of the Act. Put another way, such a question is lacking "judicially discoverable and manageable standards" and thus lies outside the judicial purview. *Nixon*, 506 U.S. at 228. But conditional questions—the legal meaning of war, invasion and predatory incursion—are well within courts' bailiwick.[3]

---

[3] The government also quotes *Ludecke*'s statement that "[t]he very nature of the President's power to order the removal of all enemy aliens rejects the notion that courts may pass judgment upon the exercise of his discretion." *Id.* at 164. But the Court was simply rejecting the argument that judicial approval was a *prerequisite* to arrest, detention or deportation. That principle had been established as early as the War of 1812. *See Lockington v. Smith*, 115 F. Cas. 758 (C.C.D. Pa. 1817). Indeed, immediately after the *Ludecke* language the government quotes, the Court dropped a footnote containing a long recitation from and citation to *Lockington*. *Ludecke*, 335 U.S. at 164 n.7. And *Lockington* did not foreclose

One month before the Supreme Court's decision in *Ludecke*, this Court reviewed a nearly identical challenge seeking injunctive and declaratory relief against enforcement of the AEA. *See Citizens Protective League*, 155 F.2d at 290. The challengers similarly alleged that AEA authority lapsed with the cessation of hostilities with Germany. *Id.* at 292. We rejected the challengers' war-termination argument because "[i]t is not for the courts to determine the end of a war declared by the Congress." *Id.* at 295. We said no more—and no less—than the Supreme Court would the following month. The elected branches—not the unelected bench—decide when a war has terminated. That is a question of *fact* for elected leaders. That does not mean that courts cannot pass on the *legal* meaning of statutory terms.

Finally, the government cites the Ninth Circuit's decision in *California v. United States* for the proposition that an invasion is a nonjusticiable political question. 104 F.3d 1086 (9th Cir. 1997). That case is inapposite and—insofar as it carries any relevance—cuts directly against the government. There, California advanced precisely the theory the government claims here: that illegal immigration constitutes an invasion of the United States. *Id.* at 1090. This was part of a theory—advanced by several states—asserting that (i) illegal immigration is an invasion; (ii) the United States was derelict in its duties under the Guarantee Clause to repel that invasion; and (iii) therefore the United States should compensate the states and better enforce immigration laws. *Id.* The Ninth Circuit had none of it, deeming the issue a political question better suited to the halls of the Congress than the Article III bench. *Id.* at 1091.

---

judicial review; it expressly entertained a habeas challenge and then rejected it on the merits. *Lockington*, 115 F. Cas. at 759–62.

From that holding, the government draws the mistaken proposition that the existence *vel non* of an invasion is beyond judicial reach. That misreads *California*. That court rightly disclaimed any role "to determine that the United States has been 'invaded' *when the political branches have made no such determination*." *Id.* (emphasis added). This is merely the inverse of the *Ludecke* principle: just as the courts will not declare a properly declared war ended until the political branches do so, they will not start a war on the government's behalf. Neither side of the coin precludes judicial review of whether the Executive has properly invoked a wartime authority. And insofar as *California* has any bearing on this case, it is *against* the government. Although the court declared the issue a political question, it also rejected the states' immigration-as-invasion theory on the merits. As the court put it, invasion refers to "situations wherein a state is exposed to armed hostility from another political entity" and "was not intended to be used as urged by California." *Id.* (citing the Federalist No. 43 (J. Madison)).[4]

At bottom, the government errs by "suppos[ing] that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker*, 369 U.S. at 211. Sensitive subject matter alone does not shroud a law from the judicial eye. *Cf. Japan Whaling Ass'n*, 478 U.S. at 230 ("As *Baker* plainly held, . . . courts have the authority to construe treaties."). Indeed, we have previously considered the precise sort of question that the

[4] Other circuits confronting similar claims have likewise concluded that declaring an invasion by judicial fiat would pervert the proper role of the political branches, and also that illegal immigration is not an "invasion." *See Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996) (explaining that "invasion" requires "armed hostility from another political entity," which is not "the influx of legal and illegal aliens into" the United States); *New Jersey v. United States*, 91 F.3d 463, 468–70 (3d Cir. 1996) (same).

government contends we cannot. *See Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 514, (D.C. Cir. 2018) (reviewing whether certain conduct rises to the level of "an act of war within the meaning of [a] statut[e]"); *Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 505 F.2d 989, 1015–16 (2d Cir. 1974) (assessing whether a plane's hijacking was a "warlike act" or "warlike operation"). There is a "strong presumption" in favor of judicial review of agency action like that of the Department of Homeland Security here, which may be overcome only by "clear and convincing evidence" that the Congress intended to strip jurisdiction over the particular category of challenge. *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229–30 (2020). The government points us to no such textual hook. And its precedent fails to fill the gap.

### 3. The Alien Enemies Act

The AEA provides that "[w]henever there is a declared war . . . or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government," its apprehension, detention and removal powers apply. 50 U.S.C. § 21. Quoting a dictionary over two-hundred years post-enactment, the government claims that the term "invasion" as used in the AEA encompasses "the arrival somewhere of people or things who are not wanted there." Gov't Br. 17 (alteration omitted) (quoting *Invasion*, *Black's Law Dictionary* (12th ed. 2024)). The text and its original meaning say otherwise.

#### *a. Invasion*

Begin with the text. The term "invasion" was a legal term of art with a well-defined meaning at the Founding. It required far more than an unwanted entry; to constitute an invasion, there had to be hostilities. As one leading dictionary of the era specifies, an invasion is a "[h]ostile entrance upon the right or

possessions of another; hostile encroachment," such as when "William the Conqueror invaded England." Samuel Johnson, *Invasion*, sense 1, A DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1773). As another recounts, an invasion is a "hostile entrance into the possession of another; particularly the entrance of a hostile army into a country for the purpose of conquest or plunder, or the attack of a military force." Noah Webster, *Invasion*, sense 1, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828). And because the invasion must be "by any foreign nation or government," 50 U.S.C § 21, that entity would be an invader—*i.e.*, "[o]ne who enters the territory of another with a view to war, conquest or plunder." Webster, *Invader*, sense 1.

Next, look to context. The term "invasion" appears as part of a list of three interrelated terms: (i) "a declared war" or "any" (ii) "invasion" or (iii) "predatory incursion." The basic interpretive principle of *noscitur a sociis* counsels reading an ambiguous word that appears in a list of related terms in light of the company it keeps. *See Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961). There could be a congressionally declared war, an invasion by the belligerent government or a lesser incursion into the United States. Each could trigger a formal change in relations between the United States and the hostile power under the law of nations, and, in turn, the relationship of America to that nation's people. The surrounding statutory context confirms as much.

First, the invasion must be "against the *territory* of the United States by any foreign nation or government." 50 U.S.C. § 21 (emphasis added). The requirement that the "invasion" be conducted by a nation-state and against the United States' "territory" supports that the Congress was using "invasion" in

a military sense of the term.[5]  *See Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 131 (1807) (describing levying war against the United States as "a military enterprize . . . against any of the territories of the United States"); *Wiborg v. United States*, 163 U.S. 632, 633 (1896) (explaining that a group of seamen were charged with preparing for a "military expedition . . . against the territory and dominions of a foreign prince").  Undesired people do not arrive *against* the territory.  But foreign armies can—and as the 1798 Congress feared might—invade the territory of the United States.[6]  Second, the invasion may be actual, "attempted, or threatened."  5 U.S.C. § 21.  Again, when used in reference to hostilities among nations, an attempted or threatened invasion of the United States would mark a logical trigger for enhanced presidential authority.  Third, and relatedly, the conditional list of triggering events—a declared war, invasion or predatory incursion—must be read against the means the Congress employed to combat the same.  The AEA authorizes the President to restrain and remove the nationals of a belligerent foreign power.  Such power tracks when invasion is considered in its military sense.

Finally, consider history.  The Alien Enemies Act was enacted by the Fifth Congress amid an actual conflict—the Quasi-War—with France, a foreign power.  War was front and

---

[5]  Invasion had a secondary meaning at the Founding that described "[a]n attack on the rights of another; infringement or violation" of "the rights of another."  Webster, *Invasion*, sense 2; *see* THE DECLARATION OF INDEPENDENCE para. 7 (U.S. 1776) (accusing the Crown of an "invasion on the rights of the people"); *id.* para. 8 (returning to a military connotation of invasion).  By focusing on territory rather than individuals or rights, the Congress made plain it was using the military sense of the term.

[6]  Although TdA and other drug cartels are reported to control portions of other countries, that is not the case in the United States.

center in the minds of the enacting legislature. A little over one month before enacting the AEA, the same Congress authorized the President to raise a standing army of 10,000 men to combat any French invasion. But he could do so only "in the event of a declaration of war against the United States, or of actual invasion of their territory, by a foreign power, or of imminent danger of such invasion." Act of May 28, 1798, ch. 47, § 1, 1 Stat. 558. This language bears more than a passing resemblance to the language of the AEA, which the Congress enacted a mere thirty-nine days later. In his most famous exposition against the Alien and Sedition Act, Madison explained that an "[i]nvasion is an operation of war." James Madison, Report of 1800 (Jan. 7, 1800), *in* Founders Online [https://perma.cc/2D3N-N64Z]. In such times, the "law of nations" allowed for the expulsion of alien enemies as "an exercise of the power of war." *Id.*

Debates in the Congress surrounding ratification of the Alien and Sedition Acts support this read. Rep. Joshua Coit of Connecticut warned that the United States "may very shortly be involved in war" against France and that the "immense number of French citizens in our country" could threaten the Republic. GORDON S. WOOD, EMPIRE OF LIBERTY 247 (2009). Rep. James Bayard of Delaware pushed back on critics of the new laws by warning of aliens who might be "likely to join the standard of an enemy, in case of an invasion." 8 Annals of Cong. 1966 (1798). Rep. John Allen of Connecticut cautioned that the country could not "wait for an invasion, or threatened invasion" before granting the power to the President to remove aliens, noting that multiple European powers had fallen to France "by means of [alien] agents of the French nation." *Id.* at 1578. Opponents of the Acts contested their constitutionality and warned that—if accepted—they could lead to the suspension of habeas corpus, which is allowable "in cases of rebellion or *invasion*." *Id.* at 1956 (Statement of Rep. Albert

Gallatin of Pennsylvania) (citing U.S. Const. art. I., § 9, cl. 2) (emphasis added). Supporters disputed that any suspension would occur, *id.* at 1958, but did not dispute that the AEA drew on wartime powers. On the contrary, they invoked, among other authority, the Congress's "power . . . of providing for the common defence," *id.* at 1959 (statement of Rep. Gray Otis of Massachusetts) and the President's "powers which [he] already possesses, as Commander-in-Chief." *Id.* at 1791.[7]

This should come as no surprise. The term "invasion" was well known to the Fifth Congress and the American public circa 1798. The phrase echoes throughout the Constitution ratified by the people just nine years before. And *in every instance*, it is used in a military sense. For example, the Guarantee Clause provides that "[t]he United States shall . . . protect each [State] against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence." U.S. Const. art. IV, § 4. The clause is a federal guarantee to the states against attack from without (invasion) or within (insurrection). In describing the clause, the Federalist Papers refer to invasion and domestic violence as "bloody" affairs involving "military talents and experience" and "an appeal to the sword." The Federalist No. 44 (J. Madison). To effectuate the guarantee, the Congress has power "[t]o provide for calling forth the Militia to . . . suppress Insurrections and repel Invasions." U.S. Const. art. I, § 8, cl. 15. Again, to use military force against invasion. During these exigent times of hostilities—"in Cases of Rebellion or Invasion"—the Congress may suspend "The

---

[7] Although "legislative history is not the law," *Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019), it can provide some probative evidence of the original public meaning of the text. And here, congressional debates squarely accord with the plain meaning of the text in context and are thus "extra icing on a cake already frosted." *Van Buren v. United States*, 593 U.S. 374, 394 (2021).

Privilege of the Writ of Habeas Corpus . . . when . . . the public Safety may require it." *Id.* art. I, § 9, cl. 2. Finally, if the federal guarantee fails, a state may exercise its Article I power to "engage in War" but only if "actually invaded, or in such imminent Danger as will not admit of delay." *Id.* art. I, § 10, cl. 3. When the Constitution repeats a phrase across multiple clauses—and the early Congresses echo that phrase in statute—it is a strong signal that the text should be read *in pari materia*. *See* 2B Shambie Singer & Norman J. Singer, *Sutherland Statutes & Statutory Construction* (7th ed. Nov. 2024 update) § 51:1–3; Akhil Reed Amar, *Intratextualism*, 112 Harv. L. Rev. 747, 788–91 (1999). The theme that rings true is that an invasion is a military affair, not one of migration.

What evidence does the government muster against the weight of this evidence? It marshals a lone contemporary dictionary and then plucks the third-order usage of the term after skipping over its (still) more common military meaning. *See* Gov't Br. 17 (citing *Invasion*, sense 3, *Black's Law Dictionary* (12th ed. 2024)). *But see id.*, sense 1 ("[a] military force's hostile entry into a country or territory"); *cf. District of Columbia v. Heller*, 554 U.S. 570, 577 (2008) ("Normal meaning . . . excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation.").

***b. Predatory Incursion***

The government finds no safer refuge in the alternative "predatory incursion." The government defines the term as "(1) an entry into the United States, (2) for purposes contrary to the interests or laws of the United States." Gov't Br. 18. And it explains that illegal immigration and drug trafficking readily qualify under that standard. As before, the government misreads the text, context and history. An incursion is a lesser

form of invasion; an "[a]ttack" or "[i]nvasion without conquest." Samuel Johnson, *Incursion*, senses 1 & 2, A DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1773). Its predatory nature includes a "[p]lundering," such as the "*predatory* war made by Scotland." *Id.*, *Predatory*, sense 1. Secretary of State Thomas Pickering used the term to describe a lesser form of attack that France could conduct against the U.S. and which, in his view, could be repelled by the militia. *See* Letter from Thomas Pickering to Alexander Hamilton (June 9, 1798), *in* Founders Online [https://perma.cc/VD5M-QSNA]. This was raised in contradistinction to a full invasion, which would require an army. *Id.* Rep. Otis likewise described a predatory incursion as a lesser form of invasion or war. 8 Annals of Cong. 1791 (1798). Early American caselaw sounds a similar theme: incursions referred to violent conflict. Alexander Dallas, appearing before the Marshall Court, described "predatory incursions of the Indians" onto Pennsylvania's frontier, which had led to "an Indian war." *Huidekoper's Lessee v. Douglass*, 7 U.S. (3 Cranch) 1, 11 (1805).[8] Chief Justice Marshall referred to "incursions of hostile Indians," which involved "constant scenes of killings and scalping," and led to a retaliatory "war of extermination." *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 10 (1831); *accord Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 545 (1832) (explaining that Pennsylvania's royal charter included "the power of war" to repel "incursions" by "barbarous nations"). Like its statutory counterparts, predatory incursion referred to a form of hostilities against the United States by another nation-

---

[8] Alexander Dallas was a lawyer and the first reporter of Supreme Court decisions responsible for the "Dallas" series. He later served as Secretary of the Commonwealth of Pennsylvania, U.S. attorney for the Eastern District of Pennsylvania and Secretary of the Treasury.

state, a form of attack short of war. Migration alone did not suffice.

**4. Issues Not Decided**

Preliminary relief is not simply a fast track to the merits. Because the Supreme Court has instructed that likelihood of success on the merits is among "the most critical" factors, the parties' underlying dispute must be addressed. *Nken*, 556 U.S. at 434. Had the government shown a likelihood of success on any of the three issues above, it would have prevailed on the first factor. Two of the three issues discussed go to jurisdiction and all present purely legal questions amenable to a provisional peek at the merits. The multitude of outstanding issues raised by the parties are more amenable to resolution by the district court on remand than this Court on expedited review. It bears emphasis what we are *not* deciding.

*First*, the analysis *supra* III.A.1–3 represents a preliminary view of the merits. The government remains free to muster additional evidence and arguments. But on the record presented, the government has yet to show a strong likelihood of prevailing. That is not "in any sense intended as a final decision" or meant to "intimate [a] view as to the ultimate merits." *Brown v. Chote*, 411 U.S. 452, 456–57 (1973) (describing the role of preliminary rulings); *Univ. of Texas v. Camenisch*, 451 U.S. 390, 394 (1982) (emphasizing that it would be error to "improperly equate[] 'likelihood of success' with 'success.'"). Just as plaintiffs' TRO does not signal that they are "absolutely certain" to prevail, *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977), neither the district court nor the parties should attempt to imbue this opinion with an aura of finality.

*Second*, I do not pass on whether TdA has conducted an "invasion or predatory incursion" "against the territory of the

United States." 50 U.S.C. § 21. The government will have ample opportunity to prove its case and its evidence should be afforded the requisite deference due the President's national security judgments. *See*, *e.g.*, *Holder v. Humanitarian L. Project*, 561 U.S. 1, 36 (2010) (recognizing that the government's judgment in "sensitive [areas of] national security and foreign affairs" "is entitled to significant weight"); *Trump v. Hawaii*, 585 U.S. 667, 704 (2018) (noting the "constrained" nature of judicial "inquiry into matters of . . . national security").

*Third*, I offer no view on whether TdA's conduct is "perpetrated, attempted, or threatened . . . *by a[] foreign nation or government*." 50 U.S.C. § 21 (emphasis added). The Proclamation claims that TdA "is closely aligned with, and [] has infiltrated" the Venezuelan state such that it is a "hybrid criminal state." This issue raises disputed questions of sovereignty, authority and control that turn as much on contested facts as they do legal conclusions. Ours is a court of review, not first view; such issues are appropriately left to the district court in the first instance.

*Finally*, plaintiffs contend that the Immigration and Nationality Act (INA)'s procedures are the "exclusive procedure" for removal and thus eclipse any contrary authority in the AEA. Pl. Br. 24 (quoting 8 U.S.C. § 1229a(a)(3)). This claim, however, speaks more to plaintiffs' likelihood of success on the merits than the government's. And although it is a primarily legal question, it is one we need not—and therefore ought not—decide in this nascent posture.

### B. Balance of Harms & Public Interest

The harm to the government and the public interest factor "merge" when the government is seeking a stay, so they are considered together. *Nken*, 556 U.S. at 435. The government

spends almost all of its brief arguing the merits. As explained, the central purpose of preliminary relief—whether at the trial level or the appellate level—is to prevent irreparable injury, not to short-circuit the normal course of litigation. The equities thus loom large in this early posture. Yet the only mention of irreparable injury in the government's brief is to deny that plaintiffs' injury is irreparable. *See* Gov't Br. 12–13. Although plaintiffs must show irreparable injury to secure an injunction, it is now the defendant who—seeking relief from an injunction so obtained—must show irreparable injury absent a stay of the injunction. *See Nken*, 556 U.S. at 434 (requiring a stay applicant to show "irreparabl[e] injur[y] absent a stay"). Insofar as the argument is preserved, it is unavailing.

The government warns that "delayed removal *may be* removal denied." Gov't Br. 12 (emphasis added). Equity will not act "against something merely feared as liable to occur at some indefinite time." *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931); *see also Murthy v. Missouri*, 144 S. Ct. 7, 9 (2023) (Alito, J., with Thomas and Gorsuch, JJ., dissenting from grant of application for stay) ("[S]peculation does not establish irreparable harm."); *Singh v. Berger*, 56 F.4th 88, 97 (D.C. Cir. 2022) (explaining that "the [government] must demonstrate the specific harm that 'would'—not could—result from" denying a stay).

Next, the government claims that the TROs "impede the President from using his constitutional and statutory authority to address a predatory invasion by a hostile group." Gov't Reply 13. The President's inherent constitutional authority is not the subject of the TRO and the burden on his statutory powers under the AEA is limited. The district court's injunction covers only deportation. The President may arrest and detain purported enemy aliens under the Proclamation without violating that order. Insofar as exigent circumstances

require prompt deportation, the President can tap his substantial authorities under the INA to do so. Finally, the TRO expires in just a few days. The government has not explained why its purported harms rise or fall on a few days' delay.

The Executive's burdens are comparatively modest compared to the plaintiffs'. Lifting the injunctions risks exiling plaintiffs to a land that is not their country of origin. *See J.G.G. v. Trump*, 1:25-cv-766 (D.D.C. Mar. 16, 2025), ECF Nos. 19, 21 (informing the district court that Venezuelan members of the plaintiff class were deported to El Salvador). Indeed, at oral argument before this Court, the government in no uncertain terms conveyed that—were the injunction lifted—it would immediately begin deporting plaintiffs without notice. Plaintiffs allege that the government has renditioned innocent foreign nationals in its pursuit against TdA. For example, one plaintiff alleges that he suffered brutal torture with "electric shocks and suffocation" for demonstrating against the Venezuelan regime. *Id.* (D.D.C. Mar. 19, 2025), ECF No. 44-5 ¶ 2. While awaiting adjudication of his asylum claim, he was expelled to "El Salvador with no notice to counsel or family" based on a misinterpretation of a soccer tattoo. *Id.* ¶¶ 5–7. To date, his family and counsel have "lost all contact" and "have no information regarding his whereabouts or condition." *Id.* ¶ 10. The government concedes it "lack[s] a complete profile" or even "specific information about each individual" it has targeted for summary removal. *Id.* (D.D.C. Mar. 17, 2025), ECF No. 26-1 ¶ 9.

There is a "public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken*, 556 U.S. at 436. The government's response to this interest is that "removal . . . is not categorically irreparable." Gov't Br. 12 (quoting *Nken*, 556

U.S. at 435). But in this procedural posture, it is not plaintiffs' burden to prove irreparable injury; it is the government's. We must consider whether a stay will "substantially injure" plaintiffs. *Nken*, 556 U.S. at 434. And *Nken* emphatically states that "removal is a serious burden for many aliens." *Id.* at 435.

For these reasons, the government has not met its burden to obtain the "extraordinary remedy" of staying the district court's injunctions. *KalshiEX LLC v. CFTC*, 119 F.4th 58, 63 (D.C. Cir. 2024) (cleaned up).

**C. The Scope of Relief**

Even if we decline to stay the district court's injunctions, the government contends that we should narrow their scope. In its view, the lower court entered an "unconstitutional" "universal TRO." Gov't Br. 20; Gov't Reply 15–16. Universal injunctions "ha[ve] significantly stretched the traditional equitable powers of Article III courts." *Indus. Energy Consumers of Am. v. FERC*, 125 F.4th 1156, 1168 (D.C. Cir. 2025) (Henderson, J., concurring). Even if universal relief is constitutionally sound—and there are reasons to believe it is not—courts should be particularly wary before entering "an injunction that bar[s] the Government from enforcing the President's Proclamation against anyone" given the "toll on the federal system . . . and for the Executive Branch." *Hawaii*, 585 U.S. at 713 (Thomas, J., concurring). But what the district court did here was *not* a universal injunction—*i.e.*, it did not enter relief that goes beyond the parties to the suit. Instead, the court followed the Rules of Civil Procedure and certified a class—a class that will be bound by an unfavorable judgment just as much as by a favorable one. *See Indus. Energy Consumers of Am.*, 125 F.4th at 1169 (Henderson, J., concurring) (pointing to class actions as a procedurally proper

way to afford relief to a disparate class); Samuel Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 418, 475 (2017) (describing class actions as the "obvious answer" to the problems universal injunctions seek to address).[9]

Although the injunctions' breadth is permissible as to the plaintiffs, it is not as to all defendants. Specifically, the district court's TROs enjoin the President of the United States himself. At common law, the Chancellor could not grant "any relief against the king, or direct any act to be done by him." 3 William Blackstone, Commentaries on the Laws of England 428. This historic limitation carries forward to today and strips the federal courts of equitable "jurisdiction . . . to enjoin the President in the performance of his official duties." *Johnson*, 71 U.S. at 501. Separation of powers concerns pose an independent bar. We can no more "direct the President to take a specific executive act" than we can compel the "Congress to perform particular legislative duties." *Franklin*, 505 U.S. at 829 (Scalia, J., concurring in part and concurring in the judgment). However, the government has not sought to lift the injunction as to the President alone. We do not ordinarily dispense "relief that a party failed to clearly articulate in its briefs." *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 763 (D.C. Cir. 2014). I decline to do *so sua* sponte today. On remand, the district court should modify its TROs to exclude the President from their scope.

* * *

At this early stage, the government has yet to show a likelihood of success on the merits. The equities favor the plaintiffs. And the district court entered the TROs for a quintessentially valid purpose: to protect its remedial authority

[9] I do not pass on the class action "fit" of the plaintiffs' claims.

long enough to consider the parties' arguments.  Accordingly, and for the foregoing reasons, the request to stay the district court's TROs should be denied.

MILLETT, *Circuit Judge*, concurring: "The government of the United States has been emphatically termed a government of laws, and not of men" and women. *Marbury v. Madison*, 5 U.S. 137, 163 (1803). This means that the United States government adheres faithfully to the Constitution's requirements and duly enacted laws. Any government can hew to a legal path when dealing with easy and workaday matters of governance. The true mark of this great Nation under law is that we adhere to legal requirements even when it is hard, even when important national interests are at stake, and even when the claimant may be unpopular. For if the government can choose to abandon fair and equal process for some people, it can do the same for everyone.

In this appeal, the government seeks exceptional emergency relief from temporary restraining orders that do just one thing—prevent the summary removal of Venezuelan immigrants to a notorious prison in El Salvador or other unknown locations without first affording them some semblance of due process to contest the legal and factual bases for removal. Plaintiffs are Venezuelan immigrants who the government claims are members of a violent criminal gang known as Tren de Aragua. In the government's view, based on its allegation alone, Plaintiffs can be removed immediately with no notice, no hearing, no opportunity—zero process—to show that they are not members of the gang, to contest their eligibility for removal under the law, or to invoke legal protections against being sent to a place where it appears likely they will be tortured and their lives endangered.

The district court has been handling this matter with great expedition and circumspection, and its orders do nothing more than freeze the status quo until weighty and unprecedented legal issues can be addressed through a soon-forthcoming preliminary injunction proceeding. There is neither jurisdiction nor reason for this court to interfere at this very preliminary stage or to allow the government to singlehandedly

moot the Plaintiffs' claims by immediately removing them beyond the reach of their lawyers or the court. *See* Oral Arg. 1:44:39-1:46:23, *J.G.G. v. Trump*, 25-5067 (D.C. Cir. 2025), https://perma.cc/LB7B-7UFN (J. Millett: "My question is, if we were to grant the relief you request, would the government consider it necessary to allow time to file a habeas petition before removing people? * * * [Is it] the government's position that it could immediately resume mass removals of the five named Plaintiffs and the class members, immediately? Government: "Your Honor, * * * we take the position that the AEA does not require notice * * * [and] the government believes there would not be a limitation [on removal.]"). The Constitution's demand of due process cannot be so easily thrown aside.

For those reasons I agree with the judgment denying the government's motions for stays in this case.

**I**

This case arises at the intersection of the Due Process Clause of the Constitution, U.S. CONST. Amend. V, and the Alien Enemies Act of 1798, 50 U.S.C. §§ 21-24.

**A**

The Fifth Amendment to the Constitution provides, as relevant here, that "[n]o person shall * * * be deprived of life, liberty, or property without due process of law." U.S. CONST. Amend. V. The "persons[s]" protected by that foundational guarantee include all persons present in the United States, the law-abiding as well as those who violate the law, the immigrant without documentation as well as the citizen. *See Reno v. Flores*, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles aliens to due process of law in

deportation proceedings.") (citing *The Japanese Immigrant Case*, 189 U.S. 86, 100-101 (1903)).

While the Due Process Clause's coverage is broad, the amount of process due can vary based on the nature and context of the governmental intrusion. *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("Once it is determined that due process applies, the question remains what process is due. * * * Consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.") (internal citation and quotation marks omitted); *Snyder v. Massachusetts*, 291 U.S. 97, 116-117 (1934) ("Due process of law requires that the proceedings shall be fair, but fairness is a relative, not an absolute concept. * * * What is fair in one set of circumstances may be an act of tyranny in others.").

At its most basic, due process requires notice of adverse governmental action, an opportunity to be heard, and the right to an unbiased decisionmaker. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'") (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)); *Mullane v. Cent. Hanover Bank & Trust Co*., 339 U.S. 306, 313 (1950) ("Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case."); *Tumey v. State of Ohio*, 273 U.S. 510, 523 (1927) (Due process is violated when the decision maker has a "direct" and "substantial" interest "in reaching a conclusion against" the defendant.).

In the specific context of immigration, Congress has enacted a comprehensive legal regime providing due process to those who the government alleges are unlawfully present in the United States. The Immigration and Nationality Act provides "the sole and exclusive procedure for determining whether an alien may be * * * removed from the United States." 8 U.S.C. § 1229a(a)(3). Under that Act, noncitizens are entitled to "apply for asylum" if they can "establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for [their] persecution" in the country of their nationality. *Id.* § 1158(a)(1), (b)(1)(B)(i). They also can seek "withholding of removal" to a country where it is more likely than not that they would face persecution. *See id.* § 1231(b)(3). In addition, the United States is a signatory to the Convention Against Torture and so is obligated not to return individuals to a country where they more likely than not would be tortured. *See id*. § 1231 note.

To protect the Nation's safety and security, Congress enacted special expedited removal proceedings for noncitizens who have been convicted of committing aggravated felonies, 8 U.S.C. § 1228(a), or are deemed to be "alien terrorist[s,]*" id.* § 1533(c)(2)(B). Even those expedited proceedings allow for notice and an opportunity to be heard before a neutral decisionmaker. *Id.* § 1229 ("In removal proceedings * * * written notice * * *shall be given in person to the alien * * * specifying * * * [t]he time and place at which the proceedings will be held*."); id.* § 1534(b)-(c) ("An alien who is the subject of a removal hearing under this subchapter shall be given reasonable notice of the nature of the charges * * * and the time and place at which the hearing will be held[.] * * * The alien shall have a right to be present at such hearing[.]").

**B**

The Alien Enemies Act ("AEA") allows the President to "apprehend[], restrain[], secure[], and remove[]" "alien enemies" whenever "there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion" into the United States. 50 U.S.C. § 21. Alien enemies are "natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward" who are "not actually naturalized[.]" *Id.*

If there has been no formal declaration of war by Congress, the President must make a "public proclamation[,]" 50 U.S.C. § 21, and "allow[]" enemy aliens a "reasonable time" to comply with the proclamation's orders, *id.* § 22. The only exception is for enemy aliens "chargeable with actual hostility, or other crime against the public safety[.]" *Id.*

Under the AEA, when a "complaint against" an "alien enemy resident" is presented to a court of the United States, the court's "duty" is to provide "a full examination and hearing on such complaint" and to decide whether there is "sufficient cause" to have that person removed or otherwise detained. 50 U.S.C. § 23.

The AEA was one of several measures known as the Alien and Sedition Acts passed in 1798 when the United States feared that France was planning a military invasion. STANLEY ELKINS & ERIC MCKITRICK, THE AGE OF FEDERALISM 588-591 (1993). The original version of the law was introduced by pro-war

Federalists and it would have required federal courts to simply fall in line and enforce the President's order:

> [A]ll Justices and Judges of the Courts of the United States * * * shall be * * * required to discharge, enforce, and execute the duties and authorities which shall be incumbent upon them respectively, by virtue of the rules and directions which, in any proclamation or other public act, the President of the United States shall and may make[.]

8 ANNALS OF CONG. 1786 (1798).

That language received prompt opposition from Republicans who strongly resisted its effort to make judges "be obedient to the will of the President" rather than "being obedient to the laws." 8 ANNALS OF CONG. 1789 (1798) (statement of Rep. Gallatin). As Representative Gallatin summarized the problem, "the whole of the bill might as well be in two or three words, viz: 'The President of the United States shall have the power to remove, restrict, or confine alien enemies and citizens whom he may consider as suspected persons.'" *Id.*

That original version of the Act was quickly rejected. Congress enacted instead the provision now codified at 50 U.S.C. § 23, in which courts, when presented with a case, are to undertake an independent examination of the asserted authority to remove a person under the Act. *An Act Respecting Alien Enemies*, ch. 66, § 3, 1 Stat. 578 (1798). As Representative Gordon explained, the AEA as amended would not violate "habeas corpus" because "[t]here is nothing in this bill to prevent a person from being brought before a Judge." 8 ANNALS OF CONG. 1985 (1798); *see id.* at 2026 (statement of Rep. Harper) ("Every man seized under this law, will have a

right to sue out a writ of habeas corpus, and if it appear that he is a citizen, he must be discharged."); *id.* at 1967 (statement of Rep. Bayard) ("This bill provides only for the arrestation of persons in certain cases, and it will be competent for every person so arrested to obtain a writ of habeas corpus.").[1]

As James Madison explained, the AEA was passed based on Congress's "power to declare war" and was in accord with "the law of nations." *The Report of 1800*. The Supreme Court subsequently agreed with Madison's assessment, holding that the AEA is a constitutional exercise of congressional authority to "vest[] the President" with a "war power" to manage alien enemies during the "shooting war" and an appropriate period thereafter. *Ludecke v. Watkins*, 335 U.S. 160, 165 (1948).

Before now, the AEA has been invoked only three times during the nation's history: the War of 1812, World War I, and World War II. *See Lockington v. Smith*, 15 F. Cas. 758, 758-759 (C.C.D. Pa. 1817) (discussing the War of 1812

[1] The AEA's counterpart was the Alien Friends Act, which gave the President authority to remove "all such aliens as he shall judge dangerous to the peace and safety" regardless of whether there was a declared war or invasion. *An Act Concerning Aliens*, ch. 58, § 1, 1 Stat. 571 (1798). Many considered the Alien Friends Act unconstitutional because it gave the President unreviewable discretion to remove noncitizens. *See* GORDON WOOD, EMPIRE OF LIBERTY 249-250 (2009). James Madison argued that the Alien Friends Act was unlawful because it did not allow for "the benefits of a fair trial[.]" James Madison, *The Report of 1800* (Jan. 7, 1800), https://perma.cc/K564-KQND. Thomas Jefferson also concluded that the Alien Friends Act was contrary to law because it violated the right to "due process[.]" Kentucky General Assembly, *Resolutions Adopted by the Kentucky General Assembly* (Nov. 10, 1798), https://perma.cc/7JL4-N86T. No one was ever removed under the Alien Friends Act and it expired in 1800. AGE OF FEDERALISM, at 591-592.

proclamation); Proclamation, 40 Stat. 1651 (1917) (World War I); Proclamation: Alien Enemies—Japanese, 6 Fed. Reg. 6,321 (Dec. 10, 1941) (World War II).[2]

Judicial review has always been available to noncitizens detained or removed under the AEA. During the War of 1812, Chief Justice John Marshall and federal District Judge St. George Tucker ordered a British subject released because the local marshal had acted beyond his delegated authority by detaining the plaintiff without proper notice. *See* Gerald Neuman & Charles Hobson, *John Marshall and the Enemy Alien*, 9 GREEN BAG 39, 41-43 (2005) (describing the unreported case of *United States v. Thomas Williams* (C.C.D. Va. 1813)). The Pennsylvania Supreme Court later agreed with the Chief Justice that those subject to the AEA are entitled to judicial review. *Lockington's Case*, Bright (N.P.) 269, 273, 285 (Pa. 1813).

These early cases set a precedent followed during the twentieth century. Review was available during World War I, *see, e.g.*, *Ex parte Gilroy*, 257 F. 110, 114 (S.D.N.Y. 1919), as well as World War II, *e.g.*, *Ludecke v. Watkins*, 335 U.S. 160, 172 (1948) ("[H]earings are utilized by the Executive to secure an informed basis for the exercise of summary power[.]"). Indeed, during World War II, a former "member of the Nazi Party" not only received a hearing on his eligibility for removal, but also had his case heard by the Supreme Court. *Ludecke,* 335 U.S. at 162 n.3.

---

[2] The AEA has been amended once when, during World War I, language clarified that it applied to both men and women. *An Act to amend section four thousand and sixty-seven of the Revised Statutes by extending its scope to include women*, ch. 55, 40 Stat. 531 (1918).

As the court in *Gilroy* explained, "[v]ital as is the necessity in time of war not to hamper acts of the executive in the defense of the nation and in the prosecution of the war, of equal and perhaps greater importance, is the preservation of constitutional rights." 257 F. 110 at 114.

**II**

**A**

Tren de Aragua ("TdA") is a violent transnational criminal organization based in Venezuela. *See* United States Department of State, Designation of International Cartels, (Feb. 20, 2025), https://perma.cc/XJ7F-GY8U. The State Department designated TdA a foreign terrorist organization on February 20, 2025. *See id.*

Although not publicly disclosed at the time, on March 14, 2025, President Trump signed a Proclamation invoking the Alien Enemies Act in response to "the Invasion of the United States by Tren De Aragua." *See* Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua, 90 Fed. Reg. 13033 (Mar. 14, 2025). The Proclamation was not released publicly until March 15, 2025, at 3:53 pm ET. *See id*; ECF No. 28-1 (Cerna Decl.) ¶ 5.[3]

The Proclamation "find[s] and declare[s] that TdA is perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States[,]" and that "TdA is undertaking hostile actions and conducting irregular warfare against the territory of the United States both directly and at the direction, clandestine or otherwise, of the

[3] All ECF documents refer to the district court docket in this case, *J.G.G. v. Trump*, No. 25-cv-766 (D.D.C. Mar. 18, 2025).

Maduro regime in Venezuela." Proclamation § 1. Based on these findings, the Proclamation provides that "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." Proclamation § 1. The Proclamation further "direct[s] that all Alien Enemies described in * * * th[e] proclamation are subject to immediate apprehension, detention, and removal, and further that they shall not be permitted residence in the United States." Proclamation § 3. The Proclamation directs the Attorney General and the Secretary of Homeland Security to execute these directives. Proclamation § 4.

The Proclamation does not establish any process by which individuals are given notice of the government's determination that they meet the Proclamation's criteria and are therefore removable to a country of the government's choosing. Nor does the Proclamation establish any process by which individuals may challenge the government's determination that they meet the Proclamation's criteria. Instead, upon the government's determination that an individual meets the Proclamation's criteria, that individual is subject to "immediate" removal, without notice and without time or opportunity to challenge their removal. Proclamation § 3.

**B**

Plaintiffs are a class of Venezuelan nationals in government custody who the government claims are subject to removal under the Proclamation. Plaintiffs are in the United States without permission or lawful documentation and, as a result, most if not all are already in immigration detention centers across the United States pending immigration hearings

or removal proceedings. But beginning in March 2025, at least some of them were moved to the El Valle Detention Facility in Texas. *See* ECF No. 3-3 (J.G.G. Decl.) ¶ 5; ECF No. 3-4 (Carney Decl. for G.F.F.) ¶ 12; ECF No. 3-5 (Shealy Decl. for J.G.O.) ¶ 5; ECF No. 3-6 (W.G.H. Decl.) ¶ 7; ECF No. 3-8 (J.A.V. Decl.) ¶ 7; ECF No. 44-6 (Thierry Decl.) ¶ 5; ECF No. 44-8 (Kim Decl.) ¶ 5. The government was unable to inform this court whether all individuals subject to the Proclamation have been moved to the El Valle Detention Facility, or whether they are scattered across detention centers around the country. Oral Arg. 1:47:43.

Apparently having caught wind of the forthcoming Proclamation and the summary removals planned under it, in the early morning hours of March 15, 2025, five named Plaintiffs filed in the United States District Court for the District of Columbia a class action complaint and petition for writ of habeas corpus, and a motion for a Temporary Restraining Order ("TRO") against the President, Attorney General, Department of Homeland Security, Immigration and Customs Enforcement, and Department of State. *See* ECF No. 1 (Complaint); ECF No. 3 (TRO Motion). Plaintiffs allege that their expected summary removal would be unlawful because the Proclamation violated the terms of the AEA, bypassed the procedures set forth for removal in the Immigration and Nationality Act, violated the Administrative Procedure Act ("APA"), and deprived the Plaintiffs of constitutionally required due process to challenge their eligibility for removal. *See* ECF No. 1 (Complaint).

All five of the named Plaintiffs vehemently deny that they are members of TdA. *See* ECF No. 3-3 (J.G.G. Decl.) ¶ 3; ECF No. 44-11 (Carney Decl. for G.F.F.) ¶ 3; ECF No. 44-12 (Smyth Decl. for J.A.V.) ¶¶ 9, 11; ECF No. 3-6 (W.G.H. Decl.) ¶ 12; ECF No. 44-9 (Shealy Decl. for J.G.O.) ¶ 4. Several of

the named Plaintiffs state, in fact, that they sought asylum in part because they themselves were victims targeted by TdA and other gangs. *See* ECF No. 44-11 (Carney Decl. for G.F.F.) ¶ 3; ECF No. 44-12 (Smyth Decl. for J.A.V.) ¶ 5; ECF No. 3-6 (W.G.H. Decl.) ¶¶ 3, 11, 12.

According to Plaintiffs' declarations, the government has accused one named Plaintiff, who is a tattoo artist, of TdA membership on the basis of his tattoo design, which was sourced from Google. ECF No. 3-3 (J.G.G. Decl.) ¶ 4. Other individuals subject to the Proclamation have also denied membership in TdA and have stated that the government has wrongly accused them of TdA membership based on tattoos that have no connection to TdA. *See, e.g.*, ECF No. 44-5 (Tobin Decl.) ¶ 7 (declaring that individual is a Venezuelan professional soccer player with a tattoo of a soccer ball with a crown, similar to the logo of his favorite soccer team, Real Madrid). The government also accused another named Plaintiff of TdA membership because he attended a party where he knew no one other than the person who invited him. ECF No. 3-4 (G.F.F. Decl.) ¶¶ 5-6.

At 9:20 am ET, on the morning of March 15, 2025, the district court "contacted the [g]overnment and connected with defense counsel[.]" *J.G.G. v. Trump*, No. 25-cv-766 (JEB), 2025 WL 890401, at *6-7 (D.D.C. Mar. 24, 2025). At 9:40 am ET, the district court granted Plaintiffs' motion for a TRO which prohibited the government from removing the five named Plaintiffs based on the Proclamation for fourteen days absent further order from the district court. Second Minute Order (Mar. 15, 2025). That same day, the government appealed the district court's TRO and filed an emergency motion to stay the TRO in this court. The district court also set an emergency hearing for 5:00 pm ET that day to consider whether to issue a TRO as to the entire class of individuals

whom the government asserts are subject to removal under the Proclamation.

Despite Plaintiffs' lawsuit and the district court's order setting a hearing for that afternoon, the government seems to have begun the removal process that morning. *See* ECF No. 44-9 (Shealy Decl.) ¶ 8; ECF No. 44-10 (Quintero Decl.) ¶ 3; ECF No. (Carney Decl.) ¶¶ 12-13; ECF No. 44-12 (Smyth Decl.) ¶ 14. By 9:20 am ET, at least one named Plaintiff, J.G.O., had been taken to an airport along with other Venezuelans. ECF No. 44-9 (Shealy Decl.) ¶ 8.

On the afternoon of March 15, 2025, the district court held a hearing on Plaintiffs' class certification motion. During the hearing, Plaintiffs represented that two flights "were scheduled for this afternoon that may have already taken off or [will] during this hearing." *See* Mar. 15 Tr. 12:23-25. In response, at 5:22 pm ET, the court adjourned the hearing and directed the government to determine whether removal of individuals under the Proclamation was underway. Around 6:00 pm ET, the district court resumed, and the government represented that it had no flight information to report to the court. *See* Mar. 15 Tr. 15:4-18:8. During the hearing, the district court also allowed Plaintiffs to dismiss their habeas claims without prejudice. *See* Mar. 15 Tr. 22:24-25.

The district court then provisionally certified a class of all Venezuelan noncitizens subject to the Proclamation. *See* Mar. 15 Tr. 23:1-4, 25:9-10. At approximately 6:45 pm ET, the district court issued an oral TRO prohibiting the government from removing members of the class pursuant to the Proclamation for fourteen days absent further order from the district court. *See* Mar. 15 Tr. 41:18-21. The court also directed the government "that any plane containing" individuals subject to the Proclamation "that is going to take

off or is in the air needs to be returned to the United States[.]" Mar. 15 Tr. 43:12-15. The district court emphasized that "this is something that [the government] need[ed] to make sure [was] complied with immediately." Mar. 15 Tr. 43:18-19.

The court issued a written TRO at approximately 7:25 pm ET. *See* Fourth Minute Order (Mar. 15, 2025); ECF No. 21 (Plaintiffs' Response to Defendants' Notice) at 1-2. As relevant here, that order provides: "Plaintiffs' Motion for Class Certification is GRANTED insofar as a class consisting of 'All noncitizens in U.S. custody who are subject to the March 15, 2025, Presidential Proclamation entitled "Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua" and its implementation' is provisionally certified; [] The Government is ENJOINED from removing members of such class (not otherwise subject to removal) pursuant to the Proclamation for 14 days or until further Order of the Court[.]" Fourth Minute Order (Mar. 15, 2025). The court then set a highly expedited schedule for the government to seek vacatur of the TROs. *Id.*

In so ruling, the district court was explicit that its order did not affect the government's ability to apprehend or detain individuals pursuant to the Proclamation, nor did it require the government to release any individual in its custody subject to the Proclamation. Mar. 15 Tr. 42:16-18; Mar. 21 Tr. 9:2-16; *J.G.G.*, 2025 WL 890401, at *1. In addition, neither TRO prevented the government from deporting any individual on the basis of authorities other than the Proclamation, including under the Immigration and Nationality Act. Mar. 15 Tr. 47:5-8; *J.G.G.*, 2025 WL 890401, at *1; *see also* ECF No. 28-1 (Cerna Decl.) ¶ 6 (government informing the court that a plane "departed after" the district court's TRO, "but all individuals on that third plane had Title 8 final removal orders and thus

were not removed solely on the basis of the Proclamation at issue").

**C**

Questions of the government's compliance with the TROs soon arose, which the district court continues to investigate. *See* Second Minute Order (Mar. 18, 2025); ECF No. 47 (District Court Order dated Mar. 20, 2025); ECF No. 49 (Notice filed by Gov't dated Mar. 20, 2025); ECF No. 50 (Notice filed by Gov't dated Mar. 21, 2025); ECF No. 56 (Notice filed by Gov't dated Mar. 24, 2025).

In those proceedings, the government has taken the position that it was not legally bound by and had no obligation to obey the district court's oral orders directing the return of airplanes in flight. The government's repeated position in district court has been that those oral orders had no legal force until reduced to writing. *See* ECF No. 24 (Gov't Mot. to Vacate) at 2 ("[A]n oral directive is not enforceable as an injunction."); Mar. 17 Tr. 16:12-14 ("Oral statements are not injunctions and [] the written orders always supersede whatever may have been stated in the record[.]"); *id.* at 17:20-21 ("[O]ral statements are not injunctions[.]"); *see also* Mar. 21 Tr. 4:18-19, 6:4-5 (district court noting the government's position that the oral ruling was not binding); Oral Arg. 1:48:24-1:49:19.

On March 24, 2025, the district court denied the government's motion to vacate the TROs. The district court found that Plaintiffs are likely to succeed on their claim that either the Proclamation or its implementation are unlawful under the AEA and unconstitutional for failure to provide Plaintiffs with any advance opportunity to challenge whether they qualify for removal under the Proclamation's terms. *See J.G.G.*, 2025 WL 890401, at *3.

**III**

The government asks this court to stay the TROs.  I agree with Judge Henderson that a stay should be denied.  There is an unsurmountable jurisdictional barrier to the government's request for a stay, and the government's own threshold jurisdictional arguments fail.  In addition, the balance of harms weighs strongly in favor of the Plaintiffs.

**A**

**1**

A stay pending appeal is an "extraordinary" remedy. *Citizens for Resp. & Ethics in Washington v. Federal Election Comm'n*, 904 F.3d 1014, 1017 (D.C. Cir. 2018) (per curiam). To obtain such exceptional relief, the stay applicant must (1) make a "strong showing that [it] is likely to succeed on the merits" of the appeal; (2) demonstrate that it will be "irreparably injured" before the appeal concludes; (3) show that issuing a stay will not "substantially injure the other parties" interested in the proceeding; and (4) establish that "the public interest" favors a stay.  *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

Here, the standard for obtaining a stay is even more daunting.  That is because this court has no jurisdiction to hear an appeal from a temporary restraining order, making any claim of likelihood of success vanishingly low.  *See Belbacha v. Bush*, 520 F.3d 452, 455 (D.C. Cir. 2008); *see also Brotherhood of Railway & S. S. Clerks, Freight Handlers, Exp. & Station Emp. v. National Mediation Bd.*, 374 F.2d 269, 275 (D.C. Cir. 1966) ("A stay pending appeal is always an

extraordinary remedy, and it is no less so when extraordinary jurisdiction must be asserted as a prerequisite.”).

By statute, “our appellate jurisdiction generally extends only to the ‘final decisions’ of district courts.” *Salazar ex rel. Salazar v. District of Columbia*, 671 F.3d 1258, 1261 (D.C. Cir. 2012) (quoting 28 U.S.C. § 1291). There is an exception to that finality requirement for “[i]nterlocutory orders * * * granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions.” 28 U.S.C. § 1292(a)(1). But that provision encompasses “injunctions” only. *See United States v. Hubbard*, 650 F.2d 293, 314 n.73 (D.C. Cir. 1980). There “is no [equivalent] statutory provision for the appeal of a temporary restraining order.” *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *4 (D.C. Cir. Feb. 15, 2025) (quoting Wright & Miller, Fed. Prac. & Proc. Civ. § 2951 (3d ed. June 2024 update)).

As a result, we can review a TRO only if the appellant can show that the order is the legal equivalent of a preliminary injunction. *See Belbacha*, 520 F.3d at 455. The “label attached to an order by the trial court is not decisive[,]” and instead appellate courts must “look to other factors” to determine whether a TRO should be treated as a preliminary injunction. *Adams v. Vance*, 570 F.2d 950, 953 (D.C. Cir. 1978) (citation omitted).

Among those factors, we assess whether the TRO (1) remains in force longer than the time permitted for such an order under Federal Rule of Civil Procedure 65, *Sampson v. Murray*, 415 U.S. 61, 86 (1976); (2) “foreclose[s]” the appellant “from pursuing further interlocutory relief in the form of a preliminary injunction,” *Belbacha*, 520 F.3d at 455 (citation omitted); or (3) otherwise upsets “the status quo

pending further proceedings" in ways that have "irretrievable" consequences, *Adams*, 570 F.2d at 953.

The government has not shown that any of those exceptions apply.

*First*, the TROs fall well within the 14-day time length (extendable for another 14 days for "good cause") allowed by Federal Rule of Civil Procedure 65. FED. R. CIV. P. 65(b)(2). The district court has been handling this complicated matter with speed and diligence, and has directed the Plaintiffs to file any motion to convert the TROs into a preliminary injunction by March 26, 2025, which is a date within the original 14-day time period for the TROs. When a district court arranges for a "prompt hearing on a preliminary injunction[,]" this court does not short-circuit that process and treat a TRO as a "*de facto*" injunction. *Office of Pers. Mgmt. v. American Fed'n of Gov't Emps., AFL-CIO*, 473 U.S. 1301, 1305 (1985) (Burger, C.J., in chambers).[4]

*Second*, the government does not even argue that the TROs have somehow impaired its ability to pursue injunctive relief of its own. So that avenue for appeal of the TROs is closed.

*Third*, the district court's TROs are carefully tailored just to preserve the status quo while the court obtains briefing and the factual development needed to rule on a motion for a preliminary injunction. In removal cases, the status quo is the "state of affairs before the removal order was entered." *Nken*, 556 U.S. at 418 ("Although such a stay acts to 'ba[r] Executive Branch officials from removing [the applicant] from the

[4] For those reasons, the government's argument that the TROs amount to preliminary injunctions because they are slated to last 14 days is without merit. Gov't First Stay Mot. 3-5.

country,' * * * it does so by returning to the status quo[.]") (citation omitted). That status quo is the time before the Proclamation and removals under it commenced. *See also Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022) ("[T]he status quo [i]s 'the last peaceable uncontested status' existing between the parties before the dispute developed.") (quoting 11A Wright & Miller § 2948 (3d ed. 1998)).

Importantly, the district court has tailored its TROs to operate even more narrowly than the status quo by allowing the apprehension and detention of alleged TdA members under the Proclamation, proscribing only their removal under the AEA. Mar. 15 Tr. 42:16-18 (ordering a TRO "to prevent the removal of the class for 14 days"); Mar. 21 Tr. 9:2-16 (underscoring that the TROs allow the government to keep Plaintiffs "in-custody" and do "not order anybody to be released into the United States"); *J.G.G.*, 2025 WL 890401, at *1 ("Neither Order prevented the Government from apprehending anyone pursuant to the * * * Proclamation."). In addition, the court has been explicit that nothing in the TROs prohibits removals based on other legal grounds such as the Immigration and Nationality Act. Mar. 15 Tr. 47:5-8; *J.G.G.*, 2025 WL 890401, at *1 ("[N]either Order prevented the Government from deporting anyone—including Plaintiffs—through authorities *other than* the Proclamation, such as the INA.").

In those ways, this case bears no resemblance to *Adams v. Vance*, *supra*, on which the government hangs its jurisdictional hat. Gov't First Stay Mot. 5; Gov't Second Stay Mot. 9. In *Adams,* this court treated a TRO as a preliminary injunction because, instead of "preserv[ing] the status quo pending further proceedings," it "commanded an unprecedented action irreversibly altering [a] delicate diplomatic balance" in the "arena" of international restrictions on whale hunting. 570

F.2d at 953. In particular, that TRO would have forced the Secretary of State to file a formal "objection" to an action of the International Whaling Commission. *Id.*

The TROs at issue here are the polar opposite. Rather than compelling Executive action, they simply stay the government's hand in part.

**2**

The government nonetheless argues that the TROs should be treated as injunctions because they work "an extraordinary harm" to the President's authority under Article II to conduct foreign affairs. Gov't First Stay Mot. 4; Gov't Second Stay Mot. 8. But the government has shown no such harm here, and its own arguments weigh against it.

To start, as noted above, the TROs do not affect the government's ability to remove deportable individuals under federal laws other than the AEA or to detain and arrest anyone who is a threat to national or domestic security. So the only potential harm is the temporary inability to remove individuals under the AEA and Proclamation.

As to that limitation, the government agrees that individuals are entitled to challenge in court whether they fall within the terms of the AEA or are otherwise not lawfully removable under it. Oral Arg. 1:41:55-1:42:28, 1:42:50-1:43:12. Indeed, the government repeatedly points to unidentified habeas corpus litigation in Texas raising those very types of claims. Oral Arg. 19:46-20:10, 20:30-20:50, 22:14-22:20, 31:00-31:40.

Given that the government agrees that removal *can be delayed* to allow for due process review in habeas consistent

with national security, the same must be true in this courthouse. Certainly the government has given no reason that the delays occasioned by these TROs affect national security in a way different than the removal delays associated with the habeas corpus cases of which it procedurally approves. And, if the government were correct in concluding that AEA removal challenges could be brought in habeas, that litigation could afford the same relief from imminent removal sought here. So the government has not shown how the nature of the relief afforded in these TROs itself somehow impacts national security.

The government's last national security objection is that the district court's oral order on March 15th to turn around airplanes removing class members under the AEA was the equivalent of a court ordering a carrier group to redeploy from the South China Sea. Oral Arg. 1:03-1:12.

A TRO directing military deployments or maneuvers certainly would raise profound separation of powers questions warranting the most careful consideration and remediation. But nothing remotely like that happened here. The district court's TROs only directed immigration officials to preserve their custody, and thus the court's jurisdiction, over the Plaintiffs. The government does not dispute that the Plaintiffs on the non-military planes and the planes themselves were fully under its control at the time of the court's oral order. *See Munaf v. Geren*, 553 U.S. 674, 686 (2008) ("An individual is held 'in custody' by the United States when the United States official charged with his detention has 'the power to produce' him.") (quoting *Wales v. Whitney,* 114 U.S. 564, 574 (1885)); *see also Braden v. Thirtieth Judicial Circuit Court of Kentucky*, 410 U.S. 484, 489 n.4 (1973) (petitioner can be "in custody" of an entity through that entity's agent); *Umanzor v. Lambert*, 782 F.2d 1299, 1302 (5th Cir. 1986) (stating that there was "little

difficulty in concluding" that habeas petitioner was "in custody" where petitioner "was under actual physical restraint by the government's agent—the airline" and noting that petitioner "was imprisoned inside of the aircraft, against his will, until the aircraft completed the flight and he was released[]").

Even more to the point, the government's persistent theme for the last ten days has been that the district court's oral direction regarding the airplanes was *not* a TRO with which it had to comply. *See* ECF No. 24 (Gov't Mot. to Vacate) at 2 ("[A]n oral directive is not enforceable as an injunction."); Mar. 17 Tr. 16:12-14 ("Oral statements are not injunctions and [] the written orders always supersede whatever may have been stated in the record[.]"); *id.* at 17:20-21 ("[O]ral statements are not injunctions[.]"); *see also* Mar. 21 Tr. 4:18-19, 6:4-5 (district court noting the government's position that the oral ruling was not binding); Oral Arg. 1:48:24-1:49:19.

I leave the merits of that argument for the district court to resolve in the first instance. But the one thing that is not tolerable is for the government to seek from this court a stay of an order that the government at the very same time is telling the district court is not an order with which compliance was ever required. Heads the government wins, tails the district court loses is no way to obtain the exceptional relief of a TRO stay.[5]

---

[5] *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (A party may not "prevail[] in one phase of a case on an argument and then rely[] on a contradictory argument to prevail in another phase.") (citation omitted); *Solo v. United Parcel Serv. Co.*, 947 F.3d 968, 972 n.2 (6th Cir. 2020) (positions in district court and on appeal cannot be contradictory).

Next, the government claims that the TROs "risk[] scuttling delicate international negotiations" providing for the removal of Plaintiffs to Venezuela and El Salvador. Gov't Second Stay Mot. 9; ECF No. 26-2 (Kozak Decl.) ¶¶ 2-4. The government then says that "removal delayed tends to become removal denied." Gov't Reply 3.

But the government's arguments keep running into themselves. The government has no objection on diplomatic grounds to removal delays while individualized review of whether a noncitizen falls within the Proclamation's own terms is under way. At least as long as it is a habeas action. But once again, we are lacking any explanation as to why the Plaintiffs' APA claim challenging the government's across-the-board failure to allow any opportunity for that review is somehow a different strain on diplomatic relations. At bottom, the TROs' purpose is to ensure that justice is neither delayed nor denied to Plaintiffs.

In addition, the government does not explain why there would be any possible breakdown in diplomatic discussions over ensuring that removed individuals are, in fact, members of TdA. Surely the government claims no diplomatic interest in sending individuals to El Salvador or Venezuela who are *not* members of TdA and so are not covered by the Proclamation. *See* Proclamation § 1 (invoking authority over "Venezuelan citizens 14 years of age or older who *are* members of TdA") (emphasis added). I will not put the cart before the horse and rely on a harm that assumes the very fact Plaintiffs vigorously contest.

**3**

There is yet another (non-jurisdictional) procedural problem with the government's request for a stay. Appellate

Litigation 101 requires parties seeking a stay from this court to first request one from the district court. FED. R. APP. P. 8(a)(2); *Powder River Basin Res. Council v. United States Dep't of Interior*, No. 24-5268, 2025 WL 312649, at *1 (D.C. Cir. Jan. 24, 2025) (per curiam); *Teva Pharms. USA, Inc. v. Food & Drug Admin.*, No. 05-5401, 2005 WL 6749423, at *1 (D.C. Cir. Nov. 16, 2005) (per curiam).

The government is fully familiar with that requirement. In fact, the government routinely asks this court to dismiss stay requests by other parties for failure to seek a stay below, *see* Gov't Br. 9, *Vertical Aviation Int'l, Inc. v. Federal Aviation Auth.*, No. 25-1017 (D.C. Cir. Mar. 19, 2025); Gov't Br. 8, *Frontier Airlines, Inc. v. Department of Transp.*, No. 25-1002 (D.C. Cir. Feb. 6, 2025); Gov't Br. 10, *Bull v. Drug Enf. Agency*, No. 13-1279 (D.C. Cir. Nov. 20, 2013), and we commonly agree, *see Vertical Aviation Int'l, Inc. v. Federal Aviation Auth.*, No. 25-1017 at 1 (D.C. Cir. Mar. 19, 2025); *Frontier Airlines, Inc. v. Department of Transp.*, No. 25-1002 at 1 (D.C. Cir. Feb. 6, 2025); *Bull v. Drug Enf,. Agency*, No. 13-1279 at 1 (D.C. Cir. Nov. 20, 2013).

Yet the government completely failed to seek stays of the TROs from the district court at all. Not for lack of time. It has had more than a week to do so. And not for temporarily forgetting the requirement. It has openly flagged its noncompliance in its briefs. Gov't First Stay Mot. 4 n.1; Gov't Second Stay Mot. 8 n.1. There are occasional exceptions to seeking a stay in district court, but the government has argued none of them here.

I would deny the stay on this additional ground. The government needs to play by the same rules it preaches. And it needs to respect court rules.

**B**

While the government has not demonstrated a likelihood of establishing jurisdiction over its appeals and request for a stay of the TROs, a majority of this panel has concluded otherwise. Given that resolution, I address why the government's own threshold arguments challenging the district court's jurisdiction also are unlikely to succeed.

**1**

**a**

The government argues that Plaintiffs' case is non-justiciable because the Executive Branch's interpretation of the AEA as applying to the removal of members of a criminal gang is a judicially unreviewable political question. Gov't First Stay Mot. 4.

I note at the outset that the government's argument does not suggest that the Plaintiffs' *constitutional* entitlement to notice and some opportunity for pre-removal due process is a political question. So this argument by the government does not actually affect the district court's jurisdiction to enter the TROs.

Anyhow, political questions are decisions committed by the Constitution to the discretion of the Political Branches or lacking judicially manageable standards of review. *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 197-198 (2012) (*Zivotofsky I*). Although federal courts must account for prudential considerations when deciding whether an issue constitutes a political question, *see Baker v. Carr*, 369 U.S. 186, 217 (1962), the Constitution's assignment of responsibilities and the feasibility of judicial review are "the

most important" factors, *Schieber v. United States*, 77 F.4th 806, 810 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 688 (2024).

The gravamen of the government's position is that the President has total and unreviewable authority to decide whether the statutory prerequisites for invoking the AEA are met in Plaintiffs' case. This includes deciding whether TdA is a "foreign nation or government" and whether its actions amount to an "invasion or predatory incursion" into the United States. 50 U.S.C. § 21.

That argument is not likely to succeed. The judiciary, not the Executive, has the ultimate constitutional responsibility and capacity for saying what statutes and statutory terms mean.

Under the Constitution, federal courts are vested with the "judicial Power of the United States[,]" U.S. CONST. Art. III, § 1, and "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury*, 5 U.S. at 177. "When the meaning of a statute [is] at issue, the judicial role [is] to 'interpret the act of Congress, in order to ascertain the rights of the parties.'" *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 385 (2024) (quoting *Decatur v. Paulding*, 39 U.S. 497, 515 (1840)).

In addition, statutory interpretation is judicially manageable because it does not require courts to exercise "their own political judgment[.]" *Rucho v. Common Cause*, 588 U.S. 684, 705 (2019). Instead, the judicial "task is to discern and apply the law's plain meaning as faithfully" as possible. *BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1542 (2021). Because questions about meaning are objectively discernible from statutory text and context, courts can decide them "by applying their own judgment." *Loper Bright*, 603 U.S. at 392.

That is why the "Supreme Court has never applied the political question doctrine in cases involving statutory claims of this kind." *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 855 (D.C. Cir. 2010) (Kavanaugh, J., concurring in the judgment). Instead, the Court has emphasized that whether to "enforce a specific statutory right" is "a familiar judicial exercise," not a political question. *Zivotofsky I*, 566 U.S. at 196.

That remains true even if the statute's subject concerns foreign or military affairs. *Zivotofsky*, 566 U.S. at 196 (statutory right to passport designation implicating diplomatic status of Jerusalem is not a political question). Indeed, "[i]t is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker*, 369 U.S. at 211. Many legal questions arising from statutes involving foreign policy are not political questions.[6] And many cases require courts to decide whether the plaintiff has a statutory right based on terms like "war," "peace," and "hostilities" abroad. *See Lee v. Madigan*, 358 U.S. 228, 229 (1959); *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 140-141 (1948); *Ludecke*, 335 U.S. at 166-167; *Al-Alwi v. Trump*, 901 F.3d 294, 300 (D.C. Cir. 2018).

---

[6] *See Zivotofsky I*, 566 U.S. at 194; *Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221, 229 (1986); *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 254 n.25 (1984); *Al-Tamimi*, 916 F.3d at 13; *Schieber*, 77 F.4th at 812; *Simon v. Republic of Hungary*, 812 F.3d 127, 150 (D.C. Cir. 2016), *abrogated on other grounds by Federal Republic of Germany v. Philipp*, 592 U.S. 169 (2021); *Wilson v. Libby*, 535 F.3d 697, 703-704 (D.C. Cir. 2008); *DKT Memorial Fund, Ltd. v. Agency for International Dev.*, 810 F.2d 1236, 1238 (D.C. Cir. 1987); *Population Institute v. McPherson*, 797 F.2d 1062, 1068 (D.C. Cir. 1986).

This case fits that same apolitical, statutory-construction mold. The parties disagree about the meaning of words. For example, relying on dictionaries from when the AEA was written, the plaintiffs argue that the word "invasion" means "entrance of a hostile army[.]" Pls' Br. 21 (citing Webster's Dictionary, *Invasion* (1828)). By contrast, the government cites a modern dictionary defining "invasion" as the "arrival somewhere of people or things who are not wanted[.]" Gov't First Stay Mot. 12 (citing Black's Law Dictionary, *Invasion* (12th ed. 2024)). The judiciary can resolve this disagreement with settled tools of statutory construction.

To be sure, other non-interpretive parts of the Proclamation may involve expert and discretionary judgments. For example, whether a criminal gang has infiltrated a foreign government so deeply that it has become a part of that government itself may well be a judgment for the Political Branches to make. *Cf. Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 28 (2015) (deciding political status of Jerusalem is a political question); *Oetjen v. Century Leather Co.*, 246 U.S. 297, 302 (1918) (determining government of Mexico is a political question); *Jones v. United States,* 137 U.S. 202, 212 (1890) (determining sovereignty over Guano Islands is a political question); *Lin v. United States*, 561 F.3d 502, 506 (D.C. Cir. 2009) (determining sovereignty over Taiwan is a political question); U.S. CONST. Art. II, § 3 (The President "shall receive Ambassadors and other public Ministers[.]"). But once those decisions are made, determining whether the political answer falls within the meaning of a statutory term is the job of the Judicial Branch.

**b**

The government's efforts to shoehorn the statutory interpretation questions in this case into the political-question doctrine are unlikely to succeed.

*First*, the government argues that the Supreme Court foreclosed judicial review of the AEA's meaning in *Ludecke*.

Actually, the Supreme Court said the opposite. *Ludecke*, which is the only Supreme Court case interpreting the AEA, said that courts may not "pass judgment upon the exercise of [the President's] discretion" when invoking the AEA. 335 U.S. at 164. But the discretion to which the Court referred was the President's judgment whether, in the conduct of a war, to invoke the Act and, if so, whether to remove, relocate, or just detain alien enemies. *Ludecke,* 335 U.S. at 164-169.

But the separate issue of what the AEA's text means is a question of law, not discretion. That is why the Supreme Court specifically held that the AEA's "interpretation and constitutionality" are matters to be decided by federal courts. *Ludecke,* 335 U.S. at 163-164. In fact, the central question resolved by the Supreme Court was whether the term "war" in Section 21 of the Act requires ongoing hostilities for the AEA to remain in force. *Id.* at 166-167. The Court engaged in statutory construction and held that, even if the shooting has stopped, the relevant state of "war" continues until the Political Branches terminate the Nation's state of war. *Id.* at 167-169. So *Ludecke* conclusively held—and showed—that interpreting

the meaning of the AEA's words falls within the Judicial Branch's wheelhouse.[7]

*Second*, the government maintains that whether there has been an "invasion or predatory incursion" of the United States and whether TdA is a "foreign nation or government" are committed to the President's discretion. Not likely.

For one, this case does not require the court to "supplant a foreign policy decision" with its own "unmoored determination of what United States policy" should be. *Zivotofsky I*, 566 U.S. at 196. Instead, the district court is assessing whether exceptional removal procedures are available for alleged members of TdA under the AEA. The Supreme Court addressed the same question for German nationals in *Ludecke*. 335 U.S. at 166-167. There, the Supreme Court decided what "war" means under the AEA. This case involves what the neighboring terms "invasion" and "incursion" mean. 50 U.S.C. § 21. How the President should combat the dangers posed by TdA, whether to treat TdA as an arm of the Venezuelan state, and whether to remove or detain qualifying TdA's members are not questions under review, any more than the President's conduct of World War II was under review in *Ludecke*. All the district court is deciding is whether the AEA permits the government to deny Plaintiffs all pre-removal notice and due process. Resolving that issue is a core judicial responsibility. *See, e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004).

[7] The government also claims that this court held that AEA claims are non-justiciable in *Citizens Protective League v. Clark*, 155 F.2d 290 (D.C. Cir. 1946). Not so. *Citizens Protective League* ruled on the merits of a constitutional challenge to the AEA, concluding that the "Alien Enemy Act is constitutional[.]" *Id.* at 293. Any contrary suggestion in the opinion regarding the non-justiciability of statutory interpretation issues was superseded by *Ludecke*.

In addition, the government is mistaken about the extent of unilateral Executive authority under the Constitution. An assertion of exclusive Executive authority is "the least favorable of possible constitutional postures" and it runs aground here on the express constitutional assignment of relevant authority to Congress. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 640 (1952) (Jackson, J. concurring). For it is Congress that has the power to "repel Invasions[,]" U.S. CONST. Art. I, § 8, cl. 15, and retains "plenary authority" over noncitizens, *INS v. Chadha*, 462 U.S. 919, 940 (1983); *see* U.S. CONST. Art. I, § 8, cl. 4. While the "United States" must "protect each" state "against Invasion," nothing in the Constitution assigns this responsibility exclusively to the President. *Id.* Art. IV, § 4, and, in fact, Article I indicates otherwise, *id*. Art. I, § 8, cl. 15 (giving Congress the power to repel invasions).

To be sure, the President enforces laws that Congress makes on these subjects because the President must "take Care that the Laws be faithfully executed[.]" U.S. CONST. Art. II, § 3. But that authority is bounded by the statutory limits Congress has set in the AEA, and determining what those statutory terms mean is a judicial responsibility. *Id.* Art. III, § 1. This is so even for questions concerning war and international aggression. "From the very beginning" federal courts have determined "the law of nations which prescribes, for the conduct of war, the status, rights and duties of enemy nations as well as of enemy individuals." *Ex parte Quirin*, 317 U.S. 1, 27-28 (1942).

The government argues lastly that, as a practical matter, the judiciary should not contradict the Executive's interpretation of the statute. Gov't First Stay Mot. 17-18. That sounds like an argument for the version of the AEA that Congress refused to enact, under which courts would simply

follow "the rules and directions which, in any proclamation or other public act, the President of the United States shall and may make[.]" 8 ANNALS OF CONG. 1786 (1798). Congress chose instead to enact an AEA that denied unchecked Executive authority and left an independent role for the courts. 50 U.S.C. § 23; *contrast An Act Concerning Aliens*, ch. 58, § 1, 1 Stat. 571 (1798) (granting the President discretion to remove any alien he "judge[d] dangerous to the peace").

In any event, the government identifies no prudential reasons the district court or this court should shrink back in this case. The government has not identified any conflict with "the other *two* branches" at all, *Al-Tamimi*, 916 F.3d at 12 (emphasis added). Nor, at this pre-merits stage, has the government explained why the district court's preservation of the status quo so that the Plaintiffs can obtain the due process review (which the government agrees they can have) crosses any prudential lines. Something "more is required" for a political question than mere "inconsistency between a judicial decision and the position of" an Administration. *Id.*

**2**

**a**

Equally unavailing is the government's suggestion that the District of Columbia is the incorrect location for this suit. The government argues that, because the Plaintiffs' "claims sound in habeas" and the "only proper venue" for a habeas petition is the venue where a detainee is being held, Plaintiffs must sue in Texas—not the District of Columbia. Gov't First Stay Mot. 8.

At the outset, to the extent the government is arguing that Plaintiffs' failure to file in the district of detention deprives the district court of subject matter jurisdiction, that argument has

no purchase. In a habeas petition, the place of detention matters for personal jurisdiction or venue, but not for subject matter jurisdiction. *See Braden*, 410 U.S. at 493 (applying "traditional venue considerations" to identify the correct forum for a habeas suit); *see also Rumsfeld v. Padilla*, 542 U.S. 426, 434 n.7 (2004) (referring to "jurisdiction" as used in the habeas statute, "not in the sense of subject-matter jurisdiction of the District Court"); *id.* at 451 (Kennedy, J., concurring) ("[T]he question of the proper location for a habeas petition is best understood as a question of personal jurisdiction or venue.").

But the government's argument flounders for a more fundamental reason. Plaintiffs' claims are not habeas claims and do not sound in habeas. Their complaint originally included one count alleging their detention violated the right to habeas corpus. ECF No. 1 (Complaint) ¶¶ 105-106. But the district court has since granted Plaintiffs' motion to dismiss that count from the complaint, Mar. 15. Tr. 22:23-25, and the rest of Plaintiffs' claims are routine APA claims.

Habeas corpus is the proper vehicle for challenges to the legality of custodial *detention*, not the proper vehicle for a petitioner to "claim the right to * * * remain in a country or to obtain administrative review potentially leading to that result." *DHS v. Thuraissigiam*, 591 U.S. 103, 117 (2020). The Supreme Court has been crystal clear on this point: "The writ simply provide[s] a means of contesting the lawfulness of restraint and securing release" from detention. *Id.*

In *Thuraissigiam*, a noncitizen in detention sought a writ of habeas corpus to prevent his deportation to Sri Lanka. The Court held that he could not pursue his claim through habeas because he sought, in many ways, the opposite of release from detention. 591 U.S. at 119. "[T]he Government [wa]s happy to release him—provided the release occur[red] in the cabin of

a plane bound for Sri Lanka." *Id.* But, because Thuraissigiam wanted instead "the opportunity to remain lawfully in the United States[,]" his requested relief fell "outside the scope of the writ[.]" *Id.*

Likewise, in *Munaf*, American citizens in U.S. custody in Iraq during military operations there filed habeas petitions to prevent their transfer to Iraqi authorities for criminal prosecution. 553 U.S. at 692. The Supreme Court held that their "claims do not state grounds upon which habeas relief may be granted." *Id.* "Habeas is at its core a remedy for unlawful executive detention[,]" and "[t]he typical remedy for such detention is, of course, release." *Id.* at 693. Because the "last thing" the petitioners in *Munaf* wanted was "simple release"—"that would expose them to apprehension by Iraqi authorities for criminal prosecution"—they could not press their claims through a habeas action. *Id.* at 693-694.

Like the plaintiffs in *Thuraissigiam* and *Munaf*, Plaintiffs here do not seek release from detention; they want to stay in detention in the United States. The gravamen of their complaint is that the government cannot implement the President's proclamation by removing them from the United States and releasing them into the custody of a foreign sovereign, especially without affording them basic due process. *See* ECF No. 1 (Complaint) ¶¶ 71-73. In other words, the "last thing" Plaintiffs want is release from U.S. detention, *Munaf*, 553 U.S. at 693.

**b**

Given that precedent, the Plaintiffs' APA action is an appropriate vehicle for the challenges they raise to the defendant agencies' implementation of the Proclamation without notice and due process. Unless otherwise precluded by

statute, the APA generally provides a cause of action to challenge removals outside of the immigration laws. *Shaughnessy v. Pedreiro*, 349 U.S. 48, 51 (1955); *see Robbins v. Regan*, 780 F.2d 37, 42 (D.C. Cir. 1985) ("[J]urisdiction over APA challenges to federal agency action is vested in district courts unless a preclusion of review statute * * * specifically bars judicial review in the district court."); *see also* 8 U.S.C. § 1252(g) (stripping courts of jurisdiction to review, as relevant here, removal orders under Title 8, Chapter 12).

Nothing in the AEA forecloses judicial review of an alleged enemy alien's claim that removal would be unlawful. Quite the opposite, Section 23 expressly provides for judicial review of claims raised by persons before the court. And the AEA, of course, is not part of Title 8, Chapter 12, and so is not subject to Section 1252(g)'s jurisdiction stripping.

We recently reached that same conclusion in *Huisha-Huisha*. There, asylum seekers in detention in Texas challenged the Executive's use of 42 U.S.C. § 265, a public health statute, to expel them from the United States. 27 F.4th at 723-724, 726-727, 733. The asylum seekers argued that the use of Section 265 was "contrary to law" under the APA and was improperly implemented by the agency. Compl. ¶¶ 74-79, 83-84, 101-102, *Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022). The government did not argue that there was any jurisdictional impediment to APA review, and we found none.

Plaintiffs' suit here fits the APA bill as well. Instead of the Executive using Section 265 to justify removals, it relies on the Alien Enemies Act. But, because the AEA is outside Chapter 12 of the U.S. Code, plaintiffs may challenge their removals under the APA.

As the government does not dispute, venue for Plaintiffs' APA claims is proper in the District of Columbia. It is the judicial district where defendants—agencies and officers of the United States—reside. *See* 28 U.S.C. § 1391(e)(1) ("A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity * * * may * * * be brought in any judicial district in which [] a defendant in the action resides[.]").[8]

**c**

The government's insistence that Plaintiffs' claims can only proceed through habeas, and not under the APA, is not likely to succeed either.

*First*, the government is wrong that "review of AEA enforcement lies only in habeas[.]" Gov't Second Stay Mot. 21. Our decision in *Citizens Protective League* shows otherwise. There, we entertained non-habeas "civil actions"

---

[8] Even if Section 1252(g) barred individual plaintiffs from relying on the APA to challenge their individual removals, it would not bar Plaintiffs' class-wide challenge to the procedures—or lack thereof—by which removals are being effectuated. Section 1252(g)'s reference to a "decision or action[,]" 8 U.S.C. § 1252(g), "describes a single act rather than a group of decisions or a practice or procedure employed in making decisions." *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 56 (1993) (quoting *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479, 492 (1991) (analyzing similar language in 8 U.S.C. § 1255). That language therefore "describes the denial of an individual application," and so "applies only to review of denials of individual * * * applications." *Id.* (quoting *McNary*, 498 U.S. 479 at 492). For that reason, both *Reno* and *McNary* found district courts had jurisdiction over class-wide challenges to the procedural implementation of immigration processes. *Id.* at 55-56; *McNary*, 498 U.S. at 491-494.

brought by 159 German nationals and a non-profit organization to challenge removals under the AEA. *Citizens Protective League*, 155 F.2d at 291.

Outside the context of the AEA, the Supreme Court has also not required plaintiffs to use habeas when they do not challenge detention. The Court has never "recognized habeas as the sole remedy where the relief sought would not terminate custody, accelerate the date of release, or reduce the custody level." *Skinner v. Switzer*, 562 U.S. 521, 534 (2011). To the contrary, when the relief sought is simply to "stay" in the United States, that relief "falls outside the scope of the writ[.]". *Thuraissiggiam*, 591 U.S. at 119.

*Second*, the government relies on *LoBue v. Christopher*, 82 F.3d 1081 (D.C. Cir. 1996), to argue that, so long as Plaintiffs could have petitioned for habeas to secure the relief they seek, no other cause of action is available. *Thuraissiggiam* and *Munaf* establish that habeas relief is not available in this context, so the government's *LoBue* argument is beside the point.

*LoBue* is off point for another reason. In that case, two plaintiffs detained in Illinois for extradition to Canada filed habeas corpus actions in Illinois and then a separate APA suit in the District of Columbia. They argued that the extradition laws were unconstitutional. *Id.* at 1081-1083. This court rejected the plaintiffs' attempt to make an end-run around habeas. Because success in their declaratory suit would have "preclusive effect" on their concurrently filed habeas petitions and so would secure their release from confinement, it did not matter that the plaintiffs did not "formally s[eek] a release from custody" in this court. *Id.* at 1083.

Plaintiffs, by contrast, are not manipulating anything. The government's implementation of the Proclamation gave no individual notice or any time at all to file suit to challenge their removal. Only a swift class action could preserve the Plaintiffs' legal rights before the rushed removals mooted their cases and thrust them into a Salvadorean prison. So success in this suit would not secure Plaintiffs' release from U.S. custody—the remedy they could secure through habeas petitions. Success would maintain their federal custody.

Even on its own terms, *LoBue* has no bearing on this case. *LoBue* concerned extradition, not removal, and this court specifically distinguished an extradition challenge from Supreme Court precedent "allowing an alien subject to a deportation order to seek relief by way of a declaratory judgment action." 82 F.3d at 1083.

**IV**

On top of the threshold jurisdictional barriers to our appellate jurisdiction and to the government's ability to succeed on the merits of its own jurisdictional objections to the district court's TROs, the other stay factors weigh against the government.

One of the "most critical" factors for a stay is "whether the applicant will be irreparably injured[.]" *Nken*, 556 U.S. at 434. The government's argument for irreparable injury does not hold up on this record.

According to the government, the district court's TROs interfere with the President's authority to execute the law and to oversee foreign affairs. Yet the government conceded at oral argument that all Plaintiffs in the class are entitled to submit habeas petitions in the district of their confinement challenging

whether they are members of TdA. Oral Arg. 19:51-20:14, 56:16-56:26, 1:41:55-1:42:28, 1:42:50-1:43:12. Even assuming Plaintiffs' claims to remain in detention could be pressed under habeas, any such habeas proceeding would allow them to obtain the same relief they seek here—review of their eligibility for removal under the Proclamation. And so the government's preference for habeas proceedings would produce at least the same restriction on the President's authority to remove the Plaintiffs that the TROs impose.

In other words, the Executive Branch's asserted injury is actually just a dispute over which procedural vehicle is best situated for the Plaintiffs' injunctive and declaratory claims. The Executive Branch prefers 300 or more individual habeas petitions in Texas and wherever else Plaintiffs are detained to this class APA case in Washington D.C. Regardless of whether the government is entitled to a different venue and procedural vehicle, an assertion of a "procedural right *in vacuo*" does not amount to irreparable injury warranting immediate emergency relief. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

In addition, the TROs create no risk to the public. The TROs only prevent the Executive from removing alleged members of TdA who are already detained under the AEA. Second Minute Order (Mar. 15, 2025). The Executive remains free to take TdA members off the streets and keep them in detention. The Executive can also deport alleged members of TdA under the INA in expedited fashion if the government can prove they committed a serious crime, 8 U.S.C. § 1228(a), or are terrorists, 8 U.S.C. §§ 1531-1537.

Finally, there is the more basic question of whether any of the Plaintiffs are, in fact, members of TdA. The Plaintiffs vigorously argue that they have nothing to do with this gang.

*See* ECF No. 3-3 (J.G.G. Decl.) ¶ 3; ECF No. 44-11 (Carney Decl. for G.F.F.) ¶ 3; ECF No. 44-12 (Smyth Decl. for J.A.V.) ¶¶ 9, 11; ECF No. 3-6 (W.G.H. Decl.) ¶ 12; ECF No. 44-9 (Shealy Decl. for J.G.O.) ¶ 4.[9]

At the same time, the injury to the Plaintiffs is great and truly irreparable. They face immediate removal on grounds that they say have no application to them and yet their claims have never been heard. And the removals under the AEA thus far have been not to their home countries, but directly into a Salvadorean jail reported to have a notorious reputation for human rights abuses and disappearances. ASSOCIATED PRESS, *What to know about CECOT, El Salvador's mega-prison for gang members*, (Mar. 17, 2025), https://perma.cc/7WER-NB7G.

Worst of all, the government has confessed that its preference that Plaintiffs use habeas corpus to challenge their eligibility for AEA removal is a phantasm: The government's position at oral argument was that, the *moment* the district court TROs are lifted, it can *immediately* resume removal flights without affording Plaintiffs notice of the grounds for their removal or any opportunity to call a lawyer, let alone to file a writ of habeas corpus or obtain any review of their legal challenges to removal. Oral Arg. 1:44:04-1:45:51. It is irreparable injury to reduce to a shell game the basic lifeline of due process before an unprecedented and potentially irreversible removal occurs.

---

[9] The lack of irreparable injury to the government is also the reason for denying the government's request for mandamus relief. Mandamus is inappropriate when the normal appellate process is adequate to address the government's injury. *In re Flynn*, 973 F.3d 74, 78 (D.C. Cir. 2020) (en banc) ("A petition for a writ of mandamus 'may never be employed as a substitute for appeal.'") (quoting *Will v. United States*, 389 U.S. 90, 97 (1967).

## V

Over one-hundred-and-fifty years ago, the Supreme Court addressed whether civilian courts could be closed just because the Executive declared an emergency. The Court said no.

> The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government.

*Ex parte Milligan*, 71 U.S. 2, 120-121 (1866).

The government's removal scheme denies Plaintiffs even a gossamer thread of due process, even though the government acknowledges their right to judicial review of their removability. The district court's temporary restraining orders have appropriately frozen the status quo until an imminent motion for preliminary injunction is filed. The district court acted well within its discretion in doing so. We lack jurisdiction to review the government's motion to stay those orders, and the government's jurisdictional objections to the district court's actions do not raise a substantial question at this stage.

For all of the foregoing reasons, I agree that the government's motions for stays must be denied.

WALKER, *Circuit Judge*, dissenting:

Tren de Aragua is a violent criminal organization linked to Venezuela.  The President invoked the Alien Enemies Act of 1798 to remove its members from our country.[1]  Venezuelan nationals alleged to be members of this group were swiftly sent to a detention center in Texas for summary removal.[2]

Five individuals confined at that Texas facility quickly sued the President here in Washington, D.C.  They say that the President exceeded his authority under the Act.  They also say they're not members of Tren de Aragua.[3]

The two sides of this case agree on very little.  But what is at this point uncontested is that "individuals identified as alien enemies . . . may challenge that status in a habeas petition."[4]

---

[1] Presidential Proclamation, *Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua* (March 15, 2025) (the "Proclamation") (citing the Alien Enemies Act, 50 U.S.C. § 21, et seq., 1 Stat. 577, 577-78 (1798)).

[2] *See* Complaint, ECF 1, at 3-5 ¶¶ 9-13, *J.G.G. et al. v. Trump, et al.*, No. 1:25-cv-00766 (D.D.C. Mar. 15, 2025).

[3] *See* Plaintiffs' Response to Motion to Vacate TRO, ECF 44, at 7 ("all five of the named Plaintiffs dispute that they are members of the TdA [i.e., Tren de Aragua]." (citing declarations)).

[4] Government's Reply in Support of Emergency Appeal, at 14; *see also* Oral Arg. at 17:38 – 21:33, *available at* youtube.com/live/4DoTLGECQSU.

In other words, according to the Government, the door to the federal courthouse in Brownsville, Texas is open, and the Government has not represented that it will affirmatively prevent a detainee from seeking emergency habeas relief in his district of confinement if he tries to do so.  In fact, despite the Government's haste, and notwithstanding Plaintiffs' allegations of underhanded conduct, deportees *have* managed nonetheless to file petitions for habeas corpus both here and in the Southern District of Texas.  *Cf.*

The problem for the Plaintiffs is that habeas claims must be brought in the district where the Plaintiffs are confined. For the named Plaintiffs at least, that is the Southern District of Texas. Because the Plaintiffs sued in the District of Columbia, the Government is likely to succeed in its challenge to the district court's orders.

The Government has also shown that the district court's orders threaten irreparable harm to delicate negotiations with foreign powers on matters concerning national security. And that harm, plus the asserted public interest in swiftly removing dangerous aliens, outweighs the Plaintiffs' desire to file a suit in the District of Columbia that they concede they could have brought in Texas — and that longstanding legal principles regarding habeas require them to have brought in Texas.

The Government has met its burden, so we should grant the stay pending appeal.

**I. The District Court's Orders Are Appealable Orders.**

We must have jurisdiction before we consider an appeal. Temporary restraining orders ordinarily aren't appealable.[5] But the district court's extraordinary orders here are.

---

*I.M. v. United States Customs & Border Protection*, 67 F.4th 436, 444 (D.C. Cir. 2023) (brief custody of a few weeks would not "all but prevent judicial review of expedited removal orders").

[5] *OPM v. American Federation of Government Employees, AFL-CIO*, 473 U.S. 1301, 1303-04 (1985) ("denials of temporary restraining orders are ordinarily not appealable").

It's fair to ask why this is "the established rule." *Id.* After all, we have appellate jurisdiction to review orders "granting . . . injunctions, or refusing to dissolve or modify injunctions," 28 U.S.C. § 1292(a)(1), and "TROs almost certainly fall within the historical

Operating under intense time pressure, the district court granted a temporary restraining order preventing the removal of the named plaintiffs, then quickly certified a class of "all noncitizens in U.S. custody who are subject to the . . . Proclamation,"[6] and then granted a temporary restraining order that "enjoined" the Government "from removing members of [that] class."[7] Together, these orders amounted to an injunction that halted the President's effort to implement his Proclamation — the success of which depends on "delicate negotiations" with "foreign interlocutors."[8]

The district court's extraordinary injunctions are appealable. Although the district court "styled" each of them as "a temporary restraining order," that "label . . . is not decisive."[9] What matters is what it did. And far from "merely

---

and modern definitions of 'injunction.'" Tyler B. Lindley, Morgan Bronson & Wesley White, *Appealing Temporary Restraining Orders* (BYU Law Research Paper No. 25-06), 77 Fla. L. Rev. (forthcoming 2025) (manuscript at 3), https://perma.cc/Q2JB-FC93. It appears likely that the rule is no product of "textualist reasoning," but rather a vestige of case law dissociated from important statutory history. *Id.* Even so, we're bound by that case law until the Supreme Court tells us otherwise.

[6] Minute Order Granting Motion for Class Certification.

[7] *Id.*

[8] Government's Emergency Motion for a Stay Pending Appeal at 26-27 ¶¶ 2-4 (Declaration of Michael G. Kozak).

[9] *Adams v. Vance*, 570 F.2d 950, 953 (D.C. Cir. 1978) (quoting Wright & Miller, Federal Practice and Procedure § 2962, at 619 (1973)).

Relatedly, district courts have halted executive actions under the guise of "administrative stays." *See, e.g.*, Minute Order, *Dellinger v. Bessent*, No. 25-cv-385 (D.D.C. Feb. 10, 2025) (administrative stay reinstating terminated official). But again, what matters is not how an order is labeled, but how it functions. These so-called

preserv[ing] the status quo pending further proceedings," the district court's orders affirmatively interfered with an ongoing, partially overseas, national-security operation.[10]

In *Adams v. Vance*, we held that when a district court's temporary order threatens "intrusion on executive discretion in the field of foreign policy," its order is immediately reviewable.[11] That's the case here. The district court told the Executive Branch to immediately stop executing a plan to repatriate or remove Venezuelan nationals pursuant to "[a]rrangements [that] were recently reached" with El Salvador and "representatives of the Maduro regime."[12] Not only that, the district court "commanded an unprecedented action" from the bench: The district judge ordered aircraft to be turned around mid-flight in the middle of this sensitive ongoing national-security operation.[13]

---

"'administrative stays' are not actually stays at all, administrative or otherwise. They are injunctions." Chris D. Moore, *So-Called "Administrative Stays" in Trump 2.*0, 104 Tex. L. Rev. Online (forthcoming 2025) (manuscript at 3), https://perma.cc/6DUP-9N7P.

[10] *Adams*, 570 F.2d at 952.

[11] *Id.*

[12] Kozak Declaration ¶ 3.

[13] Class Certification Hearing Tr. at 43:12-15, 43:18-19 (Mar. 15, 2025) ("[A]ny plane containing [putative plaintiff class members] that is going to take off or is in the air needs to be returned to the United States . . . . [T]hose people need to be returned to the United States. . . . [T]his is something that you need to make sure is complied with immediately."); *cf. Al-Bihani v. Obama*, 619 F.3d 1, 12 n.1 (D.C. Cir. 2010) (en banc) (Kavanaugh, J., concurring) ("Even when this Court might disagree with a District Court decision, that disagreement is with respect and appreciation for the dedicated work of the District Court on these matters.").

"When an order directs action so potent with consequences so irretrievable, we provide an immediate appeal to protect the rights of the parties."[14] The district court's orders here threaten an "irreversibl[e] altering [of] the delicate diplomatic balance" that high-level Executive officials recently struck with foreign powers.[15]

In a sworn declaration, the Senior Bureau Official for Western Hemisphere Affairs tells us, based on his "extensive experience since 1971 engaging in" diplomacy involving "El Salvador, Venezuela, and other countries in the region," that there is a serious risk that our diplomatic counterparts will "change their minds regarding their willingness to accept certain individuals associated with [Tren de Aragua]."[16] He also flags the risk that foreign negotiators will "seek to leverage" the delay "as an ongoing issue."[17]

As we've cautioned before, "[c]ourts must beware 'ignoring the delicacies of diplomatic negotiation.'"[18] So we can't ignore a declaration warning that these "harms could arise

---

[14] *Adams*, 570 F.2d at 953; *see also Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *13 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting) ("TROs themselves sometimes inflict irreparable injury, and in those cases an immediate appeal is available to avoid it.").

[15] *Adams*, 570 F.2d at 953; *see* Kozak Declaration ¶¶ 2-3 (explaining that Secretary of State and other high-ranking White House and State Department officials "negotiated at the highest levels with the Government of El Salvador and with Nicolas Maduro and his representatives in Venezuela in recent weeks").

[16] Kozak Declaration ¶¶ 1, 4.

[17] *Id.* ¶ 4.

[18] *Adams*, 570 F.2d at 954 (quoting *Mitchell v. Laird*, 488 F.2d 611, 616 (D.C. Cir. 1973)).

even in the short term."[19] It's no answer, therefore, to say that the district court's temporary restraining orders last only 14 days (or perhaps another 14 days after that).[20] That's more than enough time to frustrate fast-moving international negotiations.

In sum, the "extraordinary character of the order[s] at issue here . . . warrant[ ] immediate appellate review."[21]

* * *

There remains one procedural wrinkle to iron out before turning to the merits. A stay applicant must "ordinarily move first in the district court" for a stay pending appeal.[22] But here the Government didn't do so.

That doesn't preclude our review. The Federal Rules of Appellate Procedure expressly provide that an applicant may bypass that step if it shows "that moving first in the district court would be impracticable."[23] Here, the Government cited extremely exigent circumstances that made it "impracticable" to move first in the district court.[24] And it filed emergency motions in our Court *mere hours* after each temporary restraining order issued — a testament to its view of the harm

---

[19] Kozak Declaration ¶ 4.

[20] *See* Fed. R. Civ. P. 65(b)(2) (district court may, "for good cause," "extend" a 14-day TRO for "a like period").

[21] *Dellinger*, 2025 WL 559669, at *12 (Katsas, J., dissenting).

[22] Fed. R. App. P. 8(a)(1)(A).

[23] *Id.* R. 8(a)(2)(A)(ii); *see also* D.C. Cir. R. 8(a) ("motion seeking emergency relief must state whether such relief was previously requested from the district court and the ruling on that request").

[24] *See* First Emergency Stay Motion, at 4 n.1 (citing the "importance of the issues involved" and "the fast-moving nature of this case"); Second Emergency Stay Motion, at 8 n.1 (same).

that the temporary restraining orders inflict on the Executive Branch every hour that they remain in effect.[25] The Government's sidestepping of the district court under these circumstances is no impediment to our review.[26]

Because this appeal is properly before us, I now consider the stay factors, beginning with the Government's likelihood of success on the merits.[27]

## II. The Government Is Likely To Succeed On The Merits Because The Plaintiffs Cannot Sue In The District of Columbia.

The Government is likely to succeed on appeal for a technical, but important, reason: The Plaintiffs' claims sound in habeas, and habeas petitions must be brought where detainees are held. For the five named Plaintiffs, that is the Southern District of Texas.

---

[25] The district court issued the first TRO (applicable only to the named plaintiffs) at 9:40 AM, and the Government filed its 15-page emergency stay motion at 3:05 PM — less than six hours later. The district court's second TRO issued at 7:25 PM, and the Government filed its 22-page emergency stay motion, plus a two-page State Department declaration, at 1:04 AM — less than five hours later.

[26] Even if the Government's approach were procedurally irregular, the Plaintiffs have forfeited that argument by failing to raise it. *See generally* Plaintiffs' Brief in Response to Stay Motion.

[27] *Nken v. Holder*, 556 U.S. 418, 425-26 (2009) (stay factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies").

**A. The Plaintiffs' Proper Cause Of Action Is A Habeas Petition.**

The Plaintiffs' complaint raises various claims for relief. But what's their "cause of action"?[28] On what basis do they invoke federal courts' remedial power?

Many of the Plaintiffs' claims rely on the Administrative Procedure Act. The APA provides a cause of action to anyone "suffering legal wrong because of agency action."[29] The Plaintiffs allege that the President's Proclamation is "contrary to law" under the APA, because it stretches the meaning of the Alien Enemies Act and violates several other statutes.[30]

---

[28] *Cf. Trudeau v. FTC*, 456 F.3d 178, 188 n.15 (D.C. Cir. 2006) ("a 'cause of action' [is] the legal authority (e.g., the APA) that permits the court to provide redress for a particular kind of 'claim.'").

[29] *See* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.").

Plaintiffs' eighth claim for relief asserts their rights under the Fifth Amendment's Due Process Clause. Complaint, ECF 1, at 22 ¶¶ 101-04. Though "we have long held that federal courts may in some circumstances grant injunctive relief . . . with respect to violations of federal law by federal officials," that cause of action is not available when a habeas petition is available. *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 326-27 (2015); *see also Preiser v. Rodriguez*, 411 U.S. 475, 489-90 (1973).

[30] Complaint, ECF 1, at 17 ¶¶ 71-73 (citing 5 U.S.C. § 706(2)(A)); *id.* at 19-20 ¶¶ 97-100 (same); *id.* at 19 ¶ 83 (same); *id.* at 17-18 ¶ 86 (same); *id.* at 18 ¶¶ 78-79 (same); *id.* at 20 ¶ 90 (same).

Implementing the Proclamation, they add, is "arbitrary and capricious" — the quintessential APA challenge.[31]

But the APA is not the right vehicle for two reasons. First, it provides review only when there is "no other adequate remedy in a court."[32] As I will explain below, another avenue for review is available here — a petition for habeas corpus.

Second, the Proclamation here is not an "agency action." It is a Presidential Proclamation. And the "President is not an agency."[33] So the APA does not authorize review of the Proclamation. Where the "final action complained of is that of the President" — here, the President's Proclamation under the Alien Enemies Act — the APA does not provide a basis for judicial review.[34]

How are the Plaintiffs supposed to bring their claims for relief, if not via the APA? The answer appears in the very title of their own complaint: "PETITION FOR WRIT OF HABEAS

---

[31] *Id.* at 20-21 ¶¶ 93-95 (still citing 5 U.S.C. § 706(2)(A)). Plaintiffs made sure to "except Defendant Trump" from *this* claim for relief, which is titled "Violation of the Administrative Procedure Act."

[32] 5 U.S.C. § 704.

[33] *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).

[34] *Id.*

The Plaintiffs might respond that part of their complaint challenges lower-level decisions by executive officials about whether a particular plaintiff is a member of Tren de Aragua — a decision not made by the President. But that type of challenge is unique to each plaintiff, so it would seem that a class action is a poor vehicle for that type of challenge.

CORPUS."[35]   In that complaint, "Plaintiffs respectfully pray this Court to . . . Grant a writ of habeas corpus to Plaintiffs that enjoins Defendants from removing them under the [Alien Enemies Act]."[36]

Regardless of whether that would have been a paradigmatic habeas claim when habeas was first developed, it is now.  The Plaintiffs face imminent removal by Proclamation of the Executive.  They resort to court to challenge the legal and factual grounds for their threatened removal.  And if they win the argument, they cannot be summarily removed.

"At its historical core, the writ of habeas corpus" serves "as a means of reviewing the legality of Executive detention."[37] Indeed, its most central "historic purpose" was "to relieve detention by executive authorities *without judicial trial*."[38] This "great and efficacious writ" did so by requiring the custodian to "produce the body of the prisoner" to the "judge or court" and provide a "satisfactory excuse" for the prisoner's detention.[39]

---

[35] Complaint, ECF 1, at 1; *see* 28 U.S.C. § 2241 (federal habeas statute).

[36] *Id.* at 21.

[37] *INS v. St. Cyr*, 533 U.S. 289, 301 (2001), *abrogated on other grounds by statute*, *see* REAL ID Act of 2005, 119 Stat. 310, 8 U.S.C. § 1252(a)(5); *Nasrallah v. Barr*, 590 U.S. 573, 580 (2020) (acknowledging *St. Cyr*'s statutory abrogation).

[38] *St. Cyr*, 533 U.S. at 301 (quoting *Brown v. Allen*, 344 U.S. 443, 533 (1953)) (emphasis added).

[39] Sir William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 687-88 (Chase, ed. 1882).

As Blackstone put it, the great writ remedies "*all manner* of illegal confinement."[40] So habeas is used to challenge the *place* of confinement. Consider *In re Bonner*.[41] There, the Supreme Court granted habeas to a petitioner who was subject to imprisonment on a valid jury verdict.[42] Bonner's *only* complaint was that he was "unlawfully deprived of his liberty" by his placement in the wrong penitentiary. (By statute, he should have been imprisoned somewhere else.) That Bonner could (and *should*) have been confined *elsewhere* was no impediment to seeking a writ of habeas corpus. Indeed, the Court even said that "[t]o deny the writ of *habeas corpus* in such a case" would be "a virtual suspension of [the writ]."[43] After all, "a place of confinement challenge . . . *unquestionably* sounds in habeas."[44]

---

[40] *Id.* at 687 (emphasis added); *see also DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1981 (2020) ("The writ of habeas corpus as it existed at common law provided a vehicle to challenge all manner of detention by government officials, and the Court had held long before that the writ could be invoked by aliens already in the country who were held in custody pending deportation.").

As an aside, *Thuraissigiam* is of no help to the Plaintiffs here. Thuraissigiam was not making a core habeas challenge to his removal; instead, he was seeking affirmative administrative relief. *See Thuraissigiam*, 140 S. Ct. at 1969-71, 1974, 1981 (rejecting a petitioner's "very different attempted use of the writ" to seek "quite different relief" than traditionally available in habeas — namely, the "authorization for an alien to remain in a country other than his own" and "to obtain administrative or judicial review leading to that result").

[41] 151 U.S. 242, 262 (1894).

[42] *See In re Bonner*, 151 U.S. 242, 262 (1894).

[43] *Id.* at 259-60 (emphasis added).

[44] *Aamer v. Obama*, 742 F.3d 1023, 1035 (D.C. Cir. 2014) (emphasis added); *see, e.g.*, *Creek v. Stone*, 379 F.2d 106, 109 (D.C. Cir. 1967)

Another use of habeas is to challenge *transfer* from one place of detention to a different location. For instance, in *Kiyemba v. Obama*, Guantanamo detainees challenged — in habeas — their anticipated transfer to another country.[45] We deemed "a potential transfer out of the jurisdiction" to be "a proper subject of statutory habeas relief," and we rejected an argument by the Government that "the right to challenge a transfer is 'ancillary' to and not at the 'core' of habeas corpus relief."[46] If habeas was the proper cause of action there — where detainees *feared* continued detention after removal — habeas is all the more the proper cause of action here, where the Plaintiffs *will* continue to be detained after removal.[47]

To be sure, *Kiyemba* did not grant habeas relief. But that is because the detainees failed "on the merits of their present claim."[48] That decision was controlled by *Munaf v. Geren*.[49]

Munaf was in Iraq and had broken Iraqi law, and the U.S. was planning to transfer him from U.S. custody to Iraqi

("habeas corpus is available *not only* to an applicant who claims he is entitled to be freed of *all* restraints, but *also* to an applicant who protests his confinement *in a certain place*." (emphases added)); *id.* at 108-11 (habeas appropriate for statutory challenge to convicted juvenile's confinement in a receiving home rather than an appropriate psychiatric facility); *Miller v. Overholser*, 206 F.2d 415 (D.C. Cir. 1953) (habeas petition brought by a man confined to a ward for the criminally insane who said he belonged instead in an institution for the mentally ill).

[45] 561 F.3d 509, 511 (D.C. Cir. 2009).

[46] *Id.* at 513.

[47] *See id.* ("likely" to be detained).

[48] *Id.* at 514.

[49] 553 U.S. 674 (2008).

custody. The Supreme Court first held that the lower court had habeas jurisdiction. The Court then held that, on the merits, the habeas claim failed because the Court could not interfere with a foreign criminal system. In other words, *on the merits* of whether the transfer was lawful, it was lawful because Iraq had "exclusive jurisdiction to punish offenses against its laws committed within its borders."[50]

*Munaf*'s reason for denying the habeas petition was *not* that habeas cannot be used to enjoin a detainee's transfer as a general matter. If habeas was not the proper vehicle to bring the merits claim opposing the transfer in *Munaf*, the Court would not have been able to do what it did — reach the merits of that habeas claim.[51]

Myriad cases also show that challenges to extradition and deportation are properly brought in habeas. In *LoBue v. Christopher*, we said habeas was a vehicle to challenge extradition statutes, as had the Supreme Court over a century earlier.[52] Regardless of changes to immigration statutes, habeas has long been used to bring removal challenges — indeed, "[u]ntil the enactment of the 1952 Immigration and Nationality Act," "bringing a habeas corpus action in district

---

[50] *Id.* at 697.

[51] *Cf. In re Bonner*, 151 U.S. 242, 262 (1894) (granting habeas writ to petitioner who claimed he was imprisoned in the wrong penitentiary).

[52] 82 F.3d 1081, 1082-84 (D.C. Cir. 1996); *Ward v. Rutherford*, 921 F.2d 286, 288 (D.C. Cir. 1990) (Ginsburg, R.B., J.) ("actions taken by magistrates in international extradition matters are subject to habeas corpus review by an Article III district judge"); *Benson v. McMahon*, 127 U.S. 457, 462 (1888) (habeas used to challenge to extradition).

court" was "the *sole* means by which an alien could test the legality of his or her deportation order."[53]

The upshot is that habeas and removal challenges go hand-in-glove, and statutory developments since the late nineteenth century do not affect this key point.[54] That's because the summary removals challenged here are premised upon the President's authority under an eighteenth-century law. That law has not been repealed, expressly or impliedly, by later immigration laws. And the specific controls the general.[55]

It is noteworthy that the few Alien Enemies Act cases on the books almost invariably arose through habeas petitions: Both of the two Alien Enemies Act cases to reach the Supreme Court — *Ludecke v. Watkins* and *Ahrens v. Clark* — arose via habeas petitions.[56] In *Ahrens*, for example, the Supreme Court held that District of Columbia federal courts had no jurisdiction to hear habeas claims challenging confinement in New York for deportation to Germany under the Alien Enemies Act.[57]

[53] *St. Cyr*, 533 U.S. at 306; *see also Heikkila v. Barber*, 345 U.S. 229, 235 (1953) (rejecting challenge to deportation order under the APA because plaintiff "may attack a deportation order *only* by habeas corpus").

[54] *Cf. DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1971-75 (2020) (looking to the historical understanding of the scope of the writ as the touchstone for Suspension Clause analysis).

[55] *See* Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 183 (2012).

[56] *See generally Ludecke v. Watkins*, 335 U.S. 160 (1948); *Ahrens v. Clark*, 335 U.S. 188 (1948).

[57] 335 U.S. at 192-93 ("the jurisdiction of the District Court to issue the writ in cases such as this [i.e., AEA habeas petitions] is restricted to those petitioners who are confined or detained within the territorial jurisdiction of the court"). A later case, *Braden v. 30th Judicial Circuit Court of Kentucky*, 410 U.S. 484 (1973), overturned part of

Likewise, for cases in the lower courts, habeas was often the vehicle for aliens designated as enemies to challenge their designation and prevent their removal.[58]

That may explain why the Plaintiffs here titled their complaint a "petition for habeas corpus," and asked the district court to "[g]rant a writ of habeas corpus . . . that enjoins Defendants from removing them under the [Alien Enemies Act]."[59]

**B. The District Of Columbia Is Not The Proper Location For This Suit Because Of The Habeas-Channeling Rule And Habeas' District-of-Confinement Rule.**

At the district court's suggestion, the Plaintiffs voluntarily dismissed their habeas claims. That's because habeas claims must be brought where the petitioner is confined, and the Plaintiffs are not confined in the District of Columbia.

But merely dismissing the claims — even erasing the words 'habeas corpus' from the complaint — does not rescue the Plaintiffs' complaint. That's because of two important

---

*Ahrens*, but *Rumsfeld v. Padilla*, 542 U.S. 426 (2004), makes clear that *Ahrens*'s core holding remains good law. *See Padilla*, 542 U.S. at 443 ("for core habeas petitions challenging present physical confinement, jurisdiction lies in only one district: the district of confinement").

[58] *See, e.g.*, *Kaminer v. Clark*, 177 F.2d 51 (D.C. Cir. 1949); *United States ex rel. Schlueter v. Watkins*, 67 F. Supp. 556 (S.D.N.Y.), *aff'd*, 158 F.2d 853 (2d Cir. 1946). *But cf. Citizens Protective League v. Clark*, 155 F.2d 290 (D.C. Cir. 1946) (claims not characterized as habeas, but habeas issue neither raised nor addressed).

[59] Complaint, ECF 1, at 1, 23 ¶ f (Prayer for Relief).

rules: the "habeas-channeling rule" and the "district of confinement rule."

First, the "habeas-channeling rule" requires core habeas claims, like the Plaintiffs' claims, to be brought *in habeas*.[60] Importantly, that means they must bring their claims in compliance with habeas's unique procedural requirements. As the Supreme Court has explained, if plaintiffs could resort to "the simple expedient of putting a different label on their pleadings" — framing their challenges as § 1983 claims, for instance — they could effectively "evade" these procedural requirements.[61] The habeas-channeling rule shuts the door to that kind of gamesmanship.[62]

The second relevant habeas rule is the "district of confinement rule."[63] That rule says that habeas claims must be

---

[60] *See Nance v. Ward*, 142 S. Ct. 2214, 2222 (2022) ("this Court has held that an inmate *must proceed in habeas* when the relief he seeks would necessarily imply the invalidity of his conviction or sentence" (cleaned up) (emphasis added)); *Preiser v. Rodriguez*, 411 U.S. 475, 489-90 (1973) (plaintiffs can't "evade" habeas procedural requirements "by the simple expedient of putting a different label on their pleadings"); *Dufur v. United States Parole Commission*, 34 F.4th 1090, 1095 (D.C. Cir. 2022) ("[T]he sole remedy for assertedly unlawful incarceration is through habeas corpus.").

[61] *Preiser*, 411 U.S. at 489-90; *see Dafur*, 34 F.4th at 1095 (explaining that *Preiser*'s "habeas-channeling rule" prevents detained plaintiffs from "create[ing] a workaround to the habeas requirements").

[62] *Dafur*, 34 F.4th at 1095.

[63] *Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004) ("for core habeas petitions challenging present physical confinement, jurisdiction lies in only one district: the district of confinement."); *cf. I.M.*, 67 F.4th at 444 ("Creating exceptions to jurisdictional rules is a job for Congress, not the courts.").

brought in the specific district where the plaintiff alleges that he is illegally confined.[64] It's "derived from the terms of the habeas statute," which specifies that "District courts are limited to granting habeas relief 'within their respective jurisdictions.'"[65] And it "serves the important purpose of preventing forum shopping by habeas petitioners," who could otherwise "name a high-level supervisory official as respondent and then sue that person wherever he is amenable to long-arm jurisdiction" — for example, in Washington, D.C.[66]

Though the extradition context is not perfectly analogous to the removal context, this court's decision in *LoBue v. Christopher* illustrates these principles.[67] The plaintiffs there wanted to stop the United States from extraditing them to Canada. They were held in the Northern District of Illinois, but they sued for declaratory relief and an injunction in the District of Columbia. We held that we lacked jurisdiction to consider their case because of "the availability . . . of habeas relief elsewhere."[68] We explained that the "availability of a habeas remedy in another district ousted us of jurisdiction over an

---

[64] *Id.* Relatedly, "the proper respondent to a habeas petition is 'the person who has custody over the petitioner,'" *id.* at 434 (cleaned up) (quoting 28 U.S.C. § 2242) — the "immediate custodian rule," *id.* at 446. "Together," the district-of-confinement rule and the immediate-custodian rule "compose a simple rule that has been consistently applied in the lower courts . . . : Whenever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement." *Id.* at 447.

[65] *Id.* (quoting 28 U.S.C. § 2241(a)).

[66] *Id.*

[67] 82 F.3d 1081 (D.C. Cir. 1996).

[68] *Id.* at 1082.

alien's effort to pose a constitutional attack on his pending deportation by means of a suit for declaratory judgment."[69]

There as here, the "plaintiffs' focus [was] not explicitly on their present custody."[70] There as here, the plaintiffs tried to avoid the habeas-channeling rule by "claim[ing] that the nature of the relief requested is different here" than in habeas suits "since they have not formally sought a release from custody as in the habeas action. But we have rejected precisely such efforts to manipulate the preclusive effect of habeas jurisdiction."[71]

* * *

To sum up, the Plaintiffs' claims sound in habeas because the Plaintiffs challenge the legal and factual bases for their imminent removal — a habeas claim. That claim must be brought in the district of confinement. The named Plaintiffs

---

[69] *Id.*; *see also id.* at 1084 (addressing *Kaminer v. Clark*, 177 F.2d 51 (D.C. Cir. 1949), and explaining that though *Kaminer*'s precise holding had been overruled in 1955, "*Kaminer*'s logic controls for persons who, like the plaintiffs, have access to the habeas remedy").

[70] *Id.* at 1083; *see also Monk v. Secretary of Navy*, 793 F.2d 364, 366 (D.C. Cir. 1986) ("It is immaterial that Monk has not requested immediate release."); *cf. Wilkinson v. Dotson*, 544 U.S. 74, 83 (2005) ("[W]e believe that a case challenging a sentence seeks a prisoner's 'release' in the only pertinent sense: It seeks invalidation (in whole *or in part*) of the judgment authorizing the prisoner's confinement; the fact that the State may seek a new judgment (through a new trial or a new sentencing proceeding) is beside the point . . . ." (emphasis added)).

[71] *LoBue*, 82 F.3d at 1083; *see also Monk*, 793 F.2d at 366 ("He may not avoid the requirement that he proceed by habeas corpus by adding a request for relief that may not be made in a petition for habeas corpus."); *see also Ahrens*, 335 U.S. 192-93.

here are all confined in Raymondville, Texas, which is in the federal Southern District of Texas. Therefore, that is where they must file.

### III. The Government Satisfies The Remaining Stay Factors.

The Government has shown that it is irreparably harmed by the district court's orders. As explained above, a career State Department official has declared that the orders "harm[]" the "foreign policy of the United States" by jeopardizing the status of "intensive and delicate" negotiations with El Salvador and the Maduro regime in Venezuela. The orders risk the possibility that those foreign actors will change their minds about allowing the United States to remove Tren de Aragua members to their countries. Even if they don't change their minds, it gives them leverage to negotiate for better terms. "These harms could arise even in the short term."[72]

Reinforcing the State Department official's declaration is the irreparable harm that is all but inevitable when a court interferes with an ongoing national-security operation that is overseas or partially overseas. The Plaintiffs' counsel at oral argument could not identify an order of that kind, outside of the habeas context, that survived appellate review.[73] There are perhaps some that could be found, but they may be more cautionary tales than models to be emulated.[74]

---

[72] Kozak Declaration ¶ 4.

[73] *Cf. Boumediene v. Bush*, 553 U.S. 723 (2008) (habeas context).

[74] *Cf. Schlesinger v. Holtzman*, 414 U.S. 1321, 1322 (1973) (staying order to halt the bombing of Cambodia); *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1550-51 (D.C. Cir. 1984) (Scalia, J., dissenting) ("In Old Testament days, when judges ruled the people

The Plaintiffs might respond that the same harm to foreign affairs and national security would follow from certification of a habeas class action in Texas. But the Government has not conceded that the Plaintiffs can certify a habeas class. All the Government has conceded is that individual habeas petitions can be brought in Texas. Whether the plaintiffs can certify a class and whether that class is entitled to relief is for a federal district court in Texas to decide.[75]

---

of Israel and led them into battle, a court professing the belief that it could order a halt to a military operation in foreign lands might not have been a startling phenomenon. But in modern times, and in a country where such governmental functions have been committed to elected delegates of the people, such an assertion of jurisdiction is extraordinary. The court's decision today reflects a willingness to extend judicial power into areas where we do not know, and have no way of finding out, what serious harm we may be doing. The case before us could not conceivably warrant such unprecedented action."); *see also* Warren Weaver, Jr., *Douglas Upholds Halt In Bombing But Is Overruled*, N.Y. TIMES (Aug. 5, 1973).

[75] *Nken*, 556 U.S. at 434.

Whether Plaintiffs can seek habeas relief through a class action in the Southern District of Texas seems to be an open question for that court to resolve in the first instance. *See Jennings v. Rodriguez*, 583 U.S. 281, 324 (2018) (Thomas, J., concurring) ("This Court has never addressed whether habeas relief can be pursued in a class action."); *St. Jules v. Savage*, 512 F.2d 881 (5th Cir. 1975) (expressing no "view as to . . . the propriety of [a habeas] class action"); *Lynn v. Davis*, 2019 WL 570770 (S.D. Tex. 2019) ("*Even if* habeas claims may be pursued in a class action, . . . ." (emphasis added)). *But cf. Gross v. Quarterman*, No. CIV.A. H-04-136, 2007 WL 4411755, at *3 (S.D. Tex. Dec. 17, 2007) ("a class action . . . is not available in a habeas petition.") (dictum); *Cook v. Hanberry*, 592 F.2d 248 (5th Cir. 1979).

As for any irreparable harm to the Plaintiffs, they conceded at oral argument that they can seek all the relief in Texas that they have sought in the District of Columbia. So requiring them to sue in Texas does not impose on them irreparable harm.

Finally, as for the public interest, it favors the Government. As explained, sensitive matters of foreign affairs and national security are at stake.[76] And whatever public interest exists for the Plaintiffs to have their day in court, they can have that day in court where the rules of habeas require them to bring their suit — in Texas.

### IV. Conclusion

Deportees are already petitioning for habeas corpus in Texas.[77] At least one petitioner has already secured a hearing date in the Southern District of Texas, plus a TRO preventing his removal in the interim.[78] According to the Government, that's exactly what Plaintiffs here should have done and still can.

The district court here in Washington, D.C. — 1,475 miles from the El Valle Detention Facility in Raymondville, Texas

---

[76] *Cf. Kiyemba*, 561 F.3d at 519 (Kavanaugh, J., concurring).

[77] *See, e.g.*, Petition for Writ of Habeas Corpus, ECF 1, *Zacarias Matos v. Venegas et al*., No. 1:25-CV-00057 (S.D. Tex. March 15, 2025); Petition for Writ of Habeas Corpus, ECF 1, *Gil Rojas v. Venegas et al.*, No. 1:25-CV-00056 (S.D. Tex. March 14, 2025).

[78] Minute Order, ECF 4, *Gil Rojas v. Venegas et al.*, No. 1:25-CV-00056 (S.D. Tex. March 14, 2025) ("IT IS ORDERED that Respondents shall NOT physically remove Petitioner Adrian Gil Rojas from the United States until the Court's resolution of the writ of habeas corpus . . . ."); *id.* (ordering the Government to respond by this Friday, March 28, 2025, and setting a hearing for April 9, 2025).

— is not the right court to hear the Plaintiffs' claims. The Government likely faces irreparable harm to ongoing, highly sensitive international diplomacy and national-security operations. The Plaintiffs, meanwhile, need only file for habeas in the proper court to seek appropriate relief.

The Government has met its burden to make "a strong showing that [it] is likely to succeed on the merits" and that it "will be irreparably injured absent a stay."[79] The issuance of the stay will" not "substantially injure the other parties interested in the proceeding."[80] And "the public interest lies" with a stay.[81] Therefore, I would grant its motion for a stay pending appeal.

I respectfully dissent.

---

[79] *Nken*, 556 U.S. at 426.

[80] *Id.*

[81] *Id.*